**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

UNITED STATES OF AMERICA *ex rel.* [SEALED], and on behalf of the STATE of FLORIDA,

Plaintiff-Relator,

v.

[SEALED]

Collectively, "Defendant."

Civil Action Number: 22-cv-222

***FILED UNDER SEAL***

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS**

JURY TRIAL DEMANDED

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

UNITED STATES OF AMERICA *ex rel.* HILLARY ESTRIGHT, and on behalf of the STATE of FLORIDA,

Plaintiff-Relator,

v.

CVS HEALTH CORPORATION, CVS PHARMACY, INC., ALABAMA CVS PHARMACY, L.L.C., ALASKA CVS PHARMACY, L.L.C., AMERICAN DRUG STORES DELAWARE, L.L.C., ARIZONA CVS STORES, L.L.C., ARKANSAS CVS PHARMACY, L.L.C., CONNECTICUT CVS PHARMACY, L.L.C., CVS 2948 HENDERSON, L.L.C., CVS ALBANY, L.L.C., CVS INDIANA, L.L.C., CVS MANCHESTER NH, L.L.C., CVS BELLMORE AVENUE, L.L.C., CVS STATE CAPITAL, L.L.C., CVS MICHIGAN, L.L.C., IDAHO CVS PHARMACY, L.L.C., DELAWARE CVS PHARMACY, L.L.C., DISTRICT OF COLUMBIA CVS PHARMACY, L.L.C., GARFIELD BEACH CVS, L.L.C., GEORGIA CVS PHARMACY, L.L.C., GERMAN DOBSON CVS, L.L.C., GRAND ST. PAUL CVS, L.L.C., HIGHLAND PARK CVS, L.L.C., HOLIDAY CVS, L.L.C., HOOK-SUPERX, L.L.C., IOWA CVS PHARMACY, L.L.C., KANSAS CVS PHARMACY, L.L.C., KENTUCKY CVS PHARMACY, L.L.C., LONGS DRUG STORES CALIFORNIA, L.L.C., LOUISIANA CVS PHARMACY, L.L.C., MARYLAND CVS PHARMACY, L.L.C., MASSACHUSETTS CVS PHARMACY, L.L.C., MISSISSIPPI CVS PHARMACY, L.L.C., MISSOURI CVS PHARMACY, L.L.C., MONTANA CVS PHARMACY, L.L.C., NEBRASKA CVS PHARMACY, L.L.C., NEW JERSEY CVS PHARMACY, L.L.C., NORTH CAROLINA CVS

Civil Action Number: 22-cv-222

***FILED UNDER SEAL***

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS**

JURY TRIAL DEMANDED

PHARMACY, L.L.C., OHIO CVS STORES, L.L.C., OKLAHOMA CVS PHARMACY, L.L.C., OREGON CVS PHARMACY, L.L.C., PENNSYLVANIA CVS PHARMACY, L.L.C., RHODE ISLAND CVS PHARMACY, L.L.C., SOUTH CAROLINA CVS PHARMACY, L.L.C., TENNESSEE CVS PHARMACY, L.L.C., UTAH CVS PHARMACY, L.L.C., VERMONT CVS PHARMACY, L.L.C., VIRGINIA CVS PHARMACY, L.L.C., WARM SPRINGS ROAD CVS, L.L.C., WASHINGTON CVS PHARMACY, L.L.C., WEST VIRGINIA CVS PHARMACY, L.L.C., WISCONSIN CVS PHARMACY, L.L.C., WOODWARD DETROIT CVS, L.L.C., BUSSE CVS, L.L.C., GOODYEAR CVS, L.L.C., SHEFFIELD AVENUE CVS, L.L.C., SOUTH WABASH CVS, L.L.C., THOMAS PHOENIX CVS, L.L.C., WASHINGTON LAMB CVS, L.L.C., NAVARRO DISCOUNT PHARMACIES, INC., and LONGS DRUG STORES CALIFORNIA, L.L.C.,

Collectively, “Defendant.”

**TABLE OF CONTENTS**


I. INTRODUCTION ....... 2

II. JURISDICTION AND VENUE ....... 8

III. THE PARTIES ....... 9

A. Plaintiff/Relator ....... 9
B. CVS Health Corporation, CVS Pharmacy, Inc., and Pharmacy Subsidiaries ....... 10

IV. THE OPIOID CRISIS IN THE U.S. ....... 13

V. THE APPLICABLE STATUTES ....... 19

A. The Controlled Substances Act ....... 19
1. Pharmacies Are Obligated Not to Fill Prescriptions Until Red Flags Are Resolved ....... 23
2. Pharmacy Chains Are Responsible for the Dispensing Practices in Their Stores ....... 25
3. The CSA Applies to All Persons Who Dispense Controlled Substances ....... 26
4. A Chain Pharmacy Cannot Escape Liability for Its Corporate Malfeasance by Blaming Its Pharmacists ....... 29
5. The Purpose and Intent of the CSA Bolsters Finding Liability of Chain Pharmacy Corporate Parents ....... 31
B. The False Claims Act ....... 35
C. Opioid Use and Treatment by Government Programs ....... 37
1. Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications ....... 38
2. Medicaid Beneficiary Opioid Use and Abuse ....... 39
3. Medicare Beneficiary Opioid Use and Abuse ....... 42
4. Tricare Beneficiary Coverage and Opioid Use and Abuse ....... 45
5. Federal Employee Health Benefit Program Beneficiary Coverage and Opioid Use and Abuse ....... 47
6. State of Florida Health Care Program Beneficiary Coverage and Opioid Use and Abuse ....... 48
D. Federal Guidance Governing Pharmacy Dispensing of Opioids ....... 49
E. State Laws Governing Pharmacy Dispensing of Opioids ....... 52
F. State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping ....... 55
G. Unlawfulness of a Prescription Is Material to Government Programs' Payment ....... 59

VI. BACKGROUND ....... 60

A. CVS Has Paid Repeated Fines Related to Dispensing of Inappropriate Opioid Prescriptions ....... 60
1. DEA Investigation and Closing of CVS Pharmacies in Florida ....... 61

2. Other CVS Settlements with the DEA and State Attorneys General........ 63
3. CVS Health Omnicare Unit Pays $15 Million Fine for Allowing Opioids to be Dispensed Without a Prescription ................................................ 71
4. CVS Ensured That Its Pharmacies Were Always Well-Stocked With Opioids ................................................................................ 71
B. Incentives and Pressure to Fill All Prescriptions as Quickly as Possible ............. 75
C. CVS Had No Rigorous Dispensing Protocols or Policies to Assist Its Pharmacists to Identify Inappropriate Prescriptions ................................................ 88
D. CVS Rarely Blocked Suspicious Prescribers................................................ 93
1. CVS 2013 Data Analytics Project................................................ 93
2. Pharmacy Practices Team ................................................ 101
E. CVS Turned a Blind Eye to the Opioid Crisis ................................................ 103
F. CVS Public Statements Concealed Its Failures to Prevent Filling Medically Unnecessary Prescriptions ................................................ 106

VII. CVS'S UNLAWFUL CONDUCT ................................................108

A. Specific Examples of Unlawful Dispensing Conduct: Alabama ....................... 118
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Alabama........................................ 118
2. Alabama (Pharmacist No. 10)................................................ 120
B. Specific Examples of Unlawful Dispensing Conduct: California ..................... 124
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in California.................................... 124
2. Los Angeles, California (Pharmacist No. 8)........................................ 127
3. Orange County, California (Pharmacist No. 11). ................................. 132
C. Specific Examples of Unlawful Dispensing Conduct: Florida ......................... 136
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Florida ......................................... 136
2. Miami, Florida (Pharmacist No. 6) ................................................ 139
3. Plant City, Florida (Pharmacist No. 2)................................................ 140
4. Tampa, Florida (Pharmacists No. 2 and No. 12) .................................. 143
5. Weston, Florida (Pharmacist No. 12) ................................................ 148
D. Specific Examples of Unlawful Dispensing Conduct: Kentucky ....................... 150
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Kentucky ..................................... 150
2. Flatwoods, Kentucky (Pharmacist No. 13) ........................................... 153
E. Specific Examples of Unlawful Dispensing Conduct: Maryland ...................... 156
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Maryland ..................................... 156
2. Annapolis, Maryland (Pharmacist No. 14) ........................................... 157
F. Specific Examples of Unlawful Dispensing Conduct: Michigan ...................... 159
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Michigan...................................... 159
2. Ypsilanti, Michigan (Pharmacist No. 15) ............................................. 162
G. Specific Examples of Unlawful Dispensing Conduct: Mississippi ................... 164

1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Mississippi .... 164
2. Madison, Mississippi (Pharmacist No. 5) .... 166

H. Specific Examples of Unlawful Dispensing Conduct: Ohio .... 170
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Ohio .... 170
2. Akron, Ohio (Pharmacist No. 16) .... 174

I. Specific Examples of Unlawful Dispensing Conduct: Tennessee .... 178
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Tennessee .... 178
2. Lenoir City, Tennessee (Pharmacist No. 17) .... 182
3. Thompson's Station, Tennessee (Pharmacist No. 18) .... 186
4. Crossville, Tennessee (Relator) .... 193

J. Specific Examples of Unlawful Dispensing Conduct: Texas .... 201
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Texas .... 201
2. Breckenridge, Texas (Pharmacist No. 3) .... 203
3. Southeast Texas (Pharmacist No. 19) .... 206
4. Brownsville, Texas (Pharmacist No. 20) .... 210

K. Specific Examples of Unlawful Dispensing Conduct: Virginia .... 215
1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Virginia .... 215
2. Lynchburg, Virginia (Pharmacist No. 4) .... 217
3. Norton, Virginia (Pharmacist No. 7) .... 222

VIII. INJURY TO GOVERNMENT PROGRAMS RESULTING FROM CVS'S ACTIONS .... 229

IX. CAUSES OF ACTION .... 231

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)) .... 231
COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)) .... 231
COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C)) .... 232
COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G)) .... 232
COUNT V (Violation of Florida False Claims Act) .... 233

X. PRAYER FOR RELIEF .... 234

**<u>SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729, *ET SEQ.* AND THE FLORIDA FALSE CLAIMS ACT</u>**

1. On behalf of the United States of America ("United States") and the State of Florida, Relator hereby files this Second Amended Complaint against CVS Health Corporation, CVS Pharmacy, Inc., Alabama CVS Pharmacy, L.L.C. (Alabama), Alaska CVS Pharmacy, L.L.C. (Alaska), American Drug Stores Delaware, L.L.C. (Delaware), Arizona CVS Stores, L.L.C. (Arizona), Arkansas CVS Pharmacy, L.L.C. (Arkansas), Connecticut CVS Pharmacy, L.L.C. (Connecticut), CVS 2948 Henderson, L.L.C. (Nevada), CVS Albany, L.L.C. (New York), CVS Indiana, L.L.C. (Indiana), CVS Manchester NH, L.L.C. (New Hampshire), CVS Bellmore Avenue, L.L.C. (New York), CVS State Capital, L.L.C. (Maine), CVS Michigan, L.L.C. (Michigan), Idaho CVS Pharmacy, L.L.C. (Idaho), Delaware CVS Pharmacy, L.L.C. (Delaware), District of Columbia CVS Pharmacy, L.L.C. (District of Columbia), Garfield Beach CVS, L.L.C. (California),Georgia CVS Pharmacy, L.L.C. (Georgia), German Dobson CVS, L.L.C. (Arizona), Grand St. Paul CVS, L.L.C. (Minnesota), Highland Park CVS, L.L.C. (Illinois), Holiday CVS, L.L.C. (Florida), Hook-SupeRx, L.L.C. (Delaware), Iowa CVS Pharmacy, L.L.C. (Iowa), Kansas CVS Pharmacy, L.L.C. (Kansas), Kentucky CVS Pharmacy, L.L.C. (Kentucky), Longs Drug Stores California, L.L.C. (California), Louisiana CVS Pharmacy, L.L.C. (Louisiana), Maryland CVS Pharmacy, L.L.C. (Maryland), Massachusetts CVS Pharmacy, L.L.C. (Massachusetts), Mississippi CVS Pharmacy, L.L.C. (Mississippi), Missouri CVS Pharmacy, L.L.C. (Missouri), Montana CVS Pharmacy, L.L.C. (Montana), Nebraska CVS Pharmacy, L.L.C. (Nebraska), New Jersey CVS Pharmacy, L.L.C. (New Jersey), North Carolina CVS Pharmacy, L.L.C. (North Carolina), Ohio CVS Stores, L.L.C. (Ohio), Oklahoma CVS Pharmacy, L.L.C. (Oklahoma), Oregon CVS Pharmacy, L.L.C. (Oregon), Pennsylvania CVS Pharmacy, L.L.C. (Pennsylvania), Rhode Island CVS Pharmacy, L.L.C. (Rhode Island), South Carolina CVS Pharmacy, L.L.C.

(South Carolina), Tennessee CVS Pharmacy, L.L.C. (Tennessee), Utah CVS Pharmacy, L.L.C. (Utah), Vermont CVS Pharmacy, L.L.C. (Vermont), Virginia CVS Pharmacy, L.L.C. (Virginia), Warm Springs Road CVS, L.L.C. (Nevada), Washington CVS Pharmacy, L.L.C. (Washington), West Virginia CVS Pharmacy, L.L.C. (West Virginia), Wisconsin CVS Pharmacy, L.L.C. (Wisconsin), Woodward Detroit CVS, L.L.C. (Michigan), Busse CVS, L.L.C. (Illinois), Goodyear CVS, L.L.C. (Arizona), Sheffield Avenue CVS, L.L.C. (Illinois), South Wabash CVS, L.L.C. (Illinois), Thomas Phoenix CVS, L.L.C. (Arizona), Washington Lamb CVS, L.L.C. (Nevada), Navarro Discount Pharmacies, Inc. (Florida), and Longs Drug Stores California, L.L.C. (California) (hereinafter collectively "CVS" or "Defendant"), pursuant to the *qui tam* provisions of the federal False Claims Act and the State of Florida False Claims Act.[1]

2. Relator Hillary Estright brings this action against CVS under the False Claims Act for Defendant's violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA") its implementing regulations, 21 C.F.R. § 1301, *et seq.* and under state pharmacy laws and regulations. Those violations include: (a) knowingly dispensing controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally distributing and dispensing controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C. § 841(a). Relator also seeks to recover monies that Defendant caused the Government Programs to pay for controlled substances that were medically unnecessary and/or lacked a legitimate medical purpose in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as well as State of Florida False Claims Act.

## I. INTRODUCTION

[1] 31 U.S.C. §§ 3729 *et seq.* ("FCA"); the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq*.

3. The nation is experiencing a national public health emergency involving opioid abuse. The dispensing and distribution of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice exacerbate this crisis. This crisis has touched, and continues to touch, nearly all Americans and their families in some way or another.

4. In addition to its human cost, the epidemic has taken a monetary toll as well. Besides financial impacts like the increased costs for health care, substance abuse treatment, and law enforcement, the cost of the epidemic has also been felt by government programs like Medicare and Medicaid (collectively, "Government Programs"). The Government Programs have paid for inappropriate opioid prescriptions because CVS has intentionally and knowingly disregarded its duties under the law to properly examine and ensure that it only dispensed drugs pursuant to a proper prescription and for a legitimate medical purpose.

5. Relator has had a front-row seat on how CVS has both fueled and profited from this epidemic by repeatedly dispensing controlled substances prone to abuse without a legitimate medical purpose and outside the usual course of professional medical practice.

6. Despite Relator having raised concerns with CVS management about drug seeking activities she had witnessed, nothing was ever done.

7. Even while rampant drug diversion and abuse was occurring at and around the CVS pharmacies themselves, Relator saw how CVS has incentivized and pressured its pharmacists to fill all prescriptions presented at its pharmacies—regardless of validity—resulting in inappropriate prescriptions that were clearly not medically necessary being filled and billed, the public health and public fisc be damned. CVS has repeatedly dispensed controlled substances prone to abuse without a legitimate medical purpose and outside the usual course of professional practice.

8. Thus, CVS has both fueled and profited from the opioid epidemic by repeatedly dispensing controlled substances prone to abuse without a legitimate medical purpose and outside the usual course of professional practice.

9. CVS is subject to duties under the Controlled Substances Act ("CSA") and under state pharmacy law and regulations to take special care before dispensing these addictive and dangerous drugs. These laws and regulations required CVS to review each opioid prescription prior to dispensing and to make a determination that the prescription is both effective and valid; ensure that each prescription for an opioid is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice; refuse to dispense medication if there is reason to believe that the prescription was not issued for a legitimate medical purpose; and provide effective systems, controls, and procedures to prevent diversion and abuse of opioids. CVS violated these duties of care by dispensing extremely large amounts of opioids from its retail pharmacy stores throughout the United States and this District, as alleged in more detail below.

10. Pharmacies serve as the last line of defense between dangerous opioids and the public. For this reason, under the CSA and state pharmacy laws and regulations, a pharmacy's duty to use due care when filling prescriptions goes beyond simply following the prescription's directions. Pharmacies that are on notice of signs of diversion or abuse and any other red flags that the prescriptions are not medically appropriate may not simply robotically fill prescriptions. This is particularly true when prescriptions are unreasonable on their face because they are written in a quantity, frequency, or other manner that a reasonable pharmacist would do additional investigation and due diligence. CVS did not fulfill these duties.

11. In Relator's experience, CVS was clearly on notice of red flags that should have caused its pharmacies to investigate (and then reject) opioid prescriptions instead of filling them.

CVS was aware of red flags that should have caused its pharmacies to investigate or reject prescriptions before filling them. Examples of such red flags include: doctors who write unusually large amounts of opioid prescriptions when compared with similar practitioners in the area; early refills for opioid prescriptions; prescriptions with unusual quantities or dosages; patients seeking to fill a prescription written for someone else; multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; patients who drive long distances to have a prescription filled; consumers who seek large volumes of controlled substances in the highest strength for each prescription type; patients who appear to be creating cocktails with muscle relaxants or tranquilizers; or consumers who pay large amounts of cash for opioid prescriptions rather than using some form of insurance.

12. Relator saw that CVS routinely overlooked numerous red flags and instead filled even what were clearly inappropriate opioid prescriptions. CVS could have—and was required to—leverage its network of pharmacies all over the country to combat the scourge of inappropriate and/or medically unnecessary opioid prescriptions. CVS had full visibility into vast amounts of data about dispensing both at its pharmacies and industry-wide. Instead of leveraging that information and data to limit the filling of inappropriate prescriptions, CVS as a company intentionally has ignored the vast amount of data from its pharmacies to identify increasingly rampant prescribing abuse, identify medically inappropriate prescriptions, and provide its individual pharmacy locations the benefit of CVS's whole pharmacy infrastructure and corporate resources.

13. Indeed, CVS recognized that chain pharmacies in particular are in a unique position to stop the dispensing for suspicious prescribers because they "have the advantage of aggregated information on all prescriptions filled at the chain" and that "[a]nalyses of aggregated data … can

also target patterns of abuse by both prescribers and patients."[2] In 2013, CVS explained that "[g]iven the growing use of controlled substances and the resulting illness and deaths, *more innovative use of transparent data is only prudent*."[3]

14. To that end, CVS performed a data analytics project as a "proof of concept" in 2013. That analysis, done with what CVS described as "very high parameters" that did not "really size the problem nationally," easily identified 42 prescribers out of the approximately 1,000,000 in its database as outliers, 36 of which CVS ultimately blocked at its own pharmacies.

15. After 2013, however, CVS did not continue its data analytics program in any meaningful way, thereby willfully ignoring easily aggregated data, data that could have been used not only to support efforts to stop inappropriate dispensing pharmacy-chain wide, but also to support individual pharmacists in identifying inappropriate and/or medically unnecessary prescriptions.

16. CVS did not use the data it thought would be "prudent" for any chain pharmacy to use, while at the same time it further undermined the ability of its pharmacists to identify and block suspicious prescriptions by drastically reducing staffing and increasing its demands on pharmacists. Even while the epidemic was ravaging communities across America into which it was pouring enormous amounts of opioid drugs, CVS instead timed how quickly its pharmacists could increase prescription counts year after year with ever leaner staffing, making it impossible for them to have sufficient time to investigate, report or halt dispensing of inappropriate or medically unnecessary opioid prescriptions.

[2] Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H, *Abusive Prescribing of Controlled Substances—A Pharmacy View*, 369 NEJM. 2013, 989-991 (Sept. 12, 2013), https://www.nejm.org/doi/10.1056/NEJMp1308222.

[3] *Id*.

17. CVS did next to nothing to reduce inappropriate dispensing, instead focusing on the Company's profitability, which has been more important than any impact on Government Programs and on people's lives.

18. CVS filled opioid prescriptions throughout the U.S. (and in Tennessee) under circumstances exhibiting red flags for opioid diversion, in violation of its duties under the CSA and state pharmacies laws and regulations.

19. CVS failed to train or instruct its employees with respect to proper policies and protocols to follow to prevent diversion of opioids. This has had the direct, readily foreseeable (and intended) result of its pharmacies throughout the nation continuing to fill prescriptions despite clear red flags of diversion and abuse.

20. CVS's failure to identify, monitor, detect, investigate, report, refuse to sell, fill, or dispense inappropriate prescriptions of opioids also violated its duty to act reasonably in light of the serious and foreseeable harms associated with opioid diversion and abuse. CVS's failure to take reasonable steps to prevent opioid diversion and abuse is a direct and proximate cause of, and/or substantial factor contributing to, the use of prescription opioids around the U.S. (and in Tennessee) for consumption for non-medical, non-scientific purposes.

21. CVS knew that widespread diversion and abuse of opioids was occurring throughout the U.S. (and in this District) at a staggering scale, but turned a blind eye in order to earn higher profits. The foreseeable result of CVS's decision to continue dispensing vast quantities of opioids having no medical justification has led to widespread addiction, overdoses, death, harms to Government Programs, and the societal and economic harms that flow from prescription opioid diversion and abuse.

22. Compliance with the requirements of federal and state law governing pharmacy dispensing is central to Government Program benefits and is a condition of these medications being covered by these programs.

23. But for CVS's widespread fraud, Government Programs would have denied payment for controlled substance medications, or sought to recoup payments already made, when such prescriptions were not dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medications were intended for purposes of addiction or recreational abuse.

24. The conduct alleged herein is ongoing.

## II. JURISDICTION AND VENUE

25. According to 28 U.S.C. §§ 1331 and 1345, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States—in particular, the FCA. In addition, the FCA specifically confers jurisdiction upon the United States District Court. 31 U.S.C. § 3732(b).

26. Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims act of the State of Florida because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

27. This District Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant CVS Health is headquartered in this state and transacts business in this District and engaged in wrongdoing in this District.

28. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b). Defendant CVS Health is headquartered in this district, has transacted business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

29. Relator, who resides in this District, is unaware of any public disclosure of the information or allegations that are the basis of the Second Amended Complaint. If there has been a public disclosure, Relator is the original source of the information and allegations contained in this Second Amended Complaint. Prior to the filing of this action, Relator voluntarily provided the United States Government and the State of Florida with material information supporting the false claims that are the subject of this Second Amended Complaint.

30. The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendant to conceal from the United States and the State of Florida its wrongdoing in connection with the allegations made herein.

## III. THE PARTIES

### A. Plaintiff/Relator

31. Plaintiff/Relator Hillary Estright (hereinafter "Relator") is a resident of Crossville, Tennessee. She started as a pharmacy intern at CVS in May 2013, working in four different stores located in Birmingham, Alabama; Cookville, Tennessee; and Crossville, Tennessee. In July 2016, after graduating from pharmacy school, she became a staff pharmacist at the CVS in Tellico Plains, Tennessee, located at 9170 TN-68. In November 2016, she became the Pharmacy Manager of the Crossville CVS, which is located at 1026 West Avenue. Relator ended her employment with CVS on June 27, 2019.

32. Relator is a registered pharmacist in Tennessee with license number 40459. Her license was issued on July 18, 2016 and expires on July 31, 2020.

33. Relator has direct knowledge of the conduct alleged in this Second Amended Complaint and conducted an independent investigation to uncover false claims submitted to the United States and the State of Florida. Accordingly, Relator is an "original source" of the non-

public information alleged in this Second Amended Complaint within the meaning of the federal FCA and the State of Florida False Claims Act.

**B. CVS Health Corporation, CVS Pharmacy, Inc., and Pharmacy Subsidiaries**

34. Defendant CVS Health Corporation is a Delaware corporation with its principal place of business in Rhode Island. CVS Pharmacy, Inc. is a Rhode Island corporation with a principal place of business in Rhode Island. CVS Health Corporation and CVS Pharmacy, Inc. are collectively referred to herein as “CVS” or “CVS Health.” CVS, including through its subsidiary and affiliated entities, operates as a chain of retail pharmacies throughout the United States, including in this District. CVS is among the top dispensers of opioids in the United States and in Florida. In addition to dispensing opioids, CVS has sold millions of opioid drugs throughout the U.S. during all relevant times material hereto.

35. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion.

36. CVS has incorporated subsidiaries of its pharmacies throughout the U.S., including through Alabama CVS Pharmacy, L.L.C. (Alabama), Alaska CVS Pharmacy, L.L.C. (Alaska), American Drug Stores Delaware, L.L.C. (Delaware), Arizona CVS Stores, L.L.C. (Arizona), Arkansas CVS Pharmacy, L.L.C. (Arkansas), Connecticut CVS Pharmacy, L.L.C. (Connecticut), CVS 2948 Henderson, L.L.C. (Nevada), CVS Albany, L.L.C. (New York), CVS Indiana, L.L.C. (Indiana), CVS Manchester NH, L.L.C. (New Hampshire), CVS Bellmore Avenue, L.L.C. (New York), CVS State Capital, L.L.C. (Maine), CVS Michigan, L.L.C. (Michigan), Idaho CVS Pharmacy, L.L.C. (Idaho), Delaware CVS Pharmacy, L.L.C. (Delaware), District of Columbia CVS Pharmacy, L.L.C. (District of Columbia), Garfield Beach CVS, L.L.C. (California),Georgia CVS Pharmacy, L.L.C. (Georgia), German Dobson CVS, L.L.C. (Arizona), Grand St. Paul CVS, L.L.C. (Minnesota), Highland Park CVS, L.L.C. (Illinois), Holiday CVS, L.L.C. (Florida), Hook-

SupeRx, L.L.C. (Delaware), Iowa CVS Pharmacy, L.L.C. (Iowa), Kansas CVS Pharmacy, L.L.C. (Kansas), Kentucky CVS Pharmacy, L.L.C. (Kentucky), Longs Drug Stores California, L.L.C. (California), Louisiana CVS Pharmacy, L.L.C. (Louisiana), Maryland CVS Pharmacy, L.L.C. (Maryland), Massachusetts CVS Pharmacy, L.L.C. (Massachusetts), Mississippi CVS Pharmacy, L.L.C. (Mississippi), Missouri CVS Pharmacy, L.L.C. (Missouri), Montana CVS Pharmacy, L.L.C. (Montana), Nebraska CVS Pharmacy, L.L.C. (Nebraska), New Jersey CVS Pharmacy, L.L.C. (New Jersey), North Carolina CVS Pharmacy, L.L.C. (North Carolina), Ohio CVS Stores, L.L.C. (Ohio), Oklahoma CVS Pharmacy, L.L.C. (Oklahoma), Oregon CVS Pharmacy, L.L.C. (Oregon), Pennsylvania CVS Pharmacy, L.L.C. (Pennsylvania), Rhode Island CVS Pharmacy, L.L.C. (Rhode Island), South Carolina CVS Pharmacy, L.L.C. (South Carolina), Tennessee CVS Pharmacy, L.L.C. (Tennessee), Utah CVS Pharmacy, L.L.C. (Utah), Vermont CVS Pharmacy, L.L.C. (Vermont), Virginia CVS Pharmacy, L.L.C. (Virginia), Warm Springs Road CVS, L.L.C. (Nevada), Washington CVS Pharmacy, L.L.C. (Washington), West Virginia CVS Pharmacy, L.L.C. (West Virginia), Wisconsin CVS Pharmacy, L.L.C. (Wisconsin), Woodward Detroit CVS, L.L.C. (Michigan), Busse CVS, L.L.C. (Illinois), Goodyear CVS, L.L.C. (Arizona), Sheffield Avenue CVS, L.L.C. (Illinois), South Wabash CVS, L.L.C. (Illinois), Thomas Phoenix CVS, L.L.C. (Arizona), Washington Lamb CVS, L.L.C. (Nevada), Navarro Discount Pharmacies, Inc. (Florida), and Longs Drug Stores California, L.L.C. (California) (collectively, the "Pharmacy Subsidiaries").

37. At all times material hereto, CVS and the Pharmacy Subsidiaries have operated as one integrated entity. CVS's Pharmacy Subsidiaries have no independent decision-making capabilities and all facets of their operations are dominated, controlled and directed by CVS.

38. As a result of the control exerted by CVS, all financial gains and losses by the Pharmacy Subsidiaries inure directly to the benefit or detriment of CVS and its shareholders.

39. Thus, CVS and the Pharmacy Subsidiaries are a joint enterprise that acted to sell opioid drugs in this District and throughout the United States. As such, each act of any of the Pharmacy Subsidiaries is attributable to CVS. Moreover, at all times material hereto, these entities have enjoyed an agency and fiduciary relationship whereby each has assented to the fraudulent acts of the other with regard to the dispensing and selling of opioids.

40. CVS and the Pharmacy Subsidiaries shall be referred to herein collectively as "CVS," "the Company," or "Defendant" in reflection that the entities acted jointly in the perpetrating the fraud alleged herein.

41. Under these circumstances, the failure to impose liability on CVS for the acts or omissions of the Pharmacy Subsidiaries would work a substantial injustice.

42. CVS Pharmacy is the largest retail pharmacy in the U.S. with more than 9,960 pharmacies in 49 states, the District of Columba, and Puerto Rico, filling more than one billion prescriptions each year. CVS Health employs over 31,235 pharmacists.[4]

43. On June 15, 2015, CVS Health announced its agreement to acquire Target Corporation's pharmacy and retail clinic businesses.[5] The deal expanded CVS to new markets in Seattle, Denver, Portland and Salt Lake City.[6] The acquisition included more than 1,660 pharmacies in 47 states. CVS started rebranding the pharmacies within the Target stores on February 3, 2016.

---

[4] IQVIA, U.S. National Pharmacy Market Summary: Market Insight Report, at 2 (July 2019).

[5] Kate Taylor, *Target opening CVS pharmacies in stores is scary news for consumers*, Business Insider (February 3, 2016), https://www.businessinsider.sg/target-and-cvs-pharmacy-is-bad-news-2016-2/.

[6] Press Release, *CVS Health and Target Announce Completed Acquisition of Target's Pharmacy and Clinic Businesses* (Dec. 16, 2015), https://cvshealth.com/newsroom/press-releases/cvs-health-and-target-announce-completed-acquisition-targets-pharmacy-and.

## IV. THE OPIOID CRISIS IN THE U.S.

44. Opioids are a class of drugs that range from pain relievers available legally by prescription—such as oxycodone, hydrocodone, codeine, morphine, and fentanyl—to illegal narcotics such as heroin. According to the Medicaid and CHIP Payment and Access Commission, "the origins of widespread prescription opioid use can be traced back to the 1990s."[7] That is when the medical profession began viewing pain as a so-called "fifth vital sign," and drug manufacturers heightened their marketing campaigns.

45. All opioids are chemically related and interact with opioid receptors on nerve cells in the body and brain. Opioid pain relievers are generally safe when taken for a short time and as prescribed by a doctor, but because they produce euphoria in addition to pain relief, they can be misused (taken in a different way or in a larger quantity than prescribed, or taken without a doctor's prescription). Regular use—even as prescribed by a doctor—can lead to dependence and, when misused, opioid pain relievers can lead to addiction, overdose incidents, and death.[8]

46. Deaths from prescription opioid overdoses have quadrupled from 1999 to 2011,[9] as have opioid prescriptions, even though pain levels reported by Americans have not changed.[10] By 2013, drug overdoses were the nation's leading cause of deaths from injury, prompting one author

---

[7] Medicaid & CHIP Payment Access Comm'n, *Report to Congress On Medicaid And CHIP: Chapter 2: Medicaid And The Opioid Epidemic* 79 (2017), https://www.macpac.gov/wp-content/uploads/2017/06/Medicaid-and-the-Opioid-Epidemic.pdf.

[8] NIH National Institute on Drug Abuse: Advancing Addiction Science, https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue.

[9] Vikki Wachino, *CMCS Informational Bulletin: Best Practices for Addressing Prescription Opioid Overdoses, Misuse and Addiction* 1 (Jan. 28, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-02-02-16.pdf.

[10] Ctrs. For Medicare & Medicaid Servs., Centers For Medicare & Medicaid Services (CMS), *Opioid Misuse Strategy 2016* 2 (Jan. 5, 2017), https://www.cms.gov/Outreach-and-Education/Outreach/Partnerships/Downloads/CMS-Opioid-Misuse-Strategy-2016.pdf.

to write: "The opioid epidemic . . . that has been ravaging and shortening lives from coast to coast is a new plague for our new century."[11]

47. Some 70,237 drug overdose deaths occurred in the United States in 2017. The age-adjusted rate of overdose deaths increased significantly by 9.6% from 2016 (19.8 per 100,000) to 2017 (21.7 per 100,000). Opioids—mainly synthetic opioids (other than methadone)—are currently the main driver of drug overdose deaths. Opioids were involved in 47,600 overdose deaths in 2017 (67.8% of all drug overdose deaths).[12]

48. In 2017, the states with the highest rates of death due to drug overdose were West Virginia (57.8 per 100,000), Ohio (46.3 per 100,000), Pennsylvania (44.3 per 100,000), the District of Columbia (44.0 per 100,000), and Kentucky (37.2 per 100,000).[13]

49. States with statistically significant increases in drug overdose death rates from 2016 to 2017 included Alabama, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, West Virginia, and Wisconsin.[14]

[11] Nicholas N. Eberstadt, *Our Miserable 21st Century*, COMMENTARY MAG. (Feb. 2017), https://www.commentarymagazine.com/articles/our-miserable-21st-century/.

[12] U.S. Ctrs. for Disease Control & Prevention, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html.

[13] Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb. and Mortal. Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

[14] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics Multiple Cause of Death 1999–2017, *Wide-ranging Online Data for Epidemiologic Research* (CDC WONDER), (2019), https://wonder.cdc.gov/wonder/help/mcd.html.

50. Every day, more than 130 people in the United States die after overdosing on opioids.[15] The misuse of and addiction to opioids—including prescription pain relievers, heroin, and synthetic opioids such as fentanyl—is a serious national crisis that affects public health as well as social and economic welfare. The Centers for Disease Control and Prevention ("CDC") estimates that the total "economic burden" of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement.[16]

51. Recently, the congressionally-chartered National Safety Council revealed that, for the first time in U.S. history, a person is more likely to die from an accidental opioid overdose than from a motor vehicle crash. The analysis showed that the odds of dying from opioid overdose are also higher than from falls, drowning, gun assault, or choking.[17]

52. According to the CDC, retail opioid prescriptions were dispensed in 2017 at a national rate of 58.7 prescriptions per 100 persons.[18]

---

[15] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics, *National Vital Statistics System*, *Mortality*, CDC WONDER (2018), https://wonder.cdc.gov.

[16] Florence CS, Zhou C, Luo F, Xu L. The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 54 Med Care. 901-906 (2016).

[17] Nat'l Safety Council, *Injury Facts*, https://injuryfacts.nsc.org/all-injuries/preventable-death-overview/odds-of-dying/; *see also* Press Release, Nat'l Safety Council, *For the First Time, We're More Likely to Die from Accidental Opioid Overdose than Motor Vehicle Crash* (Jan. 14, 2019), https://www.nsc.org/in-the-newsroom/for-the-first-time-were-more-likely-to-die-from-accidental-opioid-overdose-than-motor-vehicle-crash).

[18] U.S. Ctrs. for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps*, https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

53. From 1999 to 2017, almost 400,000 people died from an overdose involving any opioid, including prescription and illicit opioids.[19] This rise in opioid overdose deaths can be outlined in three distinct waves:

- The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1999.
- The second wave began in 2010, with rapid increases in overdose deaths involving heroin.
- The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids – particularly those involving fentanyl.[20]

54. The harm is real, particularly in Florida. The abuse of prescription drugs, along with the associated morbidity and mortality, has been identified as one of the most serious and costly issues facing Floridians today. Florida is geographically and culturally situated in the middle of the national prescription drug overdose epidemic.

55. Opioids killed 5,725 Floridians in 2016, and every corner of the State is struggling to deal with the effects. In 2017, the Palm Beach County Medical Examiner estimated that he sometimes dealt with ten overdoses a day. In Manatee County, the Medical Examiner reported in 2017 that the morgue ran out of space for the bodies of opioid overdose victims. In northern Florida, Jacksonville's Chief Medical Examiner stated in 2016 that she is unable to take a day off because the morgue is so busy with overdose victims. That year, the Jacksonville Fire and Rescue

---

[19] Scholl L., Seth P., Kariisa M., Wilson N., Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb. and Mortal. Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

[20] *Id.; see also* Rudd R.A., Aleshire N., Zibbell J.E., Gladden R.M. *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 64 Morb. and Mortal Wkly. Rep. 1378-82 (2016).

Department responded to 3,411 opioid overdoses. Former Governor Rick Scott declared a state of emergency in Florida on May 3, 2017, as a result of the opioid epidemic.[21]

56. Pasco County is among the hardest hit areas of the State. From 2004 through 2012, Pasco County experienced Florida's highest drug overdose mortality rate. According to the Florida Department of Law Enforcement, in 2016, District 6 (which consists of Pasco and Pinellas Counties) experienced the highest number of oxycodone deaths per capita in Florida. In 2016, the Pasco County Sheriff's Office administered opioid addiction treatment to nearly 2,000 inmates. In 2017, someone overdosed in Pasco County once every three days. Between 2013 and 2016, the number of deaths caused by the opioids oxycodone, hydrocodone, and fentanyl increased by more than 50%. In 2018, the overdose rate in Pasco County was higher than in 2017, and the rate of overdose deaths increased in nearly every other county in the Tampa Bay area during this period.

57. These tragic deaths are only one aspect of Florida's opioid crisis, which has inflicted untold pain and suffering on tens of thousands of Floridians. Other consequences include babies born addicted to opioids, children placed in foster care after losing parents to overdoses, chronic addiction, lost job productivity, unemployment, increased spending on emergency medical services, the costs of deceptively marketed opioids, and many more.

58. Neonatal Abstinence Syndrome ("NAS") or neonatal opioid withdrawal syndrome ("NOWS") may occur when a woman uses drugs such as opioids during pregnancy. A recent national study showed a fivefold increase in the incidence of NAS/NOWS between 2004 and 2014, from 1.5 cases per 1,000 hospital births to 8.0 cases per 1,000 hospital births. That is one baby born with NAS/NOWS every 15 minutes in the United States. During the same period, hospital

costs for NAS/NOWS births increased from $91 million to $563 million, after adjusting for inflation.

59. In March 2016, the CDC, in order to reduce opioid addiction, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end-of-life care.[22] The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[23]

60. Congress has found that pharmacies are partly to blame for the crisis: "The opioid epidemic … has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[24]

61. The grave statistics about the human toll of the opioid crisis are shocking enough. But the crisis goes beyond the human toll. Not only have millions of lives been lost to opioid addiction, millions of Government Program dollars have been squandered on inappropriate and/or otherwise medically unnecessary opioid prescriptions.

62. CVS has put profits over patients and indiscriminately dispensed and billed opioid prescriptions that were inappropriate and/or medically unnecessary.

---

[22] *See generally* Deborah Dowell, M.D. *et al.*, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. and Mort. Wkly. Rep. 1 (2016) [hereinafter, *CDC Guideline*].

[23] *Id*. at 3.

[24] U.S. Senate Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement 4 (July 12, 2017).

63. CVS knowingly violated its duties under the CSA and state pharmacy laws and regulations, ignoring obviously medically unnecessary prescriptions, filling them, and fraudulently charging Government Programs.

## V. THE APPLICABLE STATUTES

### A. The Controlled Substances Act

64. The Controlled Substances Act ("CSA") and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[25]

65. The CSA categorizes controlled substances in five "Schedules."

66. Schedule II (also called herein CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[26]

67. Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[27]

[25] *See* 21 U.S.C. § 841(a).

[26] 21 U.S.C. § 812(b)(2).

[27] 21 U.S.C. § 812(b)(3).

68. Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[28]

69. Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[29]

70. The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[30]

71. Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[31] A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[32]

72. A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[33] An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[34] The pharmacy knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

---

[28] 21 U.S.C. § 812(b)(4).

[29] 21 U.S.C. § 812(b)(5).

[30] 21 U.S.C. § 841(a)(1).

[31] 21 U.S.C. § 822(a).

[32] 21 U.S.C. § 822(b).

[33] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*, 29 (Rev. 2010).

[34] 21 U.S.C. § 829.

73. A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license.[35]

74. At all times relevant to this Second Amended Complaint, CVS Health had registered its retail pharmacies with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize CVS Health pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[36]

75. Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered pharmacy like CVS Health, are not required to register with the DEA, "if such agent or employee is acting in the usual course of his business or employment."[37]

76. Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[38]

---

[35] *See, e.g., U.S. v. Kershman*, 555 F.2d 198 (8th Cir. 1977).

[36] 21 U.S.C. §§ 823(f), 802(10).

[37] 21 U.S.C. § 822(c)(1).

[38] *See generally* 21 C.F.R. § 1306.

77. Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency.[39] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[40]

78. Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[41]

79. A prescription, whether written or oral, is legally valid under the CSA **only** if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[42] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and **the person knowingly filling such a purported prescription**, as well as the person issuing it, **shall be subject to the penalties** provided for violations of the provisions of law relating to controlled substances."[43]

80. As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[44] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

[39] 21 U.S.C. § 829(a).

[40] 21 U.S.C. § 829(b).

[41] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[42] 21 C.F.R. § 1306.04(a).

[43] *Id*. (emphasis added).

[44] *Id*.

81. Moreover, "[a] prescription for a controlled substance may **only** be filled by a pharmacist, **acting in the usual course of his professional practice** and either registered individually, or employed in a registered pharmacy…."[45]

82. Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice – *i.e.*, "the usual course of his [or her] professional practice" of pharmacy.[46]

83. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[47]

84. This requires a pharmacist to use sound professional judgment in determining the legitimacy of a controlled substance prescription, which includes paying attention to the number of prescriptions issued, the number of dosage units prescribed, the doctor writing the prescriptions, and whether the drugs prescribed have a high rate of abuse. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

### 1. *Pharmacies Are Obligated Not to Fill Prescriptions Until Red Flags Are Resolved*

85. A pharmacy cannot ignore red flags indicative of diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the

[45] 21 C.F.R. § 1306.06 (emphasis added).

[46] *Id.*

[47] *See* 21 C.F.R. §§ 1306.04, 1306.06.

prescription was not written for a legitimate medical purpose."[48] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[49] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse.[50] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[51]

86. Courts, too, have recognized the obligation *not* to dispense until red flags are resolved.[52] In *Medicine Shoppe-Jonesborough,* the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held that "[t]he CSA forbids a

---

[48] *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044, 1990 WL 328750 (Dep't of Justice July 24, 1990).

[49] *East Main Street Pharmacy*, Affirmance of Suspension Order, 75 Fed. Reg. 66149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010).

[50] *Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4,729, 4,730, 1990 WL 352775 (Dep't of Justice Feb. 9, 1990).

[51] *Id.*; *see also Townwood Pharmacy*; 63 Fed Reg. 8,477, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*, 77 Fed. Reg. 44070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*, 76 Fed. Reg. 20,039, 2011 WL 1343276 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008) (revocation of registration); *Notice of United Prescriptions Services, Inc.*, 72 Fed. Reg. 50397- 01, 50407-8, 2007 WL 2455578 (Aug. 31, 2007) (revocation of registration).

[52] See Medicine Shoppe-Jonesborough v. Drug Enforcement Administration, 300 F. App'x 409 (6th Cir. 2008); United States v. Henry, 727 F.2d 1373, 1378-79 (5th Cir.1984); Holiday CVS, L.L.C. v. Holder, 839 F. Supp.2d 145 (D.D.C. 2012).

pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[53] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[54] "[B]y filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[55]

### 2. *Pharmacy Chains Are Responsible for the Dispensing Practices in Their Stores*

87. The responsibility for dispensing is not limited to pharmacists, pharmacies, or holders of DEA dispensing registrations. Rather, the corporate parent of a pharmacy may be responsible for the dispensing practices of its pharmacies and pharmacists.[56] This is so regardless of whether the parent is a registrant under the CSA or whether the parent is the entity or person actually doing the dispensing.

88. In short, case law discussed below holds that individuals or entities who have the ultimate responsibility for the dispensing of controlled substances can be liable for violations of the CSA, regardless of whether they are DEA registrants. To the extent that a corporate parent of a chain pharmacy defendant exerts sufficient control over the pharmacy operations at its stores, which the large national chains likely do, these corporate parents can be held liable for dispensing

---

[53] *Id*. at 412 (emphasis added).

[54] *Id*.

[55] *Id*.

[56] *See United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala.1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass.1996); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, at *6 (S.D. Fla. Sept. 11, 2012).

violations. Moreover, to the extent that the chain pharmacy defendants attempt to blame the individual pharmacists themselves, cases hold that parent company liability can be imposed on top of and in addition to any individual pharmacist's liability.

89. Courts routinely find that liability can attach to a broad array of persons or entities under Section 842. In particular, courts reject two arguments for limiting liability under Section 842 and its regulations. First, courts find that Section 842 can impose liability on non-registrants. Second, courts find that Section 1306.4 can be the basis for liability of pharmacy owners in addition the pharmacists themselves. These holdings are based on the purpose and structure of the CSA: those who have the ultimate responsibility for the controlled substances and ensuring compliance with the CSA should be held liable for violations, regardless of whether they are registered with the DEA.

### 3. *The CSA Applies to All Persons Who Dispense Controlled Substances*

90. Courts have found that, because the plain language of Section 842 extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[57] Importantly, in those cases, the courts found that because the pharmacy owners,

[57] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313–14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham,* 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin,* 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[58]

91. At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions. In *USA v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section 842(a)(1) even though he was not a registrant and the pharmacies he owned were separately incorporated.[59] The United States brought an action alleging that City Pharmacy LLC and City Pharmacy of Charles Town, Inc. violated Section 842(a)(1) by filling illegitimate prescriptions for controlled substances that raised one or more red flags, such as customers traveling long distances or customer receiving drug cocktails.[60]

92. The Court held that Section "842(a)(1) applies to non-registrants."[61] The Court continued, explaining that "because part C of the CSA applies broadly to all persons involved in the manufacture, distribution, and dispensing of controlled substances, including lay-persons, defendant Lewis may potentially be held liable for his conduct."[62] To support its conclusion, the Court concentrated on Defendant Lewis' involvement with the pharmacies at issue, looking

[58] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").

[59] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016).

[60] *Id*. at *2.

[61] *Id*. at *2 (citing *United States v. Moore*, 423 U.S. 122, 134 n.11 (1975) and *United States v. Stidham*, 938 F. Supp. 808, 813-814 (S.D. Ala. 1996)).

[62] *Id*.

specifically at his investment of the funds to organize and open the pharmacy, as well as the active role he played in the management of the pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

93. The *City Pharmacy* Court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability. Evaluating various legal mechanisms for piercing the corporate form, the court concluded that the pharmacies "were being used to evade the legal requirements within and undermine the public policy foundations of the CSA."[63] Thus, the Court held, "given the nature of these criminally-grounded allegations, it is not a defense to liability in this case for defendant Lewis to assert that he is shielded by the corporate form. [The pharmacies] were allegedly the entities used to evade and subvert the requirements of the CSA."[64]

94. Just like the defendant in *City Pharmacy*, CVS Health invests the funds to organize and open its numerous pharmacies and plays a very active role in the management of its pharmacies

---

[63] *Id*. at *4.

[64] *Id*.; *see also Poulin*, 926 F. Supp. at 249 *("*Mattapoisett Pharmacy, Inc. is also the alter ego of its sole owner, David Poulin, and thus David Poulin cannot use the corporate name to shield himself from personal liability."); *S & S Pharmacy*, 46 Fed. Reg. 13051-52 (Dep't of Justice Feb. 19, 1981) ("[T]he Administrator has in the past looked behind the corporate-veil to revoke or deny a registration when a responsible official of a corporate registrant has been convicted of violating the laws relating to controlled substances."); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, (S.D. Fla. Sept. 11, 2012), (finding a non-registrant owner of a pharmacy could be held liable for violations of Section 842 because the defendant was "alleged to have had responsibility over the controlled substances" and holding that "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under the [Section 842], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016)*, aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (an owner receiving the "benefits and profit" of a pharmacy, but who was not a registrant or a medical professional, can be liable for violations of the CSA because he was still "responsible for making sure that [CSA] requirements were met.").

including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

### 4. *A Chain Pharmacy Cannot Escape Liability for Its Corporate Malfeasance by Blaming Its Pharmacists*

95. In addition to finding that individuals or entities who own and control pharmacies can be liable for CSA violations, irrespective of their DEA registration status, the case law also makes it clear that pharmacies cannot escape liability under the CSA by simply blaming the pharmacists who work for them. Even though the "corresponding responsibility" of pharmacists is discussed in terms of what a pharmacist – not a pharmacy – must do, courts have found that a narrow reading of the language to insulate pharmacies from liability is not supported by the language or structure of the regulations.

96. In *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1186 (E.D. Ky. 2017), the Court looked at the regulations regarding dispensing under Section 842, and found that the pharmacy owner could be held personally liable for dispensing violations.

97. Defendant Appalachian Regional Healthcare ("ARH") unsuccessfully argued that it could not be held liable as a corporate pharmacy under Section 842(a)(1) because its implementing regulations, namely 21 C.F.R. § 1306.04, articulated the duties under that section in terms of the "pharmacist" or "practitioner," not the corporate pharmacy entity.[65] The court rejected ARH's narrow, technical reading, instead holding that "when § 1306.04(a) states that the person knowingly filling the prescription is subject to penalties, it contemplates liability for corporate

[65] *See, e.g*, § 1306.4(a) ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.").

entities as well."[66] The court continued, finding that there is "nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their role in issuing and filling invalid prescriptions."[67]

98. Likewise, other federal courts have found pharmacies and other DEA registrants liable for violations of the CSA and CSA Regulations.[68] For example, in *Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008), the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated Section 829 of the CSA and Section 1306.04 of the CSA Regulations.

99. Specifically, the Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which

---

[66] United States v. Appalachian Reg'l Healthcare, Inc., 246 F. Supp. 3d at 1189.

[67] *Id*. at 1189-1190; *see also Moore v. Covenant Care Ohio, Inc.*, 18 N.E.3d 1260, 1270 (Oh. App. 2014) (a corporate pharmacy whose subsidiary voluntarily undertook to provide pharmaceutical services to a nursing home owed a duty to exercise reasonable care in providing such services and also owed a common law duty to exercise reasonable care in dispensing and labeling of medicines).

[68] *See United States v. Green Drugs*, 905 F.2d 694, 694-5 (3rd Cir. 1990) (affirming retail pharmacy liability for violating Section 842(a)); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-3 (5th Cir. 1991) (affirming liability under Section 842(a) for corporate operator of clinic that illegally distributed controlled substances); *United States v. Cap Quality Care, Inc.*, 486 F. Supp. 2d 47, 54 (D. Maine 2007) (granting summary judgment to the United States on claims that DEA registrant clinic improperly dispensed controlled substances in violation of Sections 829 and 842); *United States v. Grab Bag Distrib.*, 189 F. Supp. 2d 1072, 1082 (E.D. Cal. 2002) (granting summary judgment to the United States on liability); *United States v. Little*, 59 F. Supp. 2d 177, 186-88 (D. Mass. 1999) (granting summary judgment to Government for pharmacy's violations of § 842(a) and concluding "a pharmacy empowered to dispense controlled substances will now be held liable . . . if it knew or should have known about an illegal diversion, or inaccurate records, and chose to do nothing"); *Poulin*, 926 F. Supp. at 252-3 (holding pharmacy liable for "filling a total of six invalid prescriptions"); *United States v. Queen Village Pharm.*, No. 89-2778, 1990 WL 165907, at *2-4 (E.D. Pa. Oct. 25, 1990) (finding retail pharmacy liable for violating Section 842(a)).

'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[69] "Medicine Shoppe fell asleep at the wheel in honoring prescriptions no reasonable pharmacist would fill without further inquiry."[70] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[71] "[B]y filling these prescriptions anyway . . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[72] The Sixth Circuit made no distinction between the pharmacy and the pharmacists employed there when determining liability.[73]

100. These decisions make clear that the dispensing obligations under the CSA are not imposed solely on pharmacists, but also on pharmacies and their corporate owners. For this reason, the chain pharmacy parent corporations like CVS Health had a responsibility under the CSA not to dispense opioids in the face of unresolved red flags about the legitimacy of the prescriptions.

#### 5. *The Purpose and Intent of the CSA Bolsters Finding Liability of Chain Pharmacy Corporate Parents*

101. The logic of the authority above is consistent with the purpose and intent of the CSA. The Supreme Court has explained that with the CSA "Congress was particularly concerned

[69] *Id*. at 412 (emphasis added).

[70] *Id*. at 413.

[71] *Id*.

[72] *Id*.

[73] *See also Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 823, 835 (11th Cir. 2018) (affirming revocation of pharmacy registration for, among other things, pharmacists dispensing prescriptions that prescriptions presented various red flags, *i.e.*, indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

with the diversion of drugs from legitimate channels to illegitimate channels."[74] So, to address this concern, courts do not want defendants using the DEA registration process and requirements (*i.e.*, the structure of the legitimate channels) to shield those responsible from liability. As one court put it, "[t]o accept [defendant's] argument that the Act does not apply to her [because she was not a registrant], even though she was responsible for the drugs, would eviscerate the goal of ensuring the movement of drugs is closely controlled."[75] "The legislative history [of the CSA] indicates that Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant."[76]

102. The DEA made a similar finding in *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*.[77] The Administrative Law Judge rejected CVS's argument that the corporate parent of a chain pharmacy was not responsible for the actions of its pharmacies. In its analysis of whether or not CVS took responsibility for its actions, the ALJ held that:

> [T]he Agency's rule is clear and the fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists. Therefore, I decline to create one rule for chain pharmacies and another rule for closely held or sole proprietor owned pharmacies. Because Respondents have failed to satisfy this requirement, the ALJ properly held that they have not accepted responsibility for their misconduct.[78]

103. At its most fundamental level, the purpose of the CSA and its regulations is to create a closed system for delivery of controlled substances and prevent the distribution of controlled substances outside of that system. To allow the entity that fully controls the operations of its

---

[74] *United States v. Moore*, 423 U.S. 122, 135 (1975).

[75] *Robinson*, 2012 WL 3984786, at *7.

[76] United States v. Moore, 423 U.S. at 134.

[77] 77 Fed. Reg. 62316-01, 62321-2; 2012 WL 4832770 (D.E.A. Oct. 12, 2012).

[78] *Id*.

registrants (such as the corporate parent of a chain pharmacy like CVS) to escape responsibility because of corporate structure thus would defeat the purpose and intent of the CSA.

104. Tennessee law defines the "Practice of Pharmacy" to mean a "patient-oriented health service profession in which pharmacists interact and consult with patients and other health care professionals to enhance patients' wellness, prevent illness, and optimize outcomes."[79] That same statute further explains that the Practice of Pharmacy involves the "[t]he interpretation, evaluation and implementation of medical orders and prescription orders," and [p]articipation in drug … selection," and "[drug] evaluation, utilization or regimen review."[80]

105. The Tennessee Board of Pharmacy's Standards of Practice specifically establish that "[a] pharmacist shall be responsible for a reasonable review of a patient's record prior to dispensing each medical or prescription order. The review shall include evaluating the … order for: [o]ver-utilization or under-utilization; [t]herapeutic duplication; [d]rug-disease contraindication; [d]rug-drug interactions; [i]ncorrect drug dosage or duration of drug treatment; drug-allergy interactions; [and] clinical abuse/misuse."[81]

106. Moreover, under Tennessee law, pharmacists are required to maintain a patient profile or record system which "shall provide for the immediate retrieval of information necessary for the pharmacist to identify previous dispensed medical and prescription orders at the time a medical or prescription order is presented." With regard to the patient profile, the pharmacy must "make a reasonable effort to obtain, record, and maintain" patient information relevant to pharmacy practice including the "[p]harmacist's comments as deemed relevant."[82]

107. Consequently, the dispensing of controlled substances when faced with warning signals, without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates both 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829) because doing so violated the pharmacist's corresponding responsibility to ensure the legitimacy of the prescription (21 C.F.R. § 1306.04) and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA) because the prescription was filled outside of the pharmacist's usual course of professional practice (21 C.F.R. § 1306.06).

108. Tennessee pharmacists have access to Controlled Substance Monitoring Program Board of Pharmacy Patient RX History Reports ("CSMD Reports"). The CSMD reports are compiled by an information system into which pharmacists in Tennessee are required to enter data regarding the controlled substance prescriptions they dispense to patients. This information system allows Tennessee pharmacists to review a patient's controlled substance prescription history before dispensing controlled substances. For example, the pharmacists can determine which doctors have prescribed controlled substances, which pharmacies have dispensed them, the quantities and dosages that have been prescribed and dispensed and when.

109. Prescribing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice.

110. Prescribing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse or diversion.

**B. The False Claims Act**

111. The FCA[83] prohibits "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval.

112. The FCA[84] prohibits "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim.

113. The FCA[85] further imposes liability upon any person who conspires to commit a violation of the FCA.

114. The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient. Any claim submitted by a Government Program provider for a payment constitutes a claim under the FCA. Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the FCA.

115. Under the FCA, a "claim" is defined broadly to include any request or demand for money that is presented to the United States, or is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest.[86]

[83] 31 U.S.C § 3729(a)(1)(A).

[84] 31 U.S.C § 3729(a)(1)(B).

[85] 31 U.S.C § 3729(a)(1)(C).

[86] 31 U.S.C. § 3729(b)(2).

116. In the Medicare Part D context, the "claim" is the Prescription Drug Event (PDE) that is sent by the dispensing pharmacy to a Part D plan sponsor or Pharmacy Benefit Manager ("PBM"), and then forwarded to CMS as part of the payment process.

117. The Part D statute provides that drugs may only be reimbursed under the program if the drug is a "covered outpatient drug." Consequently, one of the elements of the PDE is to designate whether a dispensed drug is a covered outpatient drug. Covered outpatient drugs must be dispensed pursuant to a valid prescription. Under the CSA and many parallel state laws, a prescription must satisfy a number of requirements. For example, the prescriber must be authorized to prescribe controlled substances in the jurisdiction in which he or she is licensed to practice, and must be either registered with DEA or exempt from registration.[87]

118. Perhaps most significantly, in order to be valid, a prescription must be issued "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[88] This requirement "ensures that patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse.[89] It also "bars doctors from peddling to patients who crave the drugs for those prohibited uses."[90] Violation of any one of the above requirements potentially satisfies the FCA falsity requirement.

119. The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation for violations that occurred before November 2,

[87] 21 C.F.R. § 1306.03(a).

[88] 21 C.F.R. § 1306.04(a).

[89] *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

[90] *Id*.

2015 and, for violations that occurred after that date, a civil penalty of between $11,181 and $22,363.[91]

120. One method for preventing the over-prescribing of potentially harmful opioids is to pursue those who cause the submission of false or fraudulent claims for payment for those drugs under Medicare Part D, Medicaid, and other federal and state programs. The treble damages and civil penalties awardable under the FCA, as well as under the State of Florida False Claims Act, can provide a powerful incentive for physicians and others to avoid prescribing and dispensing these substances for indications that are not supported by the approved drug compendia.[92]

121. Relevant here, Department of Justice counsel have argued that the "combining the CSA and FCA enforcement schemes can be an effective tool to address violations of the CSA that may lead to diversion of narcotics and Part D fraud,"[93] particularly in combatting the "twin evils of opioid addiction" and Government Program fraud.[94]

### C. Opioid Use and Treatment by Government Programs

122. There is an array of health care programs operated and funded by the United States and the Qui Tam States (the "Government Programs") whose purpose is to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries. Several of these Government Programs are described below.

---

[91] 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

[92] Roger Wenthe, Fighting Opioid Abuse Under Federal Health Programs With the False Claims Act, 64 United States Attorneys' Bulletin 93, 100 (Nov. 2016).

[93] Edward A. Baker, Stacy Gerber Ward, *Pursuing False Claims Act Liability for Controlled Substances Act Violations*, 64 United States Attorneys' Bulletin 101, 113 (Nov. 2016).

[94] *Id.* at 102.

123. One method for preventing the over-prescribing of potentially harmful opioids is to pursue those who cause the submission of false or fraudulent claims for payment for those drugs under Medicare Part D, Medicaid, and other federal programs. The treble damages and civil penalties awardable under the FCA can provide a powerful incentive for physicians and others to avoid prescribing and dispensing these substances for indications that are not supported by the approved drug compendia.[95]

### 1. *Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications*

124. Medicare coverage for opioid medications is provided in Part D, the prescription drug benefit program available to Medicare recipients who voluntarily enroll.[96] To participate in Part D, beneficiaries must enroll in a Part D Plan of their choice. The beneficiary pays premiums to the Plan's sponsor, which is a private entity approved by the Centers for Medicare and Medicaid Services ("CMS"). Coverage in the Plan includes deductibles, copayments, and benefit caps. The beneficiary fills the prescription at a pharmacy, which submits a claim to the Plan sponsor, and the sponsor pays the pharmacy directly or through a subcontractor. CMS reimburses the sponsor for varying portions of the prescription costs.[97]

125. To be a "covered Part D drug," a drug must be: (1) dispensable only by prescription; (2) one of the three types of "covered outpatient drug" defined in 42 U.S.C. § 1396r-8(k)(2)(A) (2016); and (3) used for a "medically accepted indication."[98]

---

[95] Roger Wenthe, Fighting Opioid Abuse Under Federal Health Programs With the False Claims Act, 64 United States Attorneys' Bulletin 93, 100 (Nov. 2016).

[96] 42 U.S.C. §§ 1395w-102 (2010).

[97] *See Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp.2d 945, 948-49 (N.D. Ill. 2009).

[98] 42 U.S.C. §§ 1395w-102(e)(1) (2010).

126. The most important of these three requirements for present purposes is the third, that the drug be used for a medically accepted indication. The statute and the regulation define this term by incorporating the Medicaid definition set forth in 42 U.S.C. §§ 1396r-8(k)(6) (2016).[99]

127. The definition is: "The term 'medically accepted indication' means any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 *et seq*.] or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i) of this section."[100] The compendia referred to are "(I) American Hospital Formulary Service Drug Information; (II) United States Pharmacopeia-Drug Information (or its successor publications); and (III) the DRUGDEX Information System."[101]

128. The Medicare manuals provide additional guidance on Part D drug coverage. The MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL, Ch. 6, § 10.6 (Rev. 18, Jan. 15, 2016), states that a medically accepted indication "refers to the diagnosis or condition for which a drug is being prescribed, not the dose being prescribed for such indication."[102]

129. Therefore, Medicare Part D and Medicaid cover only prescription drugs used for a "medically accepted indication," which means used either for an indication approved on the Food and Drug Administration (FDA) label, or for an "off-label" indication which is "supported" by one of the approved compendia. If a drug is prescribed outside of these limitations, it is not a "covered drug," and a claim for payment based on the prescription is a false claim.

### 2. *Medicaid Beneficiary Opioid Use and Abuse*

---

[99] *See* 42 U.S.C. §§ 1395w-102(e)(4)(A)(ii)(2010); 42 CFR § 423.100 (2016).

[100] 42 U.S.C. §§ 1396r-8(k)(6) (2016).

[101] 42 U.S.C. §§ 1396r-8(g)(1)(B)(i).

[102] *Id.*

130. Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal Government and state governments.

131. While Medicaid undoubtedly helps many deserving recipients, it also creates a series of incentives for potential abuse of opioids, which are rooted in federal law itself. Patients on Medicaid typically "pay no part of costs for covered medical expenses," other than perhaps a small co-payment.[103] Federal law requires that Medicaid co-payments and other "cost-sharing" borne by Medicaid recipients at lower income levels be nominal. CMS has determined that states could charge those on Medicaid no more than $4 for certain classes of drugs.[104] For dangerous opioids such as oxycodone, Medicaid co-pays can run as low as $1 for as many as 240 pills—pills that can be sold for up to $4,000 on the street.

132. As one longtime local prosecutor in opioid-ravaged eastern Kentucky recounted in DREAMLAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC: "We can talk morality all day long, but if you're drawing five hundred dollars a month and you have a Medicaid card that allows you to get a monthly supply of pills worth several thousand dollars, you're going to sell your pills."[105]

---

[103] U.S. Dep't of Health & Hum. Servs., *Frequently Asked Questions: What is the Difference* Between *Medicare and Medicaid?*, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html.

[104] *See* Final Rule, Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, Eligibility Notices, Fair Hearing and Appeal Processes, and Premiums and Cost Sharing; Exchanges: Eligibility and Eligibility and Enrollment, 78 Fed. Reg. 42159-42322 (July 15, 2013) (codified in scattered pts. of 42 C.F.R.), https://www.gpo.gov/fdsys/pkg/FR-2013-07-15/html/2013-16271.htm.

[105] Sam Quinones, Dreamland: The True Tale of America's Opiate Epidemic 211 (2015).

133. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs. Federal reimbursement for prescription drugs under the Medicaid program is limited to “covered outpatient drugs.” “Covered outpatient drugs” are drugs that are used for “a medically accepted indication.”

134. Medicaid finances a substantial proportion of substance use disorder treatment. In 2014, Medicaid financed more than one-fifth (21 percent) of substance use disorder treatment, which was slightly less than the share covered by all private insurers (22 percent). Nine percent of all spending on addiction treatment came from out-of-pocket payments by individuals.[106] By 2020, it was projected that Medicaid will finance 28 percent of substance use disorder treatment services, while other payer types are projected to remain the same.[107]

135. The Medicaid program provides medical assistance to certain low-income individuals and individuals with disabilities (Title XIX of the Social Security Act). The Federal and state governments jointly fund and administer the Medicaid program. The Federal Government pays its share of a State’s medical assistance costs (referred to as Federal financial participation (“FFP”) or “Federal share”) under the Medicaid program on the basis of the Federal medical assistance percentage (“FMAP”).

136. On November 15, 2022, CVS and various States and municipalities (not including the State of Florida) announced they had entered into a global Settlement Agreement framework

[106] Tami L. Mark, et al., Insurance Financing Increased For Mental Health Conditions But Not For Substance Use Disorders, 1986-2014, 35 Health Affairs 961 (June 2016).

[107] Substance Abuse and Mental Health Services Admin., *Projections of National Expenditures for Treatment of Mental and Substance Use Disorders, 2010–2020,* 31 HHS Publication No. SMA-14-4883, https://store.samhsa.gov/system/files/sma14-4883.pdf.

("CVS Settlement Agreement") designed to resolve substantially all opioid lawsuits by state, local, and tribal governments, if all conditions are satisfied.[108]

137. With respect to the States that entered into the CVS Settlement Agreement (and only to the extent released in that Agreement), the conduct alleged herein does not apply to the distribution or dispensing by CVS, of chemical substances, reimbursed by any State through its Medicaid program, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is (i) an opioid or opiate, as well as any product containing any such substance, (ii) a benzodiazepine, a muscle relaxer, carisoprodol, zolpidem, or gabapentin, or (iii) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. Such substances include, but are not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance. The limitation in this paragraph shall not apply to the Federal share of any health care program claims, including the Federal share of Medicaid.

### 3. *Medicare Beneficiary Opioid Use and Abuse*

138. Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases. The program is

[108] Walmart, Walmart Announces Nationwide Opioid Settlement Framework (Nov. 15, 2022), https://corporate.walmart.com/news/2022/11/15/walmart-announces-nationwide-opioid-settlement-framework.

administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

139. Starting in January 2006, Part D of the Medicare Program provided subsidized coverage for pharmacy-dispensed outpatient drugs for all beneficiaries, with low-income individuals receiving the greatest subsidies. However, a "covered Part D drug" must be used for a "medically accepted indication."

140. Medicare Part D provides optional drug benefits to Medicare beneficiaries. CMS contracts with private insurance companies, called sponsors, to provide Part D prescription drug coverage to beneficiaries who choose to enroll. Sponsors offer drug coverage to beneficiaries through Part D prescription drug plans. These Part D programs are subsidized by the federal Government, which covers the cost of drug payments.

141. In 2016, one out of every three beneficiaries received at least one prescription opioid through Medicare Part D. In total, 14.4 million of the 43.6 million beneficiaries enrolled in Medicare Part D received opioids. Medicare Part D paid almost $4.1 billion for 79.4 million opioid prescriptions for these beneficiaries. The vast majority of these opioids (80 percent) were Schedule II or III controlled substances, meaning they have the highest potential for abuse among legally available drugs.[109]

142. Several states had higher proportions of beneficiaries receiving opioids than the United States overall, which was 33 percent. Alabama and Mississippi had the highest proportions, with almost half of the State's Part D beneficiaries receiving at least one opioid—46 percent and

---

[109] Dept. of Health & Human Services OIG, *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing*, 2 (July 2017), HHS OIG Data Brief OEI-20-17-00250, https://oig.hhs.gov/oei/reports/oei-02-17-00250.pdf.

45 percent, respectively. Arkansas had 44 percent of beneficiaries receiving opioids, while Oklahoma, Tennessee, and Louisiana each had 42 percent.[110]

143. In addition, 1 in 10 Medicare Part D beneficiaries nationwide received opioids on a regular basis. Specifically, 5 million beneficiaries received opioids for 3 months or more in 2016. Research shows that the risk of opioid dependence increases substantially for patients receiving opioids continuously for 3 months. Of these 5 million beneficiaries, 3.6 million received opioids for 6 or more months and nearly 610,000 received opioids for the entire year.[111]

144. A total of 501,008 beneficiaries received high amounts of opioids through Medicare Part D in 2016. This does not include beneficiaries who had cancer or were in hospice care. Each of the 501,008 beneficiaries received an average morphine equivalent dose (MED) of greater than 120 mg a day for at least 3 months. MED is a measure that equates all the various opioids and strengths into one standard value. A daily MED of 120 mg is equivalent to taking 12 tablets a day of Vicodin 10 mg or 16 tablets a day of Percocet 5 mg. These dosages far exceed the amounts that the manufacturers recommend for both of these drugs. They also exceed the 90 mg MED level that CDC recommends avoiding for patients with chronic pain.[112]

145. As the statistics make clear, there is a real problem with inappropriate opioid prescriptions being filled by Medicare patients. Pharmacies should not be dispensing most, if not all, of the prescriptions that are clearly for excessive amounts of opioids or for patients who have been doctor shopping. However, pharmacies like CVS have failed to block these prescriptions and

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

filled them, instead choosing to bill Medicare for medically unnecessary and/or inappropriate prescriptions.

### 4. *Tricare Beneficiary Coverage and Opioid Use and Abuse*

146. TRICARE is the insurance plan of the U.S. Department of Defense and provides health care coverage for over 9 million beneficiaries. Approximately 20% of the covered population is active duty military, with the remainder composed of retirees, disabled personnel, and dependents.

147. Prescription drugs are an important part of the TRICARE health benefit, including coverage for opioid drugs.

148. Service members were prescribed pain medication at a rate four times higher in 2009 than in 2001 (Institute of Medicine (IOM), 2012). Chronic pain medication and opioid use rates in the military, specifically in Service members returning from Afghanistan, were estimated at approximately 44% and 15%, respectively.[113] Most of the prescription drugs misused by Service members are opiate pain medications, which include codeine, morphine, oxycodone, oxymorphone, hydrocodone, and hydromorphone. Combat-related injuries may help explain the increase in prescriptions and the corresponding increase in self-reported misuse of prescription drugs. Post-traumatic stress and other mental health disorders are associated with substance misuse, as are other problems experienced by returning military personnel, including sleep disturbances, traumatic brain injury, and unemployment.[114]

---

[113] R.L. Toblin, P.J. Quartana, L.A. Riviere, K. Walper, C.W. Hoge, *Chronic pain and opioid use in U.S. soldiers after combat deployment*, 174 JAMA Internal Medicine 1400-1401 (2014).

[114] National Institute on Drug Abuse (2013): *Drug Facts: Substance Abuse in the Military*, Retrieved from http://www.drugabuse.gov/publications/drugfacts/substance-abuse-inmilitary.

149. Military physicians wrote nearly 3.8 million prescriptions for pain medication in 2009, more than quadruple the number of such prescriptions written in 2001.[115] However, in the past few years, self-reported use of both prescription opioid pain relievers and use of sedatives has decreased among active duty personnel. From 2011 to 2015, the percentage of service members using pain relievers in the past month decreased by nearly half, likely reflecting prevention and appropriate prescribing initiatives set in motion by the Department of Defense.[116] Nonetheless, these medications were misused and overused more often than other drugs. Prescription drug misuse was highest in the Army and lowest in the Coast Guard.[117]

150. Opioid use disorders among military personnel often begin with a opioid pain prescription following an injury during deployment. However, due to the addictive nature of opioids, particularly coupled with mental health struggles experienced by some military service men and women, regular use of opioids can lead to addiction.

151. Many veterans have unique issues related to pain management, with two-thirds reporting they experience pain.[118] More than 9% reported that they experience severe pain, compared to only 6.4% of non-veterans, putting them at higher risk for accidental opioid pain reliever overdoses.[119] From 2001 to 2009, the percent of veterans in the VHA system receiving an

---

[115] Institute of Medicine, *Substance Use Disorders in the US Armed Forces*, National Academies Press (2013) https://www.nap.edu/catalog/13441/substance-use-disorders-in-the-us-armed-forces.

[116] Lin, L.A., Bohnert, A.S., Kerns, R.D., et al., Impact of the Opioid Safety Initiative on Opioid-Related Prescribing in Veterans, 158 Pain 833-839 (2017).

[117] Meadows, S.O., Engel, C.C, Collins, R.L, et al., *Health Related Behaviors Survey: Substance Use Among U.S. Active-Duty Service Members,* RAND Corporation, 2018. https://www.rand.org/pubs/research_briefs/RB9955z7.html.

[118] Nahin R. L., Severe pain in veterans: The effect of age and sex, and comparisons with the general population, 18 The Journal of Pain 247–254 (2017).

[119] *Id*.

opioid prescription increased from 17% to 24%.[120] Similarly, the overall opioid overdose rates of veterans increased from 14% in 2010 to 21% in 2016.[121]

#### 5. *Federal Employee Health Benefit Program Beneficiary Coverage and Opioid Use and Abuse*

152. The Federal Employees Health Benefits ("FEHB") Program is a system in which employee health benefits are provided to civilian government employees and annuitants of the United States government. The FEHB Program covers some nine million federal civilian employees, retirees, former employees, and their families. The FEHB Program is voluntary and is financed through employee and employer contributions.

153. Prescription drug coverage, available at retail and mail service pharmacies, is a key component of the FEHB Program's benefit design.

154. The opioid crisis has had a significant impact on the FEHB Program, including:

- The largest FEHB Program carrier reported a 300% increase from 2012 through 2017 in the identification of beneficiaries potentially abusing prescription opioid medications;
- The number of prescriptions for Narcan, Nalaxone and Evzio, drugs used to thwart opioid-related overdoses, doubled from 2016 through 2017;
- In 2017, the percentage of FEHB Program members enrolled in employee organization fee-for-service plans taking opioid prescriptions ranged between 17.8 percent and 24.3 percent of total beneficiaries; and

[120] Teeters, J.B., Lancaster, C.L., Brown, D.G., & Back, S.E., *Substance use disorders in military veterans: prevalence and treatment challenges*, 8 Substance Abuse and Rehabilitation 69-77 (2017).

[121] Lewei, A.L., Peltzman, T., McCarthy, J.F., et al., *Changing trends in opioid overdose deaths and prescription opioid receipt among veterans*, 57 American Journal of Preventive Medicine 106-110 (2019).

- FEHB Program ancillary costs for treatment of substance abuse have risen sharply at a rate of nearly 283 percent, from 2013 through 2016.[122]

#### 6. *State of Florida Health Care Program Beneficiary Coverage and Opioid Use and Abuse*

155. The State of Florida provides health insurance coverage for its employees, retirees, as well as their beneficiaries and survivors.

156. In addition, the Children's Health Insurance Program ("CHIP") is a partnership between the federal and the State of Florida that provides low-cost health coverage to children in families that earn too much money to qualify for Medicaid. The State of Florida provides comprehensive coverage for prescription drugs through CHIP, including coverage for opioid drugs.

157. The State of Florida also offers prisoners coverage for prescription opioid drugs.

158. These other Government Programs have also experienced widespread diversion and abuse of opioids.

159. For example, a significant percentage of the nation's prison and jail population suffers from drug addiction. The Bureau of Justice Statistics (BJS), part of the U.S. Department of Justice ("DOJ"), estimated in a 2017 report that two-thirds of offenders held in state prisons and local jails had substance abuse problems, yet only a quarter of that group received adequate drug treatment.

---

[122] U.S. Office of Personnel Management, Office of the Inspector General, *Top Management Challenges: Fiscal Year 2018*, Nov. 5, 2018, at 7-8, https://www.opm.gov/our-inspector-general/publications/special-reports-and-reviews/2018-top-management-challenges.pdf.

160. A 2016 study published in *Substance Abuse and Rehabilitation* estimated that between 24% and 36% of opioid-dependent adults cycle in and out of jails each year, creating a cycle between drug addiction and incarceration.

**D. Federal Guidance Governing Pharmacy Dispensing of Opioids**

161. The CDC has published guidelines regarding the proper use of opioids.[123] The guidelines explicitly state that "Opioid pain medication use presents serious risks, including overdose and opioid use disorder."[124] Furthermore, "[s]ales of opioid pain medication have increased in parallel with opioid-related overdose deaths."[125]

162. The CDC guidelines, and many state laws, rely on Morphine Milligram Equivalents ("MME"). As the name suggests, MME is an opioid's dosage's equivalency to morphine. Using MME is useful because it provides a constant metric to compare opioids of varying types, strengths, and delivery methods. This is particularly useful for patients who may be using a combination of different opioid products or have changed products over time.

163. The CDC has a conversion chart of the most common opioids in milligrams (mg) to MMEs.[126] So, for example, 10 tablets of hydrocodone/acetaminophen 5mg/300mg would equal 50 MME (10 tablets x 5mg of hydrocodone x 1 hydrocodone oxycodone conversion factor = 50

---

[123] U.S. Centers for Disease Control, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States*, *2016*, 65 Morb. and Mort. Wkly. Rep. (March 18, 2016).

[124] *Id*.

[125] *Id*.

[126] Opioid Oral Morphine Milligram Equivalent (MME) Conversion Factors, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Opioid-Morphine-EQ-Conversion-Factors-Aug-2017.pdf.

MME). 2 tablets of oxycodone 30mg would equal 90 MME (2 tablets x 30mg of oxycodone x 1.5 oxycodone conversion factor = 90 MME).[127]

164. The CDC has determined that in “[h]aving a history of a prescription for an opioid pain medication increases the risk for overdose and opioid use disorder, highlighting the value of guidance on safer prescribing practices for clinicians. For example, a recent study of patients aged 15–64 years receiving opioids for chronic non-cancer pain and followed for up to 13 years revealed that one in 550 patients died from opioid-related overdose at a median of 2.6 years from their first opioid prescription, and one in 32 patients who escalated to opioid dosages >200 morphine milligram equivalents (MME) died from opioid-related overdose.”[128]

165. In addition, the CDC found that “opioid-related overdose risk is dose-dependent, with higher opioid dosages associated with increased overdose risk. [Four studies] evaluated similar MME/day dose ranges for association with overdose risk. In these four studies, compared with opioids prescribed at <20 MME/day, the odds of overdose among patients prescribed opioids for chronic non-malignant pain were between 1.3 and 1.9 for dosages of 20 to <50 MME/day, between 1.9 and 4.6 for dosages of 50 to <100 MME/day, and between 2.0 and 8.9 for dosages of ≥100 MME/day. Compared with dosages of 1-<20 MME/day, absolute risk difference approximation for 50-<100 MME/day was 0.15% for fatal overdose and 1.40% for any overdose, and for ≥100 MME/day was 0.25% for fatal overdose and 4.04% for any overdose.”[129]

---

[127] U.S. Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

[128] U.S. Centers for Disease Control, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. and Mort. Wkly Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

[129] *Id.*

166. "A recent study of Veterans Health Administration patients with chronic pain found that patients who died of overdoses related to opioids were prescribed higher opioid dosages (mean: 98 MME/day; median: 60 MME/day) than controls (mean: 48 MME/day, median: 25 MME/day). Finally, another recent study of overdose deaths among state residents with and without opioid prescriptions revealed that prescription opioid-related overdose mortality rates rose rapidly up to prescribed doses of 200 MME/day, after which the mortality rates continued to increase but grew more gradually."[130]

167. Furthermore, "epidemiologic studies suggest that concurrent use of benzodiazepines and opioids might put patients at greater risk for potentially fatal overdose. Three studies of fatal overdose deaths found evidence of concurrent benzodiazepine use in 31%–61% of decedents. In one of these studies, among decedents who received an opioid prescription, those whose deaths were related to opioids were more likely to have obtained opioids from multiple physicians and pharmacies than decedents whose deaths were not related to opioids."[131]

168. "[M]ost fatal overdoses could be identified retrospectively on the basis of two pieces of information, multiple prescribers and high total daily opioid dosage, both important risk factors for overdose that are available to prescribers in the PDMP."[132]

169. In those guidelines, the CDC recommends numerous strategies to reduce inappropriate opioid prescribing. Of particular relevance here, the CDC recommends that clinicians "should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine

---

[130] *Id.*

[131] *Id.*

[132] *Id.*

milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day."[133]

170. Dosages at or above 50 MME/day increase the risks of overdose by at least 2x over the risk at <20 MME/day. In a national sample of Veterans Health Administration (VHA) patients with chronic pain receiving opioids from 2004–2009, patients who died of opioid overdose were prescribed an average of 98 MME/day, while other patients were prescribed an average of 48 MME/day.[134]

**E. State Laws Governing Pharmacy Dispensing of Opioids**

171. In 2016, Massachusetts became the first state in the nation to pass a law limiting first time opioid prescriptions to seven days.[135] Since then, over half of all states have enacted laws that restrict the prescribing or dispensing of opioids for acute pain. Fifteen states have passed laws limiting opioid prescribing for acute pain in an opioid I patient to a seven-day supply. These states include Alaska, Hawaii, Colorado, Utah, Oklahoma, Louisiana, Missouri, Indiana, West Virginia, South Carolina, Pennsylvania, New York, Maine, Connecticut, and Massachusetts. In addition, Arizona, North Carolina, and New Jersey limit initial prescribing to five days.[136]

---

[133] U.S. Centers for Disease Control *Guidelines for Prescribing Opioids for Chronic Pain*, https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf.

[134] U.S. Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

[135] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018), http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.

[136] *Id.*

172. Following surgical procedures, Arizona allows for a 14-day supply and North Carolina a seven-day supply. Nevada is the only state with an initial 14-day prescription limit.[137] The strictest limits are in Tennessee, Kentucky, and Florida where initial prescribing is limited to three to four days.[138] Minnesota also has a four-day limit, but only for acute dental or ophthalmic pain.[139]

173. When addressing risks for drug overdose, studies support the need to monitor not only duration of initial therapy, but also total daily dosing for patients. This is particularly important for those patients who are receiving 50 to 99 daily MME or more per day.[140] Nevada and Arizona have limited prescribing doses of opioids to 90 MMEs per day.[141] Maine's limit is 100 MME per day and Rhode Island limits prescriptions to 50 MME per day.[142] Tennessee allows 60 MME per day if it is for 3 days or less. Otherwise the prescriptions are restricted to 50 MME daily.[143]

174. While the majority of states focuses on general opioid prescribing limits, Alaska, Connecticut, Indiana, Louisiana, Massachusetts, Nebraska, Pennsylvania and West Virginia also

---

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] Liang, Y., Turner, B.J., Assessing risk for drug overdose in a national cohort: Role for both daily and total opioid dose?, 16 J. Pain 318-25 (2014).

[141] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018), http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.

[142] *Id.*

[143] *Id.*

set requirements regarding opioid prescribing to minors, such as discussing their risk with the minor and parent or guardian.[144]

175. Rather than setting opioid limits by statute, a few state laws direct or authorize other entities to do so (*e.g.*, New Hampshire, Ohio, Oregon, Vermont, Virginia, Washington and Wisconsin). These entities may include the Department of Health, a designated state health official, or regulatory boards, such as the Board of Medicine, Nursing and/or Dentistry. Other states, such as Rhode Island and Utah, have prescribing limits by statute, and allow other entities to adopt prescribing policies.[145]

176. In addition, state laws may provide guidance or direction related to opioid prescribing. Maryland requires providers to prescribe the lowest effective dose of an opioid for a quantity that is not greater than that needed for the expected duration of pain.[146] Utah, in addition to its seven-day prescribing limit, authorizes commercial insurers, the state Medicaid program, workers' compensation insurers and public employee insurers to implement policies for prescribing certain controlled substances.[147] The policies must include evidence-based guidelines for prescribing opioids.

177. Consequently, the dispensing of controlled substances, when faced with warning signals and without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the pharmacist's

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

corresponding responsibility under the CSA[148] to ensure the legitimacy of the prescription[149] as well as pharmacy laws and regulations in a majority of the states.

178. Prescribing or dispensing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. Prescribing or dispensing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse or diversion.

### F. State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping

179. It is undeniable that illicit street opiates and prescription opioid medications can often be linked, with legitimate prescriptions initiating the addiction, often followed by the person seeking the chemical from illegal sources once the prescription has ended. Sometimes, however, they will resort to "doctor shopping" – *i.e.*, visiting multiple physicians in various ambulatory settings to obtain more of the same opioid medications if the patient's own health care provider is unwilling or unable to renew or refill the prescription. State prescription drug monitoring programs ("PDMPs") make a significant contribution to fighting the opioid epidemic by preventing and inhibiting doctor shopping.

180. PDMPs, or PMPs (prescription monitoring programs), as they are alternatively known, are utilized by 49 states, as well as Guam and the District of Columbia.[150] Although

[148] 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829).

[149] 21 C.F.R. § 1306.04 and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA) because the prescription was filled outside of the pharmacist's usual course of professional practice. *See also* 21 C.F.R. § 1306.06.

[150] Missouri is the only state not to have a statewide PDMP, though an Executive Order was issued in July 2017 directing its formulation. PDMP TTAC, *Status of Prescription Drug Monitoring Programs (PDMP)*, www.pdmpassist.org/pdf/PDMP_Program_Status_20170824.pdf.

requirements vary by state, they generally collect data from dispensers and report to authorized users of a state's database the number of prescriptions that have been filled for scheduled drugs for each recipient. Access to the information contained in such databases is typically limited to prescribers and state officials. State pharmacy boards and health departments operate most PDMPs, but a minority relies on professional licensing agencies, law enforcement, state substance abuse agencies, or in the case of Connecticut, the Department of Consumer Protection.

181. All PDMPs monitor at least Schedule II through IV Drugs, with some also monitoring Schedule V and "Drugs of Concern" as designated by an authorized state agency. Eighteen states and the District of Columbia maintain a voluntary system, with no mandatory enrollment required of either prescribers or dispensers.[151]

182. Still, the majority of state legislatures understand that the sum total is only as good as its parts. For example, recent Georgia and Mississippi legislation tied mandatory PMDP registration to the licensed practitioner's ability to secure or renew a DEA number.[152] Maine adopted mandatory registration of both prescribers and dispensers in light of "an unprecedented 272 overdose related fatalities."[153] In an effort to combat the opioid epidemic through ensuring reliable information is accessible to prescribers, Kentucky and North Carolina have each added penalties for failure of pharmacies to comply with reporting requirements, including sanctions and a monetary penalty per offense.[154]

---

[151] PDMP TTAC, *PDMP Mandatory Query by Prescribers and Dispensers*, www.pdmpassist.org/pdf/Mandatory_Query_20170824.pdf .

[152] H.B. 249 (Ga. 2017), www.legis.ga.gov/Legislation/20172018/170657.pdf [hereinafter H.B. 249]; H.B. 1032 (Miss. 2017), http://billstatus.ls.state.ms.us/2017/pdf/history/HB/HB1032.xml.

[153] Weekly Notices of State Rule-Making: Public Input for Proposed and Adopted Rules, https://www.maine.gov/sos/cec/rules/notices/2017/010417.html.

[154] H.B. 314 (Ky. 2017); H.B. 243 (N.C. 2017).

183. Statutory requirements for submitting and gathering prescription data are of little value if the statutes fail to specify how the data will be used. At least fifteen states enhanced their "query" requirements or how a prescriber or dispenser must check the state's PDMP system for patient information before prescribing a controlled substance. Checking the PDMP for opioid prescriptions from other sources is a recommended step in the CDC's "Checklist for prescribing opioids for chronic pain."[155] The Arkansas legislature directed licensing boards to adopt regulations requiring prescribers to query the PDMP when prescribing an opioid from Schedules II or III for each time a medication was prescribed to a patient.[156] Texas followed suit by naming specific categories of drugs that require a query prior to being prescribed ("opioids, benzodiazepines, barbiturates, or Carisoprodol").[157] Some states (*e.g.*, Georgia, Louisiana, Pennsylvania, and North Carolina) do not require query of all controlled substance prescriptions in certain situations. For example, the query requirement may not be applicable to providers of certain specialties if the prescription is for less than a three-day supply and contains less than 26 pills, the patient is terminally ill, or when the controlled substance is administered in a hospital. Georgia and South Carolina's legislatures added consequences for those practitioners who fail to query the PDMP, requiring them to be reported to their licensure boards for disciplinary action.[158]

---

[155] U.S. Centers for Disease Control, *Checklist for Prescribing Opioids for Chronic Pain*, https://www.cdc.gov/drugoverdose/pdf/pdo_checklist-a.pdf.

[156] S.B. 339, 91st Gen. Assembly, Reg. Sess. (Ark. 2017), http://www.arkleg.state.ar.us/assembly/2017/2017R/Bills/SB339.pdf.

[157] H.B. 2561 (Tex. 2017), https://legiscan.com/TX/text/HB2561/id/1625193/Texas2017-HB2561-Enrolled.html.

[158] *See* H.B. 3824 (S.C. 2017), https://www.scstatehouse.gov/sess122_2017-2018/bills/3824.htm; H.B. 249 (Georgia 2017). http://www.legis.ga.gov/Legislation/20172018/170657.pdf.

184. Mandatory use of PDMP programs has proven successful. In 2011 and 2012 respectively, Ohio and Kentucky mandated clinicians to review PDMP data and implemented pain clinic regulation. In these states, MME per capita decreased in 85 percent and 62 percent of counties, respectively, from 2010 to 2015.[159] New York, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, New York saw a 75 percent drop in patients' seeing multiple prescribers for the same drugs. Likewise, Tennessee, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, Tennessee saw a 36 percent drop in patients' seeing multiple prescribers for the same drugs.

185. Research has shed light on how a PDMP affects these Medicare patient behaviors.[160] A study compared Medicare opioid prescription data in 10 states that enacted use mandates from 2007-2013 with 17 other states implementing PDMPs without use mandates. In states with mandates, the percentage of Medicare enrollees who obtained prescriptions from five or more doctors was eight percent lower, compared with other states. The percentage of people getting opioids from five or more pharmacies was 15 percent lower.[161]

186. States with use mandates also saw a decline in the number of Medicare enrollees filling opioid prescriptions before the previous one had run out or obtaining more than a seven-month supply of opioids in a half-year period. These states also saw a 15 percent reduction in the number of Medicare enrollees with four or more new patient visits in six months. The authors

---

[159] U.S. Ctrs for Disease Control, *State Successes*, https://www.cdc.gov/drugoverdose/policy/successes.html.

[160] Nat'l Bureau Econ. Res. Working Paper Series, *The Effect of Prescription Drug Monitoring Programs on Opioid Utilization in Medicare* 23148 (2017), https://www.nber.org/papers/w23148.pdf.

[161] *Id.*

estimate that Medicare would save $348 million annually in unnecessary new patient visits if every state mandated use of its PDMP.[162]

**G. Unlawfulness of a Prescription Is Material to Government Programs' Payment**

187. Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances was and remains material to Government Programs' decision to pay CVS's claims for reimbursement of controlled substances. Compliance with these requirements is central to Government Program benefits and is a condition of these medications being covered by these programs.

188. Government Programs routinely deny payment for controlled substance medications, or seek to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medication is intended for purposes of addiction or recreational abuse. For example, DOJ has litigated or settled numerous actions where it was alleged that medical providers and/or pharmacies submitted claims for controlled substance medications to Government Program members that lacked a valid prescription, were not for a legitimate medical purpose and lacked a medically accepted indication, or that did not comply with State law.

189. The HHS Secretary's declaration that the opioid epidemic is a national public health emergency under federal law reflects the government's stance to deny payment for improperly dispensed controlled substances.

190. Accordingly, at all times material hereto, CVS knew or should have known that Government Programs would not pay for claims submitted if they knew that the controlled substance prescriptions at issue were invalid, did not comply with federal and/or state law, and/or

---

[162] *Id.*

lacked a legitimate medical purpose for a medically accepted indication. Alternatively, CVS knew or had reason to know that these Programs would not pay claims submitted to them if they knew that the controlled substance prescriptions were otherwise invalid.

## VI. BACKGROUND

191. At all times material hereto, CVS dispensed unreasonable dosages, quantities, and combinations of opioids throughout the U.S. (and in this District) from its own retail pharmacies despite being on notice of signs of diversion and abuse, in violation of its duties as a pharmacy under state pharmacy laws and regulations.

192. At all times material hereto, CVS has operated a vast network of over 9,960 pharmacies throughout the U.S. (and in this District), which have dispensed massive amounts of opioids, fueling the opioid epidemic throughout the U.S. In so doing, CVS violated its obligations under the CSA and state pharmacy laws and regulations as a pharmacy to prevent diversion and abuse.

### A. CVS Has Paid Repeated Fines Related to Dispensing of Inappropriate Opioid Prescriptions

193. CVS has paid fines totaling many millions of dollars as the result of a series of investigations by the DEA, the DOJ, and numerous state attorneys general investigations. It nonetheless has treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA and state pharmacy laws and regulations.

194. CVS has been investigated by the DEA for violations of the Controlled Substances Act on numerous occasions. Between 2013 and 2018 CVS agreed to pay over $55 million dollars in settlements to the DEA for alleged violations of the Controlled Substances Act.[163]

### 1. *DEA Investigation and Closing of CVS Pharmacies in Florida*

195. CVS's ongoing misconduct is highlighted in the February 2, 2012 DEA Order to Show Cause and Immediate Suspension of Registration. The Order outlined that from January 1, 2008, through December 31, 2011, CVS Store 219 purchased over 5.8 million dosage units of oxycodone from its distributors and CVS Store 5195 purchased over 2.2 million dosage units of oxycodone from its distributors.[164]

196. The off-the-charts ordering patterns of CVS retail stores should have alerted CVS to the existence of potential diversion or suspicious orders by not just these stores, but at its stores throughout the U.S. In 2010, for example, a Florida CVS pharmacy's 10-month history showed quantities more than 30 times the amount of oxycodone a typical pharmacy orders in one year.

197. One Florida CVS pharmacy set a daily limit of oxycodone 30mg prescriptions (based on the amount in stock) that the pharmacy would fill each day, to ensure that the "real pain patients" could get their prescriptions filled.

198. Customers, aware that prescriptions were first come, first served, would line up outside the store as early as 7:45 a.m. A CVS employee acting as "bouncer" included escorting off

---

[163] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 23 (Dkt. 2208-23).

[164] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 24 (Attachments C and D to Decl. Michele M. Leonhart, *Holiday CVS, L.L.C. d/b/a CVS/Pharmacy Nos. 5195/219* v. *Eric Holder, Jr. et al.*, No. 1:12-cv-191 (D.D.C. Feb. 24, 2012), Doc. Nos. 19-4 & 19-5) (Dkt. 2208-24).

the premises customers who were "hooked" on opioids in his job duties. All of these facts were documented in an enforcement action filed against CVS by the DEA.[165]

199. This conduct also resulted in the DEA revoking the registrations of these two CVS stores and CVS acknowledging that certain "retail stores did dispense certain controlled substances in a manner not fully consistent with their compliance obligations under the CSA and its implementing regulations."[166]

200. In 2015, CVS agreed to pay $22 million to resolve DEA allegations that retail stores in Sanford, Florida distributed controlled substances including opioids based on prescriptions that had not been issued for legitimate medical purposes.[167] Sanford has a population of 53,000, but the supply would support a population of 400,000.[168] According to the DEA, in 2010 a single CVS pharmacy in Sanford, Florida ordered 1.8 million oxycodone pills, an average of 137,994 pills a month.[169] Other pharmacy customers in Florida averaged 5,364 oxycodone pills a month. DEA

---

[165] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 22 (Decl. of Joseph Rannazzisi, ¶¶ 38-41, *Holiday CVS, L.L.C. d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al.*, No. 1:12-cv-191 (D.D.C. Feb. 24, 2012), Doc. No. 19-6) (Dkt. 2208-22).

[166] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 25 (Settlement Agreement) (Dkt. 2208-25).

[167] Press Release, U.S. Attorney's Office Middle Dist. of Fla., *United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances* (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution).

[168] Schoenberg, Tom, *Cardinal Health Blocked From Shipping Painkiller in Florida*, Bloomberg News (February 29, 2012), https://www.bloomberg.com/news/articles/2012-02-29/cardinal-health-blocked-from-shipping-painkiller-in-florida-1-.

[169] Leger, Donna, *DEA aims big in Cardinal Health painkiller case*, USA Today (February 27, 2012), https://usatoday30.usatoday.com/news/nation/story/2012-02-27/painkiller-abuse-DEA/53275844/1.

investigators serving a warrant to a CVS pharmacy in Sanford on October 18, 2011, noted that "approximately every third car that came through the drive-thru lane had prescriptions for oxycodone or hydrocodone."[170]

201. According to the DEA, a pharmacist at that location stated to investigators that "her customers often requested certain brands of oxycodone using street slang," an indicator that the drugs were being diverted and not used for legitimate pain management.[171] In response, CVS, in a statement issued February 17, 2012, said the Company was committed to working with the DEA and had taken "significant actions to ensure appropriate dispensing of painkillers in Florida."[172]

202. At the conclusion of the DEA audit in 2015, the DEA determined that CVS had violated the Controlled Substances Act. The DEA found that CVS "failed to design and maintain a system to detect and report suspicious orders for Schedule III-V Controlled Substances as required by Title 21 United States Code (USC) 821, Title 21 USI23(e)(1), and Title 21 Code of Federal Regulations (CFR) 1301.74(b) in violation of Title 21 USC 842(a)(5). . . ."[173] The DEA withheld issuing its final decision regarding its audit of CVS until it was sure that CVS had discontinued all distribution of hydrocodone combination products.[174]

### 2. *Other CVS Settlements with the DEA and State Attorneys General*

203. In 2010, CVS agreed to pay $77,600,000 to resolve a government investigation into unlawful sale of pseudoephedrine to criminals who made methamphetamine. At the time, the $75

---

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 25 (DEA Notice of Violation) (Dkt. 2208-20).

[174] *Id.*

million penalty was the largest civil penalty ever paid under the CSA. The DOJ press release said that between "September 2007 and November 2008, CVS supplied large amounts of pseudoephedrine to methamphetamine traffickers in Southern California, and the Company's illegal sales led directly to an increase in methamphetamine production in California." The United States Attorney remarked that "CVS knew it had a duty to prevent methamphetamine trafficking, but it failed to take steps to control the sale of a regulated drug used by methamphetamine cooks as an essential ingredient for their poisonous stew."[175]

204. On March 28, 2013, CVS Pharmacy, Inc. and Oklahoma CVS Pharmacy L.L.C. entered into a settlement with the United States and the DEA to resolve claims that CVS violated the CSA by : (1) filling prescriptions for certain prescribers whose DEA registration numbers were not current or valid; (2) entering and maintaining invalid DEA registration numbers on CVS dispensing records for certain prescriptions, which were at times provided to state prescription drug monitoring programs; and (3) entering and maintaining CVS dispensing records including prescription vial labels that identify a non-prescribing provider as the prescribing provider for certain prescriptions. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[176] In order to fill otherwise illegitimate prescriptions, CVS pharmacists substituted valid DEA registration numbers of non-prescribing practitioners in its records. The

---

[175] Press Release, U.S. Attorney's Office, Central District of California, CVS Admits Illegally Selling Pseudoephedrine to Criminals Who Made Methamphetamine, Agrees to Pay $77.6 Million to Resolve Government Investigation (October 14, 2010), https://www.justice.gov/archive/usao/cac/Pressroom/pr2010/148.html.

[176] Press Release, U.S. Attorney's Office, W. Dist. of Okla., *CVS to Pay $11 million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act* (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled).

DEA also found numerous instances of CVS pharmacists substituting false DEA registration numbers in company computer systems, on paper prescriptions, and even in the information that the pharmacy reported to the State of Oklahoma's Prescription Drug Monitoring Program.[177] CVS agreed to pay a fine of $11,000,000.[178]

205. On September 2, 2014, CVS entered into a settlement with the United States and the DEA to resolve claims against CVS for filling from April 1, 2012 to July 31, 2012, 153 prescriptions at eight different pharmacies, written by Dr. Pedro Garcia during a time period during which his Texas Department of Public Safety Controlled Substances registration was expired. CVS agreed to pay a $1,912,500 fine.[179]

206. On August 7, 2015, CVS entered into a settlement with the United States and the DEA to resolve claims that between March 3, 2010 and August, 2015 CVS stores in Rhode Island (1) filled prescriptions with invalid prescriber DEA number (knew or should have known in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.04); (2) filled prescriptions for Schedule III controlled substances written by psychiatric nurse practitioners who were not authorized under state law or by terms of their DEA registrations to issue such prescriptions in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.03(a)(1); and (3) entering, creating, or maintaining CVS dispensing records in which the DEA registration numbers of non-prescribing practitioners, were

---

[177] *See* Complaint, *U.S. v. CVS Pharmacies*, No. 5:11-cv-1124-HE, Dkt. No. 10, (W.D. Okla. Apr. 3, 2013).

[178] Press Release, U.S. Attorney's Office, W. Dist. of Okla., *CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act* (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settlecivil-penalty-claims-involving-violations-controlled).

[179] Patrick Danner, *H-E-B, CVS Fined Over Prescriptions*, San Antonio Express-News (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVS-fined-over-prescriptions-5736554.php.

substituted for the DEA registration numbers of prescribing practitioners in violation of 21 U.S.C. § 842(a)(5) and 21 C.F.R. § 1306.24.[180] CVS agreed to pay a $450,000 fine.

207. On December 18, 2015, CVS entered into a settlement with the United States and the DEA. The Settlement was the result of a DEA Inspection that was performed after CVS reported the theft of over 40,000 dosages of controlled substances by two former employees from a Texas CVS pharmacy. The inspection that was started due to theft demonstrated that CVS again failed its CSA obligations. CVS agreed to pay a fine of $345,000.00.

208. On December 31, 2015, the DEA issued a Letter of Admonition for violations in distributing controlled substances at the CVS Indiana distribution center. This DEA finding was the result of the 2013 investigation. The DEA found that CVS violated the Controlled Substances Act because of a: "[f]ailure to design and maintain a system to detect suspicious and report suspicious orders for Schedule III-V Controlled Substances as required by Title 21 United States Code (USC) 821, Title 21IC 823(e)(1), and Title 21 Code of Federal Regulations (CFR) 1301.74(b) in violation of Title 21 USC 842(a)(5) in that CVS failed to detect orders that should have been identified as suspicious for retail locations in Vincennes and Kokomo, Indiana.

209. On June 30, 2016, CVS agreed to pay $3.5 million to settle allegations that its pharmacists were filling fake prescriptions for addictive painkillers in its stores in Massachusetts and New Hampshire. The settlement resolved allegations that 50 of its stores violated the

[180] Press Release, U.S. Attorney's Office, Dist. of Rhode Island, *Drug Diversion Claims Against CVS Health Corp. Resolved With $450,000 Civil Settlement* (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

Controlled Substances Act by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[181]

210. On September 1, 2016, CVS settled with the Massachusetts Attorney General for $800,000 and agreed upon policy changes.[182] The settlement resolved allegations that CVS failed to provide its pharmacists in Massachusetts with a way to access the PMP prior to March 2013 and "that certain CVS pharmacies in Massachusetts failed to monitor drug use patterns or use sound professional judgment when dispensing controlled substances, particularly opioids." In addition to the monetary settlement, CVS agreed to implement certain changes in its pharmacy operations. These changes included updating its written policies and procedures before September 30, 2016 to include a section on MassHealth Controlled Substances Management Program (CSMP); updating its written policies and procedures before September 30, 2016 to include a mandate that CVS pharmacy staff in Massachusetts access the PMP website and review prescription history before dispensing certain drugs (including opioids); conducting an annual training on its changed policies under the settlement agreement; and annually auditing payments made in cash for MassHealth prescriptions and MassHealth members who filled prescriptions in pharmacies other than their primary pharmacy.[183]

211. On October 20, 2016, CVS entered into a settlement with the United States and the DEA to resolve claims from an investigation that the DEA had begun in January 2016. The DEA

---

[181] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacists Filled Fake Prescriptions* (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions).

[182] WBUR Newsroom, *In Settlement with Mass., CVS Agrees To Strengthen Policies Around Dispensing Opioids* (Sept. 1, 2016), https://www.wbur.org/commonhealth/2016/09/01/cvs-healey-opioids-settlement.

[183] Assurance of Discontinuance Pursuant to G.L. c. 93A, § 5.

investigated two CVS stores in Connecticut. Although the offending conduct occurred after CVS quit distributing controlled substances, it is indicative of the overall pattern and practice of CVS. The Settlement resolved claims that CVS failed to keep paper Schedule III-V prescriptions either in a separate prescription file or readily retrievable from other prescription records, which allegedly violated 21 U.S.C. 827(b)(2)(A) and (B) and 21 C.F.R. 1304.04(h)(4) and failed to keep Schedule III-V purchase invoices on at least 31 occasions in separate or in a readily retrievable manner from all other records of the pharmacy.[184]

212. On October 20, 2016, CVS entered into an $8 million dollar settlement with the United States and the DEA, "reflect[ing] the federal commitment to prevent the diversion of pharmaceutical drugs for illegal purposes."[185] According to the settlement agreement, CVS acknowledged that between 2008 and 2012 certain CVS pharmacy stores in Maryland dispensed controlled substances, including oxycodone, fentanyl and hydrocodone, in a manner not fully consistent with their compliance obligations under the CSA and related regulations."[186] This included "failing to comply with a pharmacist's liability to ensure the controlled substance prescriptions were issued for a legitimate medical purpose."[187]

213. On July 5, 2017, CVS entered into a settlement with the United States and the DEA. The investigation was begun by the DEA as a result of "an increase in the number of thefts and

---

[184] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy pays $600,000 to Settle Controlled Substances Act Allegations* (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlledsubstances-act-allegations.

[185] Press Release, U.S. Attorney's Office, District of Maryland, *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances* (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawful-distribution-controlled.

[186] *Id.*

[187] *Id.*

explained losses of Hydrocodone…" at numerous Eastern District of California CVS retail stores. The settlement resolved claims for the following misconduct: 1) failure to "provide effective controls and procedures to guard against theft and diversion of controlled substances and failure to notify DEA of certain thefts or significant losses of controlled substances within one business day of the discovery; 2) failure to maintain schedule 3-5 invoices; 3) failure to maintain Schedule 3-5 records separate from non-controlled substance records; 4) failure to conduct a Biennial Inventory on one specific day; 5) failure to maintain complete and accurate records; 6) failure to record the date of acquisition of controlled substances; 7) failure to record the amount received on Schedule 3-5 invoices; 8) failure to record the amount received and the date received on DEA 222 forms; 9) failure to maintain DEA-222 forms; and 10) failure to maintain DEA-222 forms separate from other records. CVS admitted that between April 30, 2011 and April 30, 2013 the retail stores violated their recordkeeping obligations, but it denied that the recordkeeping obligations caused any diversion. CVS agreed to pay a fine of $5,000,000.[188]

214. On June 15, 2018, CVS entered into a settlement with the United States and the DEA to resolve claims that between February, 2013 and January, 2015 CVS had failed to report to the DEA in writing, within one business day of discovery, thefts or significant losses of controlled substances, including hydrocodone, from certain Long Island CVS Pharmacy retail stores, as required by 21 C.F.R. §1301.76(b). CVS agreed to pay a $1,500,000 fine.[189]

---

[188] Press Release, U.S. Attorney's Office, Eastern Dist. Of California, *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act* (Jul. 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act).

[189] Press Release, U.S. Attorney's Office, Eastern District of New York, *CVS Pharmacy, Inc. to Pay $1.5 Million to Settle Civil Penalty Claims for Violations of The Controlled Substances Act* (June 28, 2018), https://www.justice.gov/usao-edny/pr/cvs-pharmacy-inc-pay-15-million-settle-civil-penalty-claims-violations-controlled.

215. On July 29, 2018, CVS entered into a settlement with the United States and the DEA, to resolve claims related to a November 2013 inspection of a CVS Pharmacy in Calera, Alabama. The Settlement resolved claims that CVS violated the CSA, as a result of violations of: (1) 21 C.FI 1305.13(c) (requirement to record the amount received and/or the date received on DEA 222 forms); (2) 21 C.F.R. 1304.21(a) (requirement to maintain complete and accurate records); and (3) 21 C.F.R. 1304.21(a) and/or (d) (requirement to document the number of packages received or the date package received on Schedule III through V purchase invoices). CVS agreed to pay a $1,000,000 fine.[190]

216. On April 1 2019, CVS entered into a settlement with the United States and the DEA related to several of its Rhode Island retail pharmacy locations filling thirty-nine prescriptions for Percocet, a Schedule II narcotic, that CVS pharmacists had reason to know were forged. CVS agreed to pay a fine of $535,000.[191]

217. These cases included evidence that CVS filled prescriptions that were clearly forged. For example, in 2016, CVS settled with the United States to resolve allegations stemming from two DEA investigations that revealed that over 50 CVS stores in Massachusetts and New Hampshire had filled patently forged prescriptions for addictive painkillers more than 500 times between 2011 and 2014.[192] The DEA estimated the street value of the diverted drugs to be over $1 million. One forger successfully filled 131 prescriptions for hydrocodone at eight CVS stores. One

---

[190] Press Release, U.S. Attorney's Office, Northern Dist. Of Alabama, *CVS Pharmacy Pays $1 Million Penalty in Settlement with DOJ for violations of the Controlled Substances Act* (Aug. 21, 2018), https://www.justice.gov/usao-ndal/pr/cvs-pharmacy-pays-1-million-penalty-settlement-doj-violations-controlled-substances-act).

[191] Press Release, U.S. Attorney's Office, District of Rhode Island, *CVS To Pay $535,000 for Filling Invalid Prescriptions* (Apr. 16, 2019), https://www.justice.gov/usao-ri/pr/cvs-pay-535000-filling-invalid-prescriptions.

[192] *Id.*

of those stores filled 29 prescriptions for the forger over the course of just six months, totaling 1,290 pills, or seven pills per day, an inordinate amount under the circumstances. At a different store, the same individual was able to fill 28 prescriptions that she forged for herself and three other alleged patients, even though the prescriptions were identical in every respect other than the patient name. These prescriptions were presented just days apart. Additionally, 107 of the forged prescriptions bore the Massachusetts address of a dentist who had closed her Massachusetts practice and moved to Maine, something that should have been easily discovered by CVS pharmacists by checking the DEA website or calling the phone number on the prescriptions.[193]

#### 3. *CVS Health Omnicare Unit Pays $15 Million Fine for Allowing Opioids to be Dispensed Without a Prescription*

218. On May 13, 2020, Omnicare, Inc., a subsidiary of CVS Health and a provider of pharmacy services to long-term care facilities, agreed to pay the United States a $15.3 million civil penalty to resolve allegations that it violated federal law by, among other things, allowing opioids and other controlled substances to be dispensed without a valid prescription. Omnicare operates in nursing homes and other long term care facilities. Opioids were delivered in so-called "emergency kits," and Omnicare allowed opioids and other controlled substances to be removed from these kits without a valid prescription from a physician, in violation of the Controlled Substances Act.[194]

#### 4. *CVS Ensured That Its Pharmacies Were Always Well-Stocked With Opioids*

219. CVS's reckless dispensing of opioids ensured that its pharmacies were always in need of copious amounts of the drugs. To ensure that CVS never had to turn away customers, no

---

[193] *Id.*

[194] Press Release, U.S. Attorney's Office, District of Colorado, Coalition of U.S. Attorneys Announce $15.3 Million Settlement With Omnicare, Inc., a CVS Health Company, For Improper Dispensing of Controlled Substances (May 13, 2020), https://www.justice.gov/usao-co/pr/coalition-us-attorneys-announce-153-million-settlement-omnicare-inc-cvs-health-company.

matter the legitimacy of the prescription, CVS made sure that its pharmacies always had an uninterrupted supply of opioids.

220. Until October 2014, CVS self-distributed hydrocodone combination products ("HCPs") to its pharmacies around the U.S., when those products were re-classified as Schedule II.

221. As its own distributor, CVS had even more insight into its pharmacy ordering patterns on a macro level. But instead of using that information to identify CVS pharmacies that may have been dispensing medically inappropriate prescriptions and putting a stop to it, CVS did not leverage its integrated supply chain to prevent inappropriate dispensing. It did the exact opposite: CVS removed nearly all controls over suspicious shipments, making it easier for its pharmacies to order massive amounts of controlled substances.

222. Even while the opioid epidemic has ravaged communities throughout America, CVS did not maintain and implement an effective suspicious order monitoring ("SOM") program throughout the entire period that it distributed controlled substances to its pharmacies. From 2006 until August 2010, CVS did not even have written DEA Standard Operating Procedures ("SOPs") to identify suspicious orders.[195] CVS's corporate representative recently testified in a deposition for the Multi-District Litigation pending in the Northern District of Ohio that as of December 1, 2007, he did not "believe that there was a [written] suspicious order monitoring policy put into place as of that date."[196]

223. Critically, CVS has had full access to every order its retail pharmacies placed to outside vendors, but did not believe it had any obligation to report these orders to the DEA or use

[195] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Mark Vernazza Dep. (Nov. 20, 2018), Dkt. # 1985-7 at 214:22-215:10.

[196] *Id*. at 221:5-13.

the information to stop dispensing of inappropriate prescriptions. Instead, if CVS identified "an order deviating from the normal size, frequency, and/or buying pattern and deemed to not be for legitimate purposes or are at risk of being diverted, [those orders] are not required to be reported to the DEA."[197]

224. CVS knew this view was inconsistent with the law. CVS's own internal assessment of the need to track orders of controlled substances from outside vendors concluded that it is required by "DEA's 'Know Your Customer' requirements."[198] CVS acknowledged a "[s]tore may order a little from both the OV [outside vendor] and [its own] DC [distribution center] to stay under radar" and, especially tellingly, "we may ship a potentially reportable suspicious order from our DC" if these orders are not tracked in real time.[199] CVS's internal investigation revealed that one of its pharmacies lost 68,000 hydrocodone pills and was still placing phone orders to outside vendors.[200]

225. With regard to opioid drugs it purchased from distributors, CVS failed to implement any monitoring and reporting system for the controlled substances it purchased from Cardinal or McKesson, its drug wholesalers. Not only did it fail to monitor, but on the off-chance it would discover a suspicious order shipped from Cardinal or McKesson, CVS expressly directed employees *not* to notify the DEA:

> [Controlled substance] orders that are placed to an Outside Vendor that we identify as an order deviating from the normal size, frequency, and/or buying pattern and

---

[197] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 25 (SOM presentation) (Dkt. 2208-9).

[198] *Id.*

[199] *Id.*

[200] *Id.*

deemed to not be for a legitimate purposes or are at risk of being diverted are not required to be reported to the DEA.[201]

226. Additionally, CVS, Cardinal, and McKesson understood that the distributors would require access to certain CVS information to do appropriate due diligence – yet the information was never provided by CVS. In an email from Paul Farley to Michael Mone, both Cardinal employees, Farley writes, "I spoke with Brian Whalen at CVS a couple of timeIhis morning.... They will not provide the doctor or patient information you requested unless it is requested by the DEA. He was quite adamant about this."[202]

227. Similarly, CVS had McKesson agree to a process such that, if a CVS pharmacy placed a potentially suspicious order, McKesson would not conduct any due diligence to investigate the order.[203]

228. In addition, CVS and Cardinal actually entered into a contract that contractually guaranteed CVS's unbridled right to establish and change its own threshold requirements for controlled substances ordered from Cardinal. The agreement expressly states that CVS has the discretion under the contract to set its own threshold quantities for controlled substances at any level CVS deems appropriate:

---

201 *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 26 (Craig Schiavo Dep. (Jan. 17, 2019), at 257:9-258:1) (Dkt. 2208-26).

202 *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 32 (Email) (Dkt. 2208-32).

203 *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, Exhibit 26 (Michael Oriente Dep. (July 19, 2018), 547:12-550:1) (Dkt. 2208-27).

> CVS requires the ability to adjust (up or down) the quantity of product our stores receive. This adjustment will be made on an NDC by NDC basis and will include a Threshold Quantity and an Adjustment Percentage. **Both the Threshold Quantity and Adjustment Percentage can be set to any value CVS deems appropriate**.[204]

229. CVS's actions with regard to its own distribution activities and its orders from other distributors like McKesson and Cardinal not only show its utter disregard for its obligations under the CSA, they show that it intentionally worked to make sure that its pharmacies were always able to meet the massive unchecked demand for controlled substances in its stores. This demand was largely driven by CVS's lax dispensing in its stores, which ignored evidence that the amounts being ordered and dispensed were not medically necessary and/or appropriate.

**B. Incentives and Pressure to Fill All Prescriptions as Quickly as Possible**

230. Even while the epidemic has raged throughout the nation, CVS's singular, overarching goal has been its profitability. Its retail pharmacies play an important role in ensuring CVS's overall profitability. In light of its goal, CVS pharmacies were required to fill prescriptions quickly to ensure large volumes of prescriptions were being filled. This focus on driving prescription volume above all else drives CVS's pharmacy strategy.

231. The Affordable Care Act greatly reduced the reimbursements pharmacies would get from Government Programs. By 2013, pharmacy reimbursements were down over 20 percent.[205]

232. Reduced pharmacy reimbursements could only be offset by filling a greater number of prescriptions. Unfortunately for the public and Government Programs, the timing was perfect

---

[204] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants CVS Indiana, L.L.C. and CVS Rx Services, Inc.'s Motion for Summary Judgment, p. 11 (Dkt. 2208) (emphasis added).

[205] Adam J. Fein, Ph.D., *Obamacare Will Squeeze Pharmacy Profits* (Oct. 8, 2013), https://www.drugchannels.net/2013/10/obamacare-will-squeeze-pharmacy-profits.html.

for CVS to capitalize on the opioid epidemic's explosion of pills to recoup the lost reimbursements by filling an even greater volume of prescriptions.

233. The increase in the number of prescriptions filled can be seen clearly. CVS went from filling approximately 890 million prescriptions in 2013 to filling approximately 1.34 *billion* prescriptions in 2018. Even accounting for the 20% increase in the number of CVS retail locations from 2013 to 2018 (7,600 retail locations in 2013 to 9,960 retail locations in 2018), the volume of prescriptions filled increased nearly 20% (50% increase in prescriptions filled v. 31% increase in the number of CVS retail locations).[206]

234. This was an extremely important development for CVS because as of 2017 its pharmacy division was responsible for more than 67% of its revenue.[207]

235. The performance Metrics and prescription quotas adopted by CVS for its retail stores have directly contributed to its failure to prevent medically unnecessary and/or inappropriate prescriptions from being filled.

236. As one pharmacist put it, "[t]hey measure everything, and then you get a score," including measures such as "how many prescriptions you got within the wait time." (Pharmacist No. 2)

237. Pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable CSA and state pharmacy laws and regulations.

238. If its pharmacists did not meet the CVS Metrics, they would receive negative performance reviews. For example, CVS policy required pharmacies to fill prescriptions for waiting customers within 15 minutes. That meant the pharmacy had 15 minutes from the time the

[206] CVS 2013 Annual Report; CVS 2018 Annual Report.

[207] Greg McFarlane, *How CVS Makes Its Money*, INVESTOPEDIA, July 23, 2019, https://www.investopedia.com/articles/markets/012315/how-cvs-makes-its-money.asp.

prescription was entered into the system until the prescription had to be complete and sold to the customer. CVS pharmacies were expected to fill at least 20% of its daily pharmacy customers' prescriptions as these "waiting" prescriptions. (Pharmacist No. 1)

239. The problem, however, was that the computer system did not allow for variables of any kind. If a pharmacist completed the process in 11 minutes, but the computer system estimated it would take 12 minutes, and the customer had decided to walk around the store and did not pick up their order for 15 minutes, then the pharmacist would get flagged for not meeting a specified deadline. "You got docked (on your) weekly score on that" if the customer did not pick up their order within the time allocated by the computer. (Pharmacist No. 2)

240. Furthermore, given the underlying Metrics, often pharmacists would need to fill a prescription much faster than the time officially allotted, in some instances every 30 seconds. "They count how often you fill prescriptions," Pharmacist No. 3 said. "[Y]ou can fill one prescription about every 20-to-30 seconds and that's considered slow."

241. One former CVS pharmacist described the approach to filling prescriptions at CVS as "flawed" and "creating opportunities for errors." She also believed that is exactly what happened: errors did occur at CVS. (Pharmacist No. 2)

242. Only if those sales goals and Metrics were met were pharmacists eligible for bonuses. Performance incentives were based mostly on prescription volume. CVS evaluated pharmacists on how volume grew. Other performance Metrics involved speed and volume, too, such as answering phone calls by the third ring and the number of "adherence calls" made, as well as the number of calls made to patients to remind them of their maintenance medications if they were late for refills. (Pharmacist No. 4)

243. CVS had no incentives to identify and report suspicious prescribers, patients, or prescriptions.

244. The only things measured and thus rewarded were the sales Metrics. This created a perverse culture where the number of prescriptions filled, their speed, and their corresponding reimbursements were the measures of success at CVS. The role of the pharmacist as a healthcare professional serving and counseling patients has been completely lost. Instead, at all times material hereto, CVS pharmacists have been pressured to be cogs in a prescription filling machine, rather than the last line of defense against dispensing medically unnecessary and/or inappropriate prescriptions and the corresponding fraudulent billing.

245. One pharmacist compared his experience to the *I Love Lucy* episode when Lucy worked at a factory packaging pieces of chocolate. The pieces rolled out too fast on the conveyor belt for her to handle, so she started to eat more and more of them in a doomed effort to keep up. He said, however, that the situation at CVS was far from funny. "They have you pushing so hard that you're just trying to get them out as fast as you can to survive." Pharmacist No. 5 said of filling prescriptions: "That's all you're doing."

246. The Metrics affected pharmacists' judgment when filling prescriptions. Pharmacist No. 6 explained that pharmacists would "bend to the pressure" and not refuse inappropriate prescriptions of existing customers because they fear they would take all of their other prescriptions to other competing pharmacies. This was particularly true because, if a patient has 15 prescriptions at the pharmacy and takes them all to another store, to meet the CVS Metrics the pharmacy must then find a way to make up that lost 15 prescriptions in its sales volume.

247. Pharmacist No. 21 described working as a pharmacist at CVS as a "lose-lose situation." She felt that as a pharmacist you faced an impossible choice between doing the proper due diligence on prescriptions which was slow and often caused customer complaints, which then led to bad performance reviews, or you just filled every prescription which was putting your

pharmacist license at risk. She felt that CVS created a situation where if you do your job correctly you get penalized.

248. Pharmacist No. 3 said that she was usually so busy at the time trying to do her own job, she did not have time to inquire and determine if her suspicions were warranted, or if she simply did not have the whole patient history and information in front of her. Sometimes Pharmacist No. 3 would encounter inappropriate prescriptions that had been previously filled at her store by another pharmacist. Other times, a customer would come in for a prescription that she found inappropriate and would refuse to fill, but the CVS computer system would show the prescription had been previously filled at the store.

249. Pharmacist No. 5 said it was possible that inappropriate controlled substance prescriptions were filled at his store because pharmacists, including himself, did not have time to fully vet the prescription and patient. While CVS paid lip service to supporting pharmacists who go through all the proper steps to vet a prescription, "[y]ou can't go through all the proper'steps if you don't have time," Pharmacist No. 5 said. He elaborated: "If you're supposed to inspect every single car in every ride at the fair, and you're the only per'on doing it, you're probably not going to get to all of them, and clearly you're going to miss some dangerous things happening."

250. The result is both deeply troubling and entirely predictable: massive quantities of opioids flowed out of CVS pharmacies and into communities throughout the country. The policies remained in place even as the epidemic raged unabated.

251. Despite the immense pressure on its pharmacists to fill as quickly as possible, CVS did not provide adequate staffing. The pressure to meet fill-rates and other Metrics at understaffed pharmacies created a stress-filled, chaotic environment where it was simply impossible to ensure only appropriate, medically necessary opioid prescriptions were filled.

252. For example, CVS management have continued to increase the goals even as it cut pharmacy staff. When Pharmacist No. 7 started at CVS 2007, he had four pharmacy technicians working with him and helping to fill 250 prescriptions a day. When he left in 2010, he had 2.5 technicians helping to fill 350 prescriptions a day.

253. At another CVS pharmacy in Mississippi, Pharmacist No. 5 recalled that when he started at the store in 2009, the store had 200 hours for pharmacist technicians per week. By 2019, the store was down to about 128 hours a week for pharmacy technician hours despite the prescription volume increasing to about 400 prescriptions per day. This was on top of the reduction in pharmacists as well. All too often, Pharmacist No. 5 was the only pharmacist on duty during a shift with no overlap of shifts for him and another pharmacist. This meant that he always had to handle every task that required a licensed pharmacist, in addition to all the other duties CVS required of its pharmacists (such as administering flu shots and calling 150 customers each weekend with refill reminders).

254. CVS's lean staffing and overwhelming pressure on its pharmacies to meet business goals meant that its pharmacists were not allowed to take breaks during their shifts. Pharmacist No. 5 said that said he often worked his entire 13-hour shift without breaks and has "gone all day without sitting or eating." On the days he did not eat, Pharmacist No. 5 said he was able to at least drink fluids to keep him going. But recently, he said, the Company has prohibited all eating and drinking in the pharmacy. "Without proper fluid and nutrition, it is impossible to do your job," he said.

255. The issue of understaffing was routinely raised by pharmacy staff. Little was done by CVS management to address the problem. (Pharmacist No. 1)

256. Pharmacist No. 6 said what CVS expected of them was impossible to accomplish with the staff that was provided by the Company. She often did not have time to eat lunch and barely had time to use the restroom during a shift. "It was crazy," she said.

257. Pharmacist No. 5 said that everyone at the pharmacy was complaining and "begging" for more help.

258. Another pharmacist remarked that "with the deep cuts in staff … it was impossible to do everything CVS wanted pharmacists to do." (Pharmacist No. 8)

259. In such a harried environment, it was less likely for pharmacists to notice red flags that might indicate prescriptions were invalid, and more likely that drug seeking customers would obtain inappropriate drugs. Pharmacist No. 1 believed the rushed environment caused by the fill-rate Metrics and lack of staff created an unsafe environment that put customers at risk.

260. Pharmacist No. 21 said that the CVS stores she worked at in Georgia around Atlanta and in Statesboro were "understaffed to the point where pharmacists were having to cut corners." While CVS may have paid lip service to compliance, the company simply did "not give pharmacists the tools to do it." At one store near Atlanta, the prescription numbers kept going up while the staffing went down. In a matter of a few months in 2013, the CVS went from 7 to 8 pharmacy staff members down to 4 to 5 despite increasing the number of prescriptions dispensed.

261. Pharmacist No. 21 said that this woefully inadequate staffing meant that pharmacists would "start to let certain things slide" and that it "became easier to ignore red flags" to catch up to meet the Metrics that CVS expected.

262. Drug-seeking customers often took advantage of the chaotic environment caused by CVS's understaffing of its pharmacies. The drug seeking customers were aware that a busy pharmacy meant the pharmacist was less likely to notice they are filling their prescriptions too

early or that the customer had just filled a similar prescription at another pharmacy across the street.

263. "People who are getting prescriptions they should not be getting – they are very sharp," Pharmacist No. 1 said. "They always came at our busiest hours and rush hour. They always take advantage of your stress level."

264. Filling invalid prescriptions "definitely happened" because CVS pharmacies were too busy to notice the red flags, Pharmacist No. 1 said. "I'm sure of it." Another pharmacist (Pharmacist No. 8) said that the understaffing situation at CVS pharmacies "absolutely" impacted the pharmacists' ability to catch inappropriate prescriptions for controlled substances.

265. Even when Pharmacist No. 1 brought up the issue that understaffing created an unsafe environment for customers, her manager dismissed her concerns, saying: "If you cannot work with the hours and help that we provide you, then this is not the right company for you."

266. In 2016, The Chicago Tribune investigated how pharmacies, including chain pharmacies, fostered environments where "safety laws are not being followed, computer alert systems designed to flag drug interactions either don't work or are ignored, and some pharmacies emphasize fast service over patient safety."[208] The Tribune tested 255 pharmacies to see how often pharmacies would dispense dangerous drug pairs without warning patients. As part of the investigation, the Tribune selected pairs of drugs that had serious interactions, including life-threating risks.

[208] Sam Roe, Ray Long, and Karisa King, *Pharmacies miss half of dangerous drug combinations*, CHICAGO TRIBUNE, Dec. 15, 2016, https://www.chicagotribune.com/investigations/ct-drug-interactions-pharmacy-met-20161214-story.html.

267. The results were stark: "Fifty-two percent of the pharmacies sold the medications without mentioning the potential interaction, striking evidence of an industrywide failure that places millions of consumers at risk."[209] As the Tribune detailed, "in test after test, other pharmacists dispensed dangerous drug pairs at a fast-food pace, with little attention paid to customers." Chain pharmacies "overall failed 49 percent of their tests."[210] CVS "had the highest failure rate of any chain in the Tribune tests, dispensing the medications with no warning 63 percent of the time."[211]

268. While acknowledging the difficulty in pinning the failure of the pharmacies to catch the dangerous interaction on a single cause, the Tribune concluded its interviews and studies pointed to the pharmacies' emphasis on speed as a possible explanation. Several pharmacies dispensed risky drug pairs in less than 15 minutes with no warning, and the Tribune found that "pharmacists frequently race through legally required drug safety reviews — or skip them altogether."[212] The Tribune also noted that the New Hampshire Board of Pharmacy sampled data from two retail chains in the state and found that "pharmacists spent an average of 80 seconds on safety checks for each prescription filled. . . . Of the pharmacists at stores that advertised quick service, 4 in 10 said they had made a medication error as a result of hurrying to fill a prescription within a set time."[213] And even though most pharmacies use computer software designed to flag drug interactions, experts say computer alerts are so common that pharmacists can get "alert fatigue" and ignore many of the warnings.

---

[209] *Id.*

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] *Id.*

269. The Tribune quotes several CVS pharmacists about the company's focus on its metrics.[214] The pharmacists "criticized the practice, saying it pressures them to focus more on corporate criteria than on drug interactions and other safety checks." As Chuck Zuraitis, head pharmacist at a CVS in the Chicago area said: "You get stressed, and it takes your mind away from the actual prescriptions." Another CVS pharmacist, Deepak Chande, lamented that "[e]very prescription is timed and this is the worst 'f the pharmacist's nightmares." If pharmacists fall behind, the backlog pops up in color on their computer screens, said Chande, also a former union steward. "It's an unreal pressure," he said. "Your mind is kind of frantically trying to obey it."

270. Furthermore, the Tribune examined CVS records that show that head pharmacists receive monthly what is ironically called a "WeCARE Scorecard" that tracks the percentage of prescriptions filled by the times promised. The pharmacies are ranked by district, by region and nationwide. Despite CVS saying that the color indicators on computer screens are meant to help pharmacists with "prioritizing their work," CVS recognized the problems the color coding caused and removed a red indicator for prescriptions that had gone beyond the promised pickup time because pharmacists "felt the color red denoted something negative or alarming." "We switched to an 'orange' indicator to inform a pharmacy team which prescriptions may not be ready 'efore a customer's expected arrival time," CVS wrote.

271. In response to the Tribune article, CVS said it would change numerous policies, an implicit acknowledgment of its dispensing problems.[215] Included in the promised changes were a change CVS's policies and computer system to require pharmacists to call the prescribing doctor or warn the patient when a serious drug interaction is flagged, changing to a system that will not

---

[214] *Id.*

[215] *Id.*

allow pharmacies to dispense certain flagged medications unless the pharmacists document in the computer that they have called the doctor or counseled the patient, and having CVS pharmacists undergo a comprehensive training and certification program on the new rule. Additionally, to reduce "alert fatigue," CVS said it will work with its database providers to streamline alerts to help ensure that pharmacists are presented with the most important warnings. Lastly, CVS said it will change its approach to the "offer to counsel" to require a more robust and explanatory communication.

272. The National Association of Boards of Pharmacy ("NABP") has also recognized that the use of performance metrics poses a dangerous problem in pharmacies. In 2013, it adopted Resolution 109-7-13 entitled "Metrics and Quotas in the Practice of Pharmacy."[216] The Resolution tasked NABP to "assist the state boards of pharmacy to regulate, restrict, or prohibit the use in pharmacies of performance metrics or quotas that are proven to cause distractions and unsafe environments for pharmacists and technicians." The resolution specifically cited a survey conducted by the Institute for Safe Medication Practices ("ISMP") of 673 pharmacists that revealed that 83% believed that distractions due to performance metrics or measured wait times contributed to dispensing errors and that 49% felt specific time measurements were a significant contributing factor.

273. In September 2014, the NABP announced that it had amended the *Model State Pharmacy Act and Model Rules of the National Association of Boards of Pharmacy* (*Model Act*). Reflecting Resolution 109-7-13, the Model Act now states that requiring pharmacy personnel to

[216] *Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13)*, National Association of Boards of Pharmacy, June 5, 2013, https://nabp.pharmacy/newsroom/news/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/.

meet production and/or performance metrics and/or quotas that negatively impact patient safety may be grounds for discipline.[217]

274. Building on the issues discussed in the Chicago Tribune article, The New York Times recently published two articles highlighting the various issues at chain pharmacies such as CVS Health. The first article, entitled *How Chaos at Chain Pharmacies is Putting Patients at Risk*, is an in-depth look at the crushing demands pharmacists face and the resulting consequences for public safety.[218] Similar to the allegations in this Second Amended Complaint, the article provides numerous examples of pharmacists in dozens of states who have accused CVS Health and other major drugstore chains of putting the public at risk of medication errors because of understaffed and chaotic workplaces.

275. The article chronicles letters to state pharmacy boards and interviews in which pharmacists said they struggled to keep up with an increasing number of tasks—filling prescriptions, giving flu shots, answering phones and tending the drive-through, to name a few—"all the while racing to meet Corporate performance metrics that [the pharmacists] characterized as unreasonable and unsafe in an industry squeezed to do more with less."[219]

276. Multiple surveys of pharmacists in states like Missouri, Maryland, and Tennessee revealed the widespread nature of the problems. For example, a survey of over 1,000 Missouri pharmacists exposed that a majority of pharmacists (60%) "said they 'agree' or 'strongly agree'

[217] *Newsletter*, National Association of Boards of Pharmacy, September 2014, Vol. 48, No. 8, https://nabp.pharmacy/wp-content/uploads/2016/07/Final-September-2014-NABP-Newsletter.pdf; *Model Act/Rules*, National Association of Boards of Pharmacy, https://nabp.pharmacy/publications-reports/resource-documents/model-pharmacy-act-rules/.

[218] Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, THE NEW YORK TIMES (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

[219] *Id*.

that they 'feel pressured or intimidated to meet standards or metrics that may interfere with safe patient care.' Of those surveyed in Missouri, '[a]bout 60 percent of respondents worked for retail chains, as opposed to hospitals or independent pharmacies.'"[220]

277. In one example, during his "13-hour shift with no breaks for lunch or dinner," CVS pharmacist Wesley Hickman from Leland, North Carolina, filled "552 prescriptions — about one every minute and 25 seconds — while counseling patients, giving shots, making calls and staffing the drive-through."[221]

278. In an anonymous April 2020 letter to the Texas State Board of Pharmacy, a CVS pharmacist wrote: "I am a danger to the public working for CVS."[222]

279. The article also chronicles how the large chain pharmacies stifle dissent among pharmacists, who often feel intimidated and powerless as cogs in the chain pharmacy prescription machine. At CVS, a "form for staff members to report errors asks whether the patient is a 'media threat,' according to a photo provided to The Times. CVS said in a statement it would not provide details on what it called its 'escalation process.'"[223]

280. The second New York Times article, *At Walgreens, Complaints of Medication Errors Go Missing*,[224] focuses on Walgreens but also details many problems at CVS as well. The article explains how "unreasonable" expectations on pharmacists has "led them to make mistakes while filling prescriptions and to ignore some safety procedures."

---

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] Gabler, Ellen, *At Walgreens, Complaints of Medication Errors Go Missing*, THE NEW YORK TIMES (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/health/pharmacies-prescription-errors.html.

281. In one egregious example, the Oklahoma State Board of Pharmacy cited a CVS is Owasso, Oklahoma, detailing the crushing demands on the pharmacists who had little staffing support. "The board wrote in the complaint that it had received 'several letters of concern from various CVS employees regarding the lack of adequate staffing' at the company's pharmacies." Additionally, the Oklahoma investigator, "who was at the Owasso CVS for three and a half hours, noted that the phone rang 'almost constantly, with rarely a five minute break in between calls and several instances of more than one line ringing at a time," and that there was "almost constant foot traffic" in the store and a routinely packed drive-through. The complaint also stated "that on the day of the error involving the anticonvulsant medication, the pharmacist on duty was responsible for checking 194 prescriptions in a six-hour shift — about one every two minutes."[225]

282. These Times articles bolster the allegations made in this Second Amended Complaint that CVS merely paid lip service to improving compliance with its dispensing obligations. In fact, CVS's management of its pharmacies ensured that profit remained paramount – not legal dispensing or patient safety.

**C. CVS Had No Rigorous Dispensing Protocols or Policies to Assist Its Pharmacists to Identify Inappropriate Prescriptions**

283. CVS's singular focus on filling all prescriptions as quickly as possible was fueled by a lack of rigorous dispensing protocols or policies for filling controlled substances. Such policies would not have only resulted in denying more inappropriate prescriptions, but also would have slowed down the speed at which prescriptions were being filled. Instead, CVS has insisted its dispensing practices operate as a production line which rewarded speed and penalized attention to patient care.

[225] *Id.*

284. CVS's procedure for filling prescriptions, including opioids, has been limited to a minimal check of the basics of the prescription – patient name, date of birth, check the physician's name, check the medication, verify the signature, verify the dosage, confirm the patient instructions, check the photo of the drug to see if it is the right one, approve it, then make it ready to dispense.

285. Critically, CVS pharmacies have not had robust policies or protocols about how to address inappropriate opioid prescriptions. CVS has had little in the way of checklists, guidance, training, or resources for pharmacists or technicians to consult about whether a prescription was medically appropriate and should or should not be filled. Even to the extent that CVS had policies and procedures, CVS rarely emphasized or enforced those policies.

286. Even if a pharmacist or technician did identify a prescription that was not medically appropriate, there has been a total lack of policies and procedures for the pharmacist to follow after identification. CVS has had no protocols about how to flag prescribers who consistently were writing medically unnecessary and/or inappropriate prescriptions, no protocols about how to flag prescription shopping by customers, and no protocols how they were to communicate information about trends they were seeing.

287. As one of the largest corporations in the United States, CVS could have easily invested some of its vast resources into developing uniform protocols that would have given concrete directions to its pharmacy staff. But CVS did not even use any of the available public guidance to incorporate into its own practices. Instead, it emphasized its profitability Metrics, leaving it up to its beleaguered pharmacy staff to refuse prescriptions at their own risk.

288. For example, until very recently there has been no guidance from CVS about when pharmacists needed to question certain medically inappropriate combinations (such as the "Holy Trinity" combination of opioids and muscle relaxers), no guidance about when pharmacists needed

to refuse opioids being prescribed for inappropriately long periods of time, and no guidance about identifying the number of pharmacies and/or doctors a patient was seeing.

289. CVS pharmacies essentially left the pharmacists and technicians on their own to evaluate prescriptions. Yet, the pharmacists' individual vigilance varied widely, depending on their own training and education, whether they had enough time, and the overall thought process of each pharmacist. Essentially, pharmacists had their own standards and practices for when and why they would refuse a prescription. For example, some pharmacists would fill prescriptions for patients who lived more than three miles away. Others would not fill prescriptions for patients who lived more than five miles away. (Pharmacist No. 1)

290. This has led to endemic inconsistency, with many simply choosing to fill as many prescriptions as possible. This was especially true given the pressures and incentives built into the structure of CVS pharmacies' operations not to question prescriptions and to fill as many as possible, as quickly as possible. Pharmacist No. 7 felt that the pressure (and bonuses) CVS put on pharmacists to fill more prescriptions as fast as possible disincentivized them to catch inappropriate prescriptions.

291. The problem was particularly acute for hydrocodone prescriptions before 2014. Before that time, hydrocodone was a CIII, not a CII as it is now. That has meant that CVS pharmacies paid even less attention to what any reasonable pharmacist knew was a potent and powerful opioid.

292. This lack of a meaningful compliance function to check the tide of inappropriate and/or medically unnecessary opioid prescriptions has meant that CVS pharmacy staff varied in the kind of diligence they practiced when it came to assessing suspicious customers and inappropriate prescriptions.

293. The lax dispensing habits have meant that there have been inappropriate and/or medically unnecessary prescriptions which were routinely filled at CVS pharmacies, including hundreds of thousands of opioid prescriptions paid for by Government Programs.

294. Even though many well intentioned and reasonably diligent pharmacists who, had they been given the tools and time, might have able to recognize the steadily growing influx of inappropriate opioid prescriptions, CVS continued to provide (and then enforce) no pharmacy policies to keep the opioid problem from going off the rails.

295. Of note, at no time has CVS required its pharmacists to check state PDMP databases despite the evidence that using this data reduces overdose deaths, doctor shopping, and inappropriate or medically unnecessary reimbursements. This has led in many of its stores to pharmacists simply never checking state PDMP databases at all.

296. In fact, CVS did as little as possible to encourage PDMP use. Until very recently, the PDMP system at CVS pharmacies ran on a separate computer system than pharmacists used to fill the prescription, making it very difficult for pharmacists to access this information.

297. This limited PDMP access has been the subject of at least one enforcement action against the CVS. CVS settled with the Commonwealth of Massachusetts for $800,000 and agreed to update its policies and access to the State's PDMP.[226] In the settlement agreement, CVS admitted that it "did not provide its pharmacists with sufficient internet connectivity to access the PMP website from its Massachusetts pharmacies until March of 2013." Furthermore, CVS agreed to update its policies by 2016 to mandate that its "Massachusetts pharmacy staff access the PMP

[226] WBUR Newsroom, *In Settlement with Mass., CVS Agrees To Strengthen Policies Around Dispensing Opioids* (Sept. 1, 2016), https://www.wbur.org/commonhealth/2016/09/01/cvs-healey-opioids-settlement.

website and review the prescription holder's prescription history before dispensing certain prescribed drugs as agreed to by the Parties."[227]

298. Likewise, CVS made no effort to track or otherwise encourage (let alone require) the use of the PDMP throughout the U.S. On the contrary, the fact that PDMP checking was so onerous discouraged pharmacists from checking it at the expense of filling prescriptions quickly. Having such a requirement would have greatly increased the time it took to fill prescriptions and would have identified many more prescriptions that were medically inappropriate. Unfortunately, CVS chose its bottom line over public health.

299. One pharmacist, Pharmacist No. 5, said that there was simply no time to check the PDMP database given the time constraints and pressure at CVS. This was true even though the state law in Mississippi requires pharmacists to check the state database that tracks patients' controlled-substance prescriptions if a patient comes into the pharmacy with a new controlled substance prescription.

300. Pharmacist No. 5 said checking the state PDMP database can take 15 to 20 minutes alone, meaning that he would have to take that length of time away from the never-ending conveyor belt of prescriptions that also demanded his attention. Likening his job to an assembly line, he explained: "[Y]ou have all these prescriptions coming at you. If you stop and do all these phone calls, you get further and further behind."

301. This meant that he was unable to check the database as the state law required. Pharmacist No. 5 said: "You can't get to it. You can't do what you're supposed to because you don't have time." He further elaborated: "From the time constraints, if you did do this (stop to vet

[227] Assurance of Discontinuance Pursuant to G.L. c. 93A, § 5.

a prescription), that means you'd be so far behind it would be twice as stressful," he said. "We are legally required to do certain things, and you're not able to do it because there is no time."

### D. CVS Rarely Blocked Suspicious Prescribers

302. Despite filling large quantities of controlled substances, including opioids, and even though CVS publicly acknowledged the opioid crisis raging nationally, CVS did little to identify, investigate, and block suspicious prescriber's' prescriptions from being filled at CVS pharmacies.

#### 1. *CVS 2013 Data Analytics Project*

303. In 2013, CVS announced that it was undertaking an analysis of opioid prescribers using its own data to identify inappropriate prescribing of high-risk opioids (hereinafter the "Data Analytics Project"). At the time, CVS's press release announced with great fanfare that it was proactively tackling the epidemic using its own data:

> CVS is tapping its extensive database to identify and halt inappropriate prescribing of high risk drugs such as opioid painkillers. By evaluating data on prescriptions filled at CVS/pharmacy, CVS Caremark identified providers with extreme patterns of prescribing such high-risk drugs and suspended controlled substance dispensing for those who could not justify their prescribing habits.[228]

The press release touted the "the role pharmacies can play in helping to curb the national epidemic of prescription drug abuse."[229]

304. CVS outlined its 2013 Data Analytics Project in an article in the New England Journal of Medicine. Written by two senior CVS executives, Mitch Betses, R.Ph., Senior Vice President, Pharmacy Services of CVS/Pharmacy, and Troyen Brennan, M.D., M.P.H, Executive

---

[228] Press Release, *CVS Caremark Uses Data to Combat National Prescription Drug Abuse Epidemic; Program Details Published in New England Journal of Medicine Online* (Aug. 22, 2013), https://cvshealth.com/newsroom/press-releases/cvs-caremark-uses-data-combat-national-prescription-drug-abuse-epidemic.

[229] *Id.*

Vice President and Chief Medical Officer of CVS Caremark, the article ("Abusive Prescribing of Controlled Substances — A Pharmacy View") was published on September 12, 2013.[230]

305. The article recognizes the scourge of opioid abuse in the United States and attributes the rise of the opioid epidemic in part to inappropriate prescribing. The article also recognizes that the "worst form" of inappropriate prescribing occurs in "pill mills, wherein fully licensed physicians with valid Drug Enforcement Administration (DEA) numbers write prescriptions that provide large quantities of powerful analgesics to individual patients."[231]

306. In an interview accompanying the NEJM article, EVP Brennan admitted that efforts to combat pill mills like the outlawing of prescribers being able to dispense out of their own practices in Florida "probably didn't do much other than kind of push the problem downstream to the retail pharmacies. So those physicians were still writing prescriptions and patients are getting them filled. It's just that they can no longer fill them in the doctors' offices and had to come to the retail pharmacies."[232]

307. The NEJM article recognized that the pharmacies "have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular. Under the

---

[230] Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H, *Abusive Prescribing of Controlled Substances—A Pharmacy View*, 369 NEW ENG. J. MED. 2013, 989-991 (Sept. 12, 2013), https://www.nejm.org/doi/10.1056/NEJMp1308222 (hereinafter, "NEJM Article").

[231] *Id*.

[232] Interview by Stephen Morrissey with Dr. Troyen Brennan, Executive Vice President and Chief Medical Officer of CVS Caremark (2013), https://www.nejm.org/action/showMediaPlayer?doi=10.1056%2FNEJMdo002228&aid=10.1056%2FNEJMp1308222&area=. [hereinafter "Brennan NEJM Interview"].

Controlled Substances Act, pharmacists must evaluate patients to ensure the appropriateness of any controlled-substance prescription."[233]

308. Critically, the article concluded that chain pharmacies in particular are in a unique position to combat inappropriate prescribing and dispensing. As CVS's senior executives explained:

> ***Chain pharmacies, however, have the advantage of aggregated information on all prescriptions filled at the chain.*** … Our program was intended to identify and take action against physicians and other prescribers who exhibited extreme patterns of use of "high-risk drugs" relative to other prescribers.[234]

309. In the interview accompanying the NEJM article, Brennan again acknowledged the role pharmacies play and how chain pharmacies in particular are uniquely suited to support their pharmacists identify inappropriate prescriptions using data. Brennan made clear CVS's obligations:

> ***And we [CVS] have a role, both a historical role and a current role in terms of attempting to address inappropriate prescribing.*** The federal and state laws require the pharmacist to make a determination as to whether or not a prescription is appropriate. And if not, then to not fill that prescription.… So we were looking at that and thinking well, you know, we have a lot of information on our prescribers. ***There's a million prescribers in our database. And we could characterize prescribers in a lot of different ways and perhaps provide information that would eventually be helpful and seemed like there was no reason not to use that kind of structural data***.[235]

310. The NEJM article explained the methodology used CVS data to identify suspicious prescribers of opioids. CVS used data from submitted prescriptions from March 2010 through January 2012 for the "high-risk" drugs hydrocodone, oxycodone, alprazolam, methadone, and

---

[233] NEJM Article.

[234] *Id*. (emphasis added).

[235] Brennan NEJM Interview (emphasis added).

Carisoprodol. Then, prescribers were compared with others in the same geographic region who had the same listed specialty.[236]

311. CVS then reviewed certain "parameters" it had developed to identify outliers. CVS explained its methodology in more detail:

> The first parameters were the volume of prescriptions for high-risk drugs and the proportion ’f the prescriber's prescriptions that were for such drugs, as compared with the volume and proportion for others in the same specialty and region; the thresholds for suspicion were set at the 98th percentile for volume and the 95th percentile for proportion. Next, prescribers were evaluated with regard to the number of their patients who paid cash for high-risk–drug prescriptions and the percentage of their patients receiving high-risk drugs who were 18 to 35 years of age. In both cases, the thresholds for suspicion were set at the 90th percentile among clinicians in the same region and specialty. Finally, we compared the prescriptions for noncontrolled substances with the prescriptions for controlled substances within the prescriber’s practice on the same parameters. To minimize the possibility that we would suspend dispensing privileges for clinicians who were appropriately treating patients, we attempted to interview physicians whom we’d identified as outliers to ascertain the nature of their practice and their use of controlled substances.[237]

312. Even with these extremely conservative parameters, CVS was easily able to identify 42 "outliers" from its own database of over 1 million prescribers. Indeed, Brennan acknowledged that the parameters were intentionally set to capture only a small subset of the outlier doctors. CVS intentionally "set very high parameters on very high percentages on the parameters we looked at…. [and] basically pushed ourselves way far to the left of the spectrum and identified people who were prescribing, you know, 20, 30, 40, 50 times as much opioid medication as the average practitioner did."[238]

---

[236] NEJM Article.

[237] *Id.*

[238] Brennan NEJM Interview.

313. Even then, CVS knew this was only the tip of the iceberg of the problem. Brennan admitted that the 42 outliers from a set of 1 million was a "low rate and doesn't really size the problem nationally." Instead, the CVS data analytics project was only aimed at a "very small group at the outset" and was a "proof of concept."[239]

314. The results should have raised alarm bells at CVS that its pharmacies were filling prescriptions for easy-to-identify pill mill prescribers. Even the small number of outlier prescribers accounted for massive (and alarming) amounts of prescriptions:

**Prescribing Habits of Outlier Prescribers.**

| Specialty or Type of Clinician | Average Monthly Doses of High-Risk Drugs Prescribed | | No. of Outlier Prescribers |
|---|---|---|---|
| | 42 Outlier Prescribers | Nonoutlier Prescribers | |
| Internal medicine | 11,314 | 422 | 12 |
| Physical medicine | 5,599 | 916 | 1 |
| Family practice | 12,903 | 575 | 8 |
| General practice | 24,502 | 462 | 2 |
| Psychiatry | 18,757 | 213 | 3 |
| Nurse practitioner | 10,715 | 160 | 2 |
| Obstetrics and gynecology | 11,096 | 110 | 3 |
| Physician assistant | 5,211 | 116 | 1 |
| Pain medicine | 8,811 | 3813 | 1 |
| Sports medicine | 7,025 | 387 | 1 |
| Pediatrics | 5,524 | 31 | 2 |
| Anesthesiology | 8,128 | 1749 | 1 |
| Geriatric medicine | 15,544 | 493 | 1 |
| Endocrinology | 6,142 | 116 | 1 |
| Emergency medicine | 7,935 | 203 | 2 |
| Preventive medicine | 44,397 | 662 | 1 |

315. Once identified, CVS conducted an investigation through written questionnaires and follow up to eliminate "false positives."[240] Out of the 42 outlier health care professionals, 36

[239] *Id.*

[240] NEJM Article.

were determined to be prescribing inappropriately. CVS stopped filling prescription for those 36 prescribers.[241]

316. The CVS senior executives admitted there was far more that it could do with its data, explaining that "[a]nalyses of aggregated data like ours can also target patterns of abuse by both prescribers and patients. Given the growing use of controlled substances and the resulting illness and deaths, *more innovative use of transparent data is only prudent*."[242]

317. They also signaled that they hoped to expand the use of CVS data analytics, stating they hoped that the proof of concept would be expanded. In Brennan's own words: "But the whole idea here [with the Data Analytics Project] was to see how well this worked and go after the people who looked like they were the most egregious and then use that as a sort of proof of concept that would then provide the authorities and perhaps the retail pharmacies kind of working together with an approach that would be sort of objectively based on empirical information as a way to find prescribers who might be prescribing inappropriately."[243]

318. CVS thus clearly recognized what it could do to address the problem of its pharmacies filling inappropriate prescriptions from at least as early as 2013. It also publicly admitted that it could, and should, leverage its unique position to combat inappropriate dispensing through data analytics. Yet despite those admissions, in practice, CVS did little to curb its dispensing of pill mill prescriptions.

319. Even while the epidemic ravaged communities throughout the nation, its Data Analytics Project resulted in CVS only blocking 36 prescribers out of its database of over 1 million

---

[241] *Id.*

[242] *Id.* (emphasis added).

[243] Brennan NEJM Interview.

prescribers. These results only scratched the surface of the problem. For example, the NEJM article recognizes that in Florida alone, the DEA had closed 254 "pain clinics" as of 2013. Furthermore, as shown herein, there have been many hundreds more health care professionals throughout the U.S. who have been criminally charged and many of them then convicted for their inappropriate prescribing of opioid drugs. Not only has it routinely ignored this ongoing criminal conduct, CVS has ignored the publicly available information regarding of healthcare professionals who would lose their licenses for over-prescribing opioid drugs. For example, the Pittsburgh Post-Gazette reported that between 2011 and 2015 for Pennsylvania, Ohio, West Virginia, Maryland, Virginia, Kentucky, and Tennessee (the bulk of Appalachia), there were 608 doctors disciplined for overprescribing narcotics.[244]

320. Even though its limited Data Analytics Project had proven it could use its own data to identify outlier prescribers and inappropriate prescriptions, there is no evidence CVS continued to use its easily accessible data to identify suspect doctors and medically unnecessary prescriptions. Nor is there evidence that CVS continued to analyze its own dispensing data to update its 2013 list of outliers, much less perform additional due diligence on the outliers identified.

321. Not only that, the vast majority of CVS pharmacists have been completely in the dark about the existence of the Data Analytics Project. CVS pharmacists were provided only limited information (if at all) from the Data Analytics Project to help them identity potentially fraudulent or medically inappropriate prescriptions.

---

[244] *See* Rich Lord, J. Bardy McCollough, Adam Smeltz, *Special Report: Overdosed – How doctors wrote the script for an epidemic*, Pittsburgh Post-Gazette (May 22, 2016), https://newsinteractive.post-gazette.com/overdosed/.

322. For example, despite starting to work at CVS in 2013, Pharmacist No. 21 had never heard anything about the Data Analytics Project nor did she recall seeing a list of blocked doctors.

323. Instead, limited numbers of CVS pharmacists only saw hard-copy lists of small numbers of blocked doctors. Even then, the exact purpose of the list was unclear.

324. Pharmacist No. 6 said that she did not know with certainty if the Company provided the list as a directive that required pharmacists to deny all prescriptions from the doctors on the list. Pharmacist No. 9 recalled a hard copy list of doctors who had been identified for suspicious prescriber practices posted in her pharmacy sometime around 2013-2014. That list, however, has not been updated even to this day.

325. Since 2013, CVS has not provided a current, up-to-date list of doctors flagged from the data on doctors' prescriptions on which CVS pharmacists needed to perform additional due diligence. Even if CVS did flag or block additional prescribers based on its own data, pharmacists had no ability to reference the database of those prescribers. Such a list would have helped CVS pharmacists be on the lookout for potentially invalid prescriptions. Essentially, CVS provided no information to its pharmacists about how the data analytics review worked.

326. Moreover, even after blocking dispensing for 36 prescribers in 2013, there is no indication that CVS ever reported the dispensed prescriptions of these 36 identified doctors as fraudulently billed to Government Programs. Brennan admitted as much in the 2013 interview, stating that CVS has "not been in touch with either state medical boards or the DEA about the people we suspended. . . . [T]he DEA or the state medical boards can ask for that information, and we would have to provide it. So we're on sort of a wait and see to see if the authorities are interested in it."[245]

[245] Brennan NEJM Interview.

327. The 2013 Data Analytics Project was conducted against the backdrop of the Florida DEA investigations into CVS's Sanford pharmacies and distribution center. The timing of the Project, coupled with self-serving press releases it issued announcing the results,[246] demonstrate that its efforts were nothing but a public relations campaign by CVS aimed at deflecting further DEA scrutiny. Indeed, after the flurry of activity around the Florida DEA investigations died down, CVS appears to have abandoned of the Project altogether.

**2. *Pharmacy Practices Team***

328. Only recently did CVS create what it calls the "Pharmacy Practices Team," which is purportedly tasked with identifying and investigating suspicious prescribers. Yet, this team was largely ineffective.

329. CVS has made no attempt to educate its pharmacists about the Pharmacy Practices Team or even notify them of its existence. Thus, Relator had no idea the team existed before she was contacted by the Team about a particular Crossville, Tennessee family practitioner, Dr. Maria Stubbs. Before that point, CVS had provided no indication the Team existed, much less how it operated or how to report suspicious doctors for investigation. Even during the investigation of Dr. Stubbs, there was no communication to the pharmacists in Relators' store or other CVS stores about additional due diligence that should be done on the prescribers under investigation by the Pharmacy Practices Team. The CVS pharmacies could still fill for prescribers even if they were being looked at by the Team.

[246] Press Release, *CVS Caremark Uses Data to Combat National Prescription Drug Abuse Epidemic; Program Details Published in New England Journal of Medicine Online* (Aug. 22, 2013), https://cvshealth.com/newsroom/press-releases/cvs-caremark-uses-data-combat-national-prescription-drug-abuse-epidemic.

330. After Relator informed the Pharmacy Practices Team that Dr. Stubbs was regularly prescribing what appeared to be dangerous combinations of benzodiazepines and opioids, she never heard anything further and CVS pharmacies were still able to, and did, continue filling prescriptions for Dr. Stubbs' patients.

331. Given that the existence of the Pharmacy Practices Team was unknown to CVS pharmacists, it is not surprising that CVS has provided no training or direction on how pharmacists were to voice concerns to the Pharmacy Practices Team about suspicious prescribers. Nor were there any set criteria about when a prescriber was to be investigated or reported for investigation.

332. The only instruction CVS gave its pharmacists was that they could report suspicious prescribers to their district managers. This process was problematic at best because of its informality. There have been no established policy directives on when or how pharmacists were supposed to voice concerns to their managers or what managers were supposed to do with the information. Furthermore, there has been no mechanism for the pharmacists to obtain information about the status of their complaints from their district managers. Nor were district managers directed to follow up on pharmacist information about bad doctors because doing so could negatively affect their sales numbers. Relator experienced this dynamic firsthand.

333. Relator recalls that twice she raised concerns about suspicious prescribers to her District Manager (Will Douglass) and both times she never saw any action taken by CVS to investigate, limit, or block those prescribers. In fact, when she raised concerns to her District Manager about a problematic clinic named LifeForce Pain and Wellness in Carthage, Tennessee, her District Manager told her she still had to fill prescriptions from the Clinic.

334. She also reported Dr. Victor Shada who she saw prescribe Percocet (oxycodone/acetaminophen) to an opioid-naïve patient who had a mild sunburn. This prescription was clearly inappropriate, and she reported it as such to Douglass. Relator never heard anything

further from Douglass or anyone else at CVS on the matter. Despite CVS's inactivity, she also took it upon herself to report to the Tennessee Board of Pharmacy, despite never being instructed or encouraged by CVS she should do so.

335. Thus, CVS's Pharmacy Practices Team has done little to stop CVS pharmacies from dispensing medically inappropriate prescriptions. CVS's half-hearted efforts ignored what it knew (or could have known) were pervasive, well-documented instances of health care professionals who would be disciplined, indicted or convicted.

336. To illustrate the scale of the problem CVS was ignoring as to the growing list of healthcare professionals who would lose their licenses, the Pittsburgh Post-Gazette reported that between 2011 and 2015 for Pennsylvania, Ohio, West Virginia, Maryland, Virginia, Kentucky, and Tennessee (the bulk of Appalachia), in those seven states alone there were 608 doctors who had been disciplined for overprescribing narcotics.[247]

**E. CVS Turned a Blind Eye to the Opioid Crisis**

337. CVS has had knowledge and/or notice of the opioid problem since at least 2002. At any time since CVS had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

338. Rather than act to curb the expansion of opioid use that CVS knew was occurring at a breathtaking pace, CVS chose not to undertake and/or failed to take action to put in place any of the measures it was capable of taking.

339. CVS was well aware of its obligations under the CSA and state pharmacy law and regulations to serve as a safeguard against diversion and abuse.

---

[247] *See* Rich Lord, J. Bardy McCollough, Adam Smeltz, *Special Report: Overdosed – How doctors wrote the script for an epidemic*, Pittsburgh Post-Gazette (May 22, 2016), https://newsinteractive.post-gazette.com/overdosed/.

340. The opioid crisis and corresponding damage to Government Programs alleged herein are a direct and foreseeable result of CVS's actions and inactions. The United States and the State of Florida were damaged by CVS's actions.

341. In addition to measures alleged above, CVS could and should have many years ago unilaterally taken action, and/or offered a program to: (a) limit to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduce the dispensing of stronger and extended release opioids; (c) enhance pharmacist counseling for new opioid patients; (d) limit the daily dosage of opioids dispensed based on the strength ofIe opioid; and (e) require the use of immediate-release formulations of opioids before extended-release opioids are dispensed. CVS could have and should have implemented these measures at any point in the last 17 years. Only in 2018 did CVS begin to do so.

342. CVS has failed to respond effectively to concerns raised by its own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

343. CVS also failed to use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to use data available to it to do statistical analysis to prevent the filling of prescriptions that were illegally diverted, dispensed, or otherwise contributed to the opioid crisis.

344. CVS further refused to take reasonable measures to stop its retail stores from dispensing unreasonable amounts of opioids and filling suspicious prescriptions, even while telling the public it was complying with its duties as a chain pharmacy to prevent diversion. CVS did so in order to further its goal of selling as many opioids as possible and ensuring that the growing demand for opioids would be met by skyrocketing supply and an unimpeded flow of drugs into even the most suspicious pharmacies.

345. CVS knew or should have known that its pharmacies were (a) filling multiple prescriptions from the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from outI-state patients; (e) filling prescriptions of unusual size and frequency paid for in cash; (f) filling prescriptions of unusual size and frequency from the same prescribing physician; (g) filling prescriptions of unusual size and frequency from out-of-state physicians; and (h) filing prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. The volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.

346. CVS had complete access to, and full visibility into, all prescription opioid distribution data and dispensing data related to its pharmacies nationally.

347. CVS had complete access to information revealing the doctors who prescribed the prescription opioids dispensed in its pharmacies nationally.

348. CVS had complete access to information revealing the customers who filled (or sought to fill) prescriptions for opioids in its stores nationally.

349. CVS also failed to conduct adequate internal or external audits of its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such audits, it failed to take any meaningful action as a result.

350. CVS was, or should have been, fully aware that the quantity of opioids being distributed and dispensed by its pharmacies nationwide was untenable, and in many areas extremely dangerous; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations under the law with regard to controlled substances.

351. CVS's duties were assumed voluntarily as a condition for the privilege of selling and dispensing controlled substances throughout the U.S. (and in this District).

352. Further, CVS has been warned (and penalized) repeatedly by governmental agencies and publicly available sources that diversion was occurring on a breathtaking scale and that the opioids supply chain fell well beneath the applicable duty of reasonable care.

353. The sheer volume of opioids sold, distributed, and dispensed throughout the U.S. (and in this District) has been, by itself, sufficient to alert CVS that opioids were necessarily being diverted into unlawful channels.

354. CVS breached its duties to maintain effective controls against diversion of opioids, and the foreseeable result is that widespread diversion occurred.

355. CVS's breach of duty is the proximate cause and a substantial factor contributing to the damages suffered by Government Programs alleged in this Second Amended Complaint.

356. The harms to Government Programs were foreseeable in light of CVS's breach of its duties.

### F. CVS Public Statements Concealed Its Failures to Prevent Filling Medically Unnecessary Prescriptions

357. CVS's public statements have misled the public and officials of the United States and States to believe that it was taking proactive steps to fight the opioid epidemic and prevent fraudulent dispensing and billing.

358. For example, in 2015 CVS stated publicly that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill

prescriptions they have reason to believe were issued for a non-legitimate purpose."[248] However, the implication that CVS was actually complying with its obligations under state and federal laws and regulations was false, as easily demonstrated by the fact that CVS on numerous occasions had been fined for numerous diversion-related violations.

359. Notwithstanding repeated fines for its failure to comply with federal and state law, CVS claimed in 2017, misleadingly, that its "utilization management program" "ensure[s] that opioids are being prescribed and used appropriately."[249]

360. Michael DeAngelis, senior director of communications at CVS Health, said in a statement that pharmacists at the Company evaluate all prescriptions they receive for controlled substances, like opioids, before filling them. Instead of placing the blame for its own widespread deficiencies at its own doorstep, DeAngelis placed primary blame on physicians: "While we have taken numerous actions to strengthen our existing safeguards to help address the nation's opioid epidemic, it is important to keep in mind that doctors have the primary responsibility to make sure the opioid prescriptions they write are for a legitimate purpose."[250]

361. What DeAngelis did not admit, however, was that at all times material hereto, CVS has routinely violated its corresponding duties under the CSA and state pharmacy laws and

---

[248] KTNV, *Patients Profiled at Pharmacy Counters* (Feb. 23, 2015), http://contact1846.rssing.com/chan-30860085/all_p11.html#item217.

[249] CVS Health Responds to Nation's Opioid Crisis, https://cvshealth.com/thought-leadership/cvs-health-enterprise-response-opioid-epidemic/cvs-health-responds-to-nations-opioid-crisis (Sept. 21, 2017); *see also* Expanded Opioid Response Builds on Past Efforts, https://cvshealth.com/thought-leadership/opioid-response-builds-on-past-efforts (Sept. 21, 2017).

[250] Caity Coyne, Jake Zuckerman, *Chain drug stores brought millions of opioids to WV as overdoses surged*, Charleston Gazette-Mail (July 27, 2019), https://www.wvgazettemail.com/news/health/chain-drug-stores-brought-millions-of-opioids-to-wv-as/article_258d176e-c87d-5c96-bd29-2402dc844b30.html.

regulations to act as the last line of defense to ensure that only medically necessary and/or appropriate prescriptions were being dispensed in its stores throughout America.

## VII. CVS'S UNLAWFUL CONDUCT

362. All DEA registrants like CVS have a duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[251] Diversion includes the use of medication outside the usual course of professional practice.

363. The DEA has repeatedly emphasized that, as DEA registrants, retail pharmacies like CVS are required to implement systems that detect and prevent diversion and must monitor for red flags of diversion. The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[252] According to DEA, pharmacists are the "[l]ast line of defense."[253]

364. The framework of state and federal statutes and regulations, along with industry guidelines, makes clear that all pharmacies like CVS possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market

[251] 21 C.F.R. § 1301.71(a).

[252] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order); *East Main Street Pharmacy*, 75 Fed. Reg. 66,149 (Dep't of Justice Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F.Supp.2d 145 (D.D.C. 2012); *Townwood Pharmacy*, 63 Fed. Reg. 8,477 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*, 77 Fed. Reg. 44,069 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*, 76 Fed. Reg. 20,039 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 363 (Dep't of Justice Jan. 2, 2008) (revocation of registration).

[253] *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/ prevoznik.pdf at 139-40.

for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when dispensing of medications outside the usual course of professional practice.

365. CVS Health was on notice that case law and administrative proceedings interpreting the CSA clearly required that its pharmacies recognize "red flags" indicating addiction, diversion and abuse, including:

- Criminal, civil, or administrative actions pending against the prescriber[254];
- Patient's use of street slang for certain opioids (e.g., "the M's" or "the Blues")[255];
- Cash payments: cash payments exceed national average; "unusually large" cash transactions (cash transactions average 8% or less of all transactions according to DEA)[256];
- Multiple patients with same address/last name/prescription/diagnoses/prescriber/day: (e.g., all prescriptions from the same doctor have diagnoses of lower lumbar pain; code L-4, L-5, lower back pain; or severe lower back pain)[257];
- Long distance between pharmacy and prescriber (*e.g.*, Western Pennsylvania Pharmacy filling out-of-state prescriptions; 200 miles; prescribers "not from local area")[258];

---

[254] *Holiday CVS, LLC v. Holder*, 839 F.Supp.2d 145, 160 (D.D.C. 2012).

[255] *Id.* at 161; *Holiday CVS, LLC*, 77 Fed. Reg. at 62321, 62344 (2012).

[256] Oak Hill Hometown Pharmacy v. Dhillon, 2019 WL 5606926, at *6; Jones Total Health Care Pharmacy, LLC v. DEA, 881 F.3d 823, 828 (11th Cir. 2018); Pharmacy Doctors Enterprises, Inc. v. DEA, 2019 WL 4565481, at *5; Holiday CVS, 77 Fed. Reg. at 62318, 62326, 62331, 62332; DEA Affirmance of Suspension Order, East Main Street Pharmacy, 75 Fed. Reg. 66150, 66158 (2010).

[257] *Holiday CVS*, 839 F. Supp. 2d at 161; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66159.

[258] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Holiday CVS*, 77 Fed. Reg. at 62321, 62332, 62333; DEA Affirmance of Suspension Order, *East Main Street Pharmacy*, 75 Fed. Reg. at 66163.

- Long distance between patient and prescriber (*e.g.*, "out of state")[259];
- Long distance between pharmacy and patient (*e.g.*, southern West Virginia residence to western Pennsylvania pharmacy; 200 miles; patients "not from local area")[260];
- Prescriptions filled piecemeal over multiple visits[261];
- "Pattern Prescribing":
    - Prescribers writing in a "factory-like" manner, prescriptions for the same drugs, the same quantities, without any kind of variability or change considering the different patients that come into that pharmacy;
    - The presence of an unwavering combination of the same drugs in the same strengths in the same quantities across numerous patients;
    - Multiple patients on a single day with the same combination from a single prescriber;
    - No "individualized therapy" – same prescriptions for multiple patients; maximum doses across multiple patients[262];
- High abuse potential prescriptions / "Drug Cocktails":
    - Oxycodone and Xanax;
    - Oxycodone and Alprazolam;
    - Prescriptions for both 15mg and 30 mg strengths;

---

[259] *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62326, 62335.

[260] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5; *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62332, 62333; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150.

[261] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5.

[262] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at 5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62332, 62333, 62335, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157.

- Oxycodone, Alprazolam, and Carisoprodol
- Prescriptions of an opiate and a benzodiazepine;
- Oxy 30, Oxy 15, and Xanax (Alprazolam);
- Oxy 30, Oxy 15, Alprazolam 2mg, and a fourth "filler" drug;
- Oxy 30, Oxy 15, Xanax 2 mg, Soma, and Flexural;
- 210 mg dose prescription of Oxy 30;
- High quantity prescriptions;
- Prescriptions of large volumes of controlled substances in the highest strengths;
- Multiple drugs prescribed for the same thing;
- Drugs in different classes that can cause the same side effects, like respiratory depression;
- "The Triple" or "Holy Trinity": benzodiazepine, narcotic painkiller, and sleeping pill;
- "The Homerun": benzodiazepine, narcotic painkiller, sleeping pill, and Soma;
- Multiple narcotic painkillers at the same time;
- High doses of Oxy: normal dose is 5- 10mg/4 hours;
- High doses of Xanax (alprazolam): normal dose is 4mg/day;
- High doses of Valium (diazepam): normal dose is 10mg;
- Daily dose of 300 mg of oxycodone and 60mg of hydrocodone = overdose;
- "Duplicate Therapy": multiple drugs in the same class prescribed for the same thing;
- Multiple prescriptions of same narcotic on same day;
- Multiple prescriptions of Oxycodone, Xanax, and Soma for single patient; or

  - High doses of opioids in light of overdose statistics.[263]

- Patients who arrive together with identical or nearly identical prescriptions[264];
- Patients seeking refills before prescriptions run out and/or patients with frequent loss of controlled substance medication[265];
- Prescription numbers are very close sequentially[266];
- Multiple out-of-area patients from the same town/area ("Sponsor Arrangements" in which people from mostly the mountain states travel in buses and vans and drive to the pharmacy to fill opioid prescriptions)[267];
- Patient's appearance/behavior (*e.g.*, appear not to need the medication, appear high, slurred speech, stumbling walk, drooling)[268];
- Prescribers without a specialty in pain management writing large quantities of prescriptions (*e.g.*, prescription influx from board certified pediatricians or gynecologists; doctors prescribing outside the scope of their usual practice; dentists; veterinarians)[269];

---

[263] *Jones Total Health Care Pharmacy*, 881 F.3d at 828; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62319, 62322, 62325, 62326, 62331, 62336, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157, 66158, 66159, 66165; U.S. Centers for Disease Control, CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016, 65 Morb. and Mort. Wkly Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

[264] Pharmacy Doctors Enterprises, 2019 WL 4565481, at *5.

[265] *Id*. at 5; *Holiday CVS*, 77 Fed. Reg. at 62343; *East Main Street Pharmacy*, 77 Fed. Reg. at 66157.

[266] *Holiday CVS*, 77 Fed. Reg. at 62319.

[267] *Id*. at 62319, 62331.

[268] *Id.* at 62319, 62331*; East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

[269] *Holiday CVS*, 77 Fed. Reg. at 62326, 62331; *Jones Total Health Care Pharmacy*, 881 F.3d at 828.

- Patients between the ages of 25 and 40 often paying with cash[270];
- Evidence of doctor shopping (*e.g.*, same/similar prescription prescribed by two or more prescribers at the same time)[271];
- Prescription from physician with an expired/revoked medical license, DEA number[272];
- Patient prescribed only controlled substance medications[273];
- Patient presents controlled substance prescriptions under different patient names[274];
- Patient insists on brand name product or specific generic maker of opioid[275];
- Other pharmacies in the vicinity refuse to fill prescriptions from certain providers[276];
- Prescriber pattern of larger doses and higher quantities over time[277];
- Confluence of out of state patients on a single day receiving the same medications in the same quantities from the same in-state prescriber[278]; or
- The overwhelming proportion of prescriptions filled by the pharmacy is for opioids.[279]

366. It is not just the single red flags that make the suspicious prescriptions unresolvable, but frequently the fact that there are multiple red flags at one time. So, rather than just looking for

[270] *Holiday CVS*, 77 Fed. Reg. at 62331.

[271] *Id.* at 62331, 62343.

[272] *Id.* at 62342.

[273] *Id.* at 62343.

[274] *Id.* at 62343.

[275] *Id.*

[276] *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

[277] *Id.* at 66159.

[278] *Holiday CVS*, 77 Fed. Reg. at 62333.

[279] *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 139-40.

unresolvable single red flags, CVS Health should have been looking for instances when there are multiple red flags, which would make these truly unresolvable. According to *Holiday CVS*:

> Professor Doering specifically identified such red flags as including that the patient is paying for controlled substance prescriptions with cash . . . ; the respective locations of the patient and the prescriber . . . ; that a prescriber writes for certain combinations or patterns of drugs. . . ; and multiple patients presenting "prescriptions for the same drugs, the same quantities . . . from the same doctor without any kind of variability or change considering the different patients that come into the pharmacy," thus suggesting that the physician prescribes in a ''factory like manner." *Id*. Professor Doering reviewed the various spreadsheets of the prescriptions dispensed by Respondents and testified regarding whether Respondents could have lawfully dispensed various prescriptions given the red flags they presented. For example, when questioned about Respondent CVS #219's dispensing of oxycodone 30 mg prescriptions, 8 which were issued by a Fort Lauderdale-based physician (P.G.) for persons whose addresses were in Kentucky and Tennessee and who paid cash, Professor Doering opined that the multiple red flags these prescriptions presented could not be resolved so that a reasonable pharmacist could dispense them consistent with his corresponding responsibility under federal law.[280]

367. Nor would CVS Health be able to dispense a prescription with multiple red flags by simply making a call to the prescriber. According to *Holiday CVS*:

> Doering explained that the pharmacist examines multiple red flags collectively, and testified that, in his opinion, contacting the prescribing physician and/or obtaining a diagnosis code would not resolve these red flags to a degree where the medications should have been dispensed. Tr.792–93. Doering agreed that he did not know what measures, if any, the Respondents' pharmacists took to resolve any conflicts, or whether a patient history screen was consulted prior to the dispensing event. Tr.868, 873. When pressed on whether the distance red flags were potentially explainable under various hypothetical scenarios involving vacation and travel, Doering had this to say: "The kinds of medications that we're talking about here are for chronic health problems and not acute health problems. So, it would be unlikely that someone comes to Florida on vacation, breaks a leg, and has to get oxycodone in these quantities and in these strengths. So it just doesn't add up."[281]

368. CVS Health was in the position to recognize those red flags listed above. All or some of those red flags were frequently present in hundreds of thousands of prescriptions its

[280] *Holiday CVS*, 77 Fed. Reg. at 62318.

[281] *Id*. at 62334.

pharmacies received during the relevant time period and should have caused CVS Health' pharmacies to refuse to fill prescriptions and/or report the behavior. However, CVS Health failed to do so.

369. CVS as a sophisticated, national chain pharmacy had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data allows CVS to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.[282]

370. CVS was on notice of what a compliance program should consist of. In 2006, the National Association of Chain Drug Stores ("NACDS") issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.[283] The Model Compliance Manual notes that a Retail Pharmacy may:

- Generate and review reports for its own purposes and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:
  - Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain

[282] *See, e.g.*, *Holiday CVS*, 77 Fed. Reg. 62,315 (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

[283] *In Re: National Prescription Opiate Litigation*, Third Amended Complaint (Case No. 17-md-2804) (Dkt. 2613).

drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.

- Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.
- Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

371. Yet, other than its limited 2013 Data Analytics Project discussed above, there is no evidence CVS ever leveraged its resources and troves of information to stop or further question the overwhelming majority of prescriptions written by the criminal prescribers.

372. CVS failed to fulfill its duties as the last line of defense and failed to ensure that the prescriptions it was filling were issued to a legitimate patient for a legitimate medical purpose by a practitioner acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by CVS stores throughout the U.S.

373. From about 2002 to the present (and ongoing), Defendant CVS violated the CSA and state pharmacy laws and regulations by dispensing controlled substances in violation of the pharmacist's corresponding responsibility in violation of 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice in violation of 21 C.F.R. § 1306.06.

374. CVS violated the CSA and state pharmacy laws and regulations each time it filled a controlled substance prescription without identifying and resolving those red flags because:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1).
- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a).

375. CVS failed to maintain effective controls against diversion or conduct due diligence to ensure opioids were not diverted, resulting in the gross over-dispensing of opioids. CVS thus directly contributed today's opioid epidemic and corresponding harm to Government Programs.

376. The opioid crisis described herein is a direct and foreseeable result of CVS's actions. And it was foreseeable that Government Programs would be damaged by CVS's actions.

377. Had they known that CVS dispensed scores of controlled substance prescriptions that were lacking a legitimate medical purpose and/or a medically accepted indication (and therefore did not constitute valid prescriptions under the CSA and state pharmacy law and regulations), Government Programs would have refused to pay for those opioid medications.

378. Below is just a sampling of the rampant fraud that has occurred at CVS pharmacies throughout the United States.

### A. Specific Examples of Unlawful Dispensing Conduct: Alabama

#### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Alabama*

379. The opioid epidemic has had a particularly devastating impact on Alabama.

380. Alabama has the highest rate of opioid prescriptions issued in the nation — 1.2 prescriptions per person compared with the national average of 0.71.[284] In 2017, no fewer than 422 deaths were attributable to opioid overdoses in Alabama.[285]

381. According to the Alabama Medicaid Agency, total federal and state expenditures on opioids increased more than 147% from 2011 ($9.9 million) to 2016 ($14.6 million).286

382. Opioids have had an especially dire impact on rural states like Alabama. According to a recent report by the U.S. Department of Agriculture: "Rising rates of prescription medication abuse, especially of opioids, and the related rise in heroin-overdose deaths are contributing to this unprecedented rise in age-specific mortality rates after a century or more of steady declines. This trend, if it continues, will not only lower rural population but will increase what is known as the dependency ratio: the number of people likely to be not working (children and retirees) relative to the number of people likely to be wage earners (working-age adults)."[287]

---

[284] CDC, *U.S. State Prescribing Rates, 2016,* https://www.cdc.gov/drugoverdose/maps/rxstate2016.html.

[285] The Henry J. Kaiser Family Foundation, *Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths* (2017), https://www.kff.org/other/state-indicator/opioid-overdose-deaths/.

[286] Robert Moon, MD, Alabama Medicaid Opioid Prescribing Trends and Outcomes: The Opioid Crisis in Alabama: From Silos to Solutions (March 10, 2017).

[287] U.S. Dept. of Ag., *Rural America at a Glance*, Economic Information Bulletin 182 (Nov. 2017).

383. Despite having some 176 stores located all over the State of Alabama, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

384. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| **Date** | **Name** | **City** | **Sentence** |
|---|---|---|---|
| **5-Jan-10** | Jason Michael Hunt, MD | Guntersville, AL | License suspended |
| **23-Apr-14** | Joseph Ngui Mwau Ndolo, MD | Fairhope, AL | 2 years |
| **28-Oct-15** | Peter Lodewick, MD | Birmingham, AL | 4 year probation |
| **10-Nov-15** | Ernest Albert Claybon, MD | Midfield, AL | 4 years probation |
| **8-Apr-16** | Muhammad Ali, MD | Jasper, AL | 30 months |
| **29-Apr-16** | Francisco Huidor-Figueroa, MD | Opelika, AL | 5 years probation |
| **17-Feb-17** | Shelinder Aggarwal, MD | Huntsville, AL | 15 years |
| **17-Mar-17** | Bridgette Parker, NP | Mobile, AL | 20 months |
| **24-Apr-17** | Thomas "Justin" Palmer, NP | Mobile, AL | 30 months |
| **10-May-17** | Robert Ritchea, MD | Phenix City, AL | 10 years |
| **25-May-17** | John Patrick Couch, MD | Mobile, AL | 20 years |
| **26-May-17** | Xiulu Ruan, MD | Mobile, AL | 21 years |
| **17-May-18** | Shepherd Odom, MD | Montgomery, AL | 5 years probation |
| **8-Jun-18** | Rassan Tarabein, MD | Daphne, AL | 5 years, $15,000,000 restitution |
| **17-Jan-19** | Willie Chester, MD | Montgomery, AL | 2 years probation |
| **17-Jan-19** | Steven Cox, MD | Montgomery, AL | 3 years probation |
| **17-Jan-19** | Elizabeth Cronier, NP | Montgomery, AL | 2 years probation |
| **17-Jan-19** | Julio Delgado, MD | Montgomery, AL | 2 years probation |
| **17-Jan-19** | Stephanie Ott, RN | Montgomery, AL | 2 years probation |
| **17-Jan-19** | Gilberto Sanchez, MD | Montgomery, AL | 12 years |
| **17-Jan-19** | Johnnie Chaisson Sanders | Montgomery, AL | 7 months |
| **17-Apr-19** | Elizabeth Korcz, MD | Hoover, AL | |
| **24-Apr-19** | Marshall Plotka, MD | Huntsville, AL | Indicted |
| **24-Apr-19** | Celia Lloyd-Turney, MD | Huntsville, AL | Indicted |
| **17-May-19** | Steven Bruce Hefter, MD | Birmingham, AL | 87 months |

| | | | |
|---|---|---|---|
| **29-May-19** | Lillian Akwuba, NP | Montgomery, AL | 10 years |
| **30-May-19** | Erik Raul Torres | Opelika, AL | 6 months |
| **21-Jun-19** | Rodney Morris, MD | Birmingham, AL | Pled Guilty |
| **26-Jun-19** | Paul Roberts, MD | Fultondale, AL | Indicted |
| **11-Jul-19** | James Edwards, MD | Opelika, AL | Indicted |
| **18-Nov-19** | Cindy Louise Hyche Dunn | Birmingham, AL | 10 years |

**2. *Alabama (Pharmacist No. 10)***

385. Pharmacist No. 10 worked for CVS from July 2009 to October 2015. He worked as a floater pharmacist in Alabama, as well as in Michigan and Indiana. He was terminated in October 2015.

386. He estimated he worked at 100 CVS stores in Alabama, Michigan and Indiana. Most were in small towns. Some customers would get prescriptions filled from pain clinics that were 50 to 100 miles away.

387. He could not recall any CVS policy on when to refuse to fill prescriptions or any company procedures to follow on identifying such prescriptions. They relied on the pharmacist's discretion. "I knew they [state regulators] would come after me if I filled bad prescriptions and CVS wouldn't stand behind me at all. CVS could have supported us more," Pharmacist No. 10 said.

388. He frequently saw prescriptions from pain clinics at many of the stores where he worked. As long as customers were seeking to have those prescriptions filled on time and not early, "you can't really control it," he said.

389. The area's pain clinic doctors were known by pharmacy staff. "We knew who the pain clinic doctors were," Pharmacist No. 10 said. He would find out about them through word of mouth and through his experience. "If 50 people come in for prescriptions and 30 of them don't look like they need them, you remember the doctor," he said.

390. He does not recall CVS ever issuing any communications to pharmacy staff directing them not to fill prescriptions for certain physicians.

391. Alabama's prescription monitoring program was not very robust at that time, leaving pharmacists largely to their own devices when evaluating prescriptions. "You had to do all that research on your own," Pharmacist No. 10 said.

392. He was concerned about the high strength of some of the narcotics he filled and also that patients kept coming back with prescriptions for large dosages of high-strength opioids. "Most of the people I filled for, they were on so much but they [physicians] never tried to take them down," he said.

393. "It gets to a point where there are so many people getting prescriptions, you want to say, 'Well, what is your plan?' Are they really taking the medication or are they selling them?" He saw customers come in with prescriptions for 120 hydrocodone tablets and want to pay cash for it. He would not fill such prescriptions.

394. But, for CVS management, they did not support blocking inappropriate prescriptions: "They're happy to fill the prescription," Pharmacist No. 10 said. "They look on it as that's one of 400 prescriptions you're filling that day. I don't think the management really cared," he said.

395. He recalled filling prescriptions for Alabama doctors who were subsequently indicted, including:

- Dr. Steven Bruce Hefter. In May 2019, Hefter was sentenced to 87 months in prison for illegally prescribing opioid painkillers. He pleaded guilty in December 2017 to one count of conspiracy to distribute controlled substances outside the usual scope of professional practice and not for a legitimate medical purpose. The charge arose from Hefter's involvement between 2012 and 2016 with the now defunct clinic Cindy Dunn & Dr.

Buckingham, M.D., Weight Loss Clinic and Pain Management (CDPM) in Moody, Alabama.[288] Many of Dr. Hefter's patients were Medicare beneficiaries. During the time period 2013 through 2016, Medicare Part D plans paid some $214,863 in claims for CII drugs he had prescribed:[289]

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| AMPHETAMINE SALT COMBO | 27 | 1,153.65 |
| DEXTROAMPHETAMINE-AMPHETAMINE | 25 | 920.96 |
| FENTANYL | 21 | 2,877.99 |
| HYDROCODONE-ACETAMINOPHEN | 78 | 2,370.18 |
| METHADONE HCL | 134 | 9,530.34 |
| MORPHINE SULFATE ER | 12 | 1,086.75 |
| OXYCODONE HCL | 709 | 40,520.03 |
| OXYCODONE-ACETAMINOPHEN | 28 | 2,566.24 |
| OXYCONTIN | 91 | 60,842.78 |
| SUBOXONE | 343 | 119,994.49 |
| **Grand Total** | **1,468** | **$241,863.41** |

- Dr. Francisco Huidor-Figueroa. In December 2015, Dr. Huidor-Figueroa pleaded guilty to drug distribution and money laundering charges, stemming from the operation of a pill mill

[288] Press Release, U.S. Attorney's Office, Northern Dist. Alabama, *Vestavia Hills Cardiologist Sentenced to 87 Months in Prison for Illegally Prescribing Opioids* (May 7, 2019), https://www.justice.gov/usao-ndal/pr/vestavia-hills-cardiologist-sentenced-87-months-prison-illegally-prescribing-opioids.

[289] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

in Opelika, Alabama called EMED Medical Management Corporation. Huidor-Figueroa served as the pill mill's doctor.[290]

- Dr. Peter Alan Lodewick. He was a physician at Lodewick Diabetes Center in Birmingham and pleaded guilty to assisting someone else in acquiring oxycodone by "misrepresentation, fraud, forgery, deception and subterfuge." In October 2015, he was sentenced to four years of probation and agreed to never seek re-instatement of his federal license to dispense narcotics.[291]
- Dr. Julio Delgado. In May 2018, Delgado, 56, of Homewood, Alabama, pleaded guilty to aiding and abetting the fraudulent acquisition of controlled substances. He worked for Dr. Gilberto Sanchez at Family Practice during 2015 and 2016. He admitted to writing a prescription for someone who was never his patient and without ever examining the person.[292]

[290] Press Release, U.S. Attorney's Office, Middle Dist. Alabama, *"Pill Mill" Operators Plead Guilty to Drug Distribution and Money Laundering Charges* (March 4, 2016), https://www.justice.gov/usao-mdal/pr/pill-mill-operators-plead-guilty-drug-distribution-and-money-laundering-charges.

[291] Press Release, U.S. Attorney's Office, Northern Dist. Alabama, *Birmingham Area Doctors Charged with Illegally Supplying Controlled Substances* (May 21, 2015), https://www.justice.gov/usao-ndal/pr/birmingham-area-doctors-charged-illegally-supplying-controlled-substances.

[292] Press Release, U.S. Attorney's Office, Middle Dist. Alabama, *Physician, Nurse Practitioner, and Nurse Plead Guilty in Montgomery "Pill Mill" Case* (May 15, 2018), https://www.justice.gov/usao-mdal/pr/physician-nurse-practitioner-and-nurse-plead-guilty-montgomery-pill-mill-case).

### B. Specific Examples of Unlawful Dispensing Conduct: California

#### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in California*

396. California has not escaped the opioid epidemic.

397. In the decade between 2008 and 2017, over 14,500 Californians died due to prescription opioid drug overdoses.[293] There were over 80,000 emergency room visits and hospitalizations in California from opioid overdoses during that same time period.[294] On average, about six Californians die each day from an opioid-related overdose.[295]

398. Despite having some 1,163 stores located all over the State of California, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

399. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

---

[293] California Department of Public Health, *California Opioid Overdose Surveillance Dashboard*, https://discovery.cdph.ca.gov/CDIC/ODdash/.

[294] *Id.*

[295] *Id.*

| Date | Name | City | Sentence |
|---|---|---|---|
| **23-Aug-03** | Michael Umansky, MD | Los Angeles, CA | 36 months probation |
| **18-Oct-04** | Nicholas Sasson, MD | Salina, CA | 5 years probation |
| **5-Oct-06** | Peter Ahles, MD | Anaheim, CA | 6 months home detention |
| **2-Feb-07** | Heidi Ann Winkler, MD | Norwalk, CA | 1 day |
| **5-Mar-07** | Robert Z. Braun, MD | West Hills, CA | 70 months |
| **22-Aug-07** | Joan Z Kutschbach, MD | Elk Grove, CA | 30 days |
| **30-Jun-08** | Bassam Yassine, MD | Glendora, CA | 37 months |
| **3-Nov-08** | Monique Bridget Williams, MD | Los Angeles, CA | 36 months |
| **6-May-09** | Masoud Bamdad, MD | San Fernando, CA | 25 years |
| **6-Jul-09** | Daniel Healy, MD | Arcadia, CA | 4 years |
| **21-Sep-09** | Joel Dreyer, MD | Murrieta, CA | 10 years |
| **11-Nov-09** | Vu Le, MD | Midway City, Cal | 57 months |
| **19-Nov-09** | **Peter Dietrich, MD** | **Sacramento, CA** | **60 days** |
| **16-Apr-13** | Christopher Henry Lister, MD | Victorville, CA | 14 years |
| **2-May-13** | Anush Davtyan, MD | Encino, CA | 14 years |
| **12-Aug-13** | James William Eisenberg | Venice, CA | 46 years |
| **17-Oct-13** | Alvin Mingczech Yee, MD | Mission Viejo, CA | 135 months |
| **27-Mar-14** | Dr. Toni Daniels, MD | Berkeley, CA | dismissed (dementia) |
| **4-Sep-14** | Dr. Michael Roger Chiarottino, MD | San Rafael, CA | 3 years |
| **29-Sep-14** | Terrill Eugene Brown, MD | Visalia, CA | 4 years, 9 months |
| **9-Dec-14** | William Joseph Watson, MD | Del Mar, CA | 5 years |
| **5-Jan-15** | Andrew Sun, MD | La Mirada, CA | 63 months |
| **9-Sep-15** | David Juan, M.D. | Santa Clara, CA | Felony conviction; surrendered license |
| **7-Dec-15** | Julio Gabriel Diaz, MD | Goleta, CA | 27 years |
| **4-Jan-16** | Kerry Russell Clark | Valencia, CA | 2 years probation |
| **4-Feb-16** | Madhu Garg, MD | Glendora, CA | 3 years |
| **5-Feb-16** | Hsiu Ying “Lisa” Tseng, MD | Rowland Heights, CA | 30 years |
| **11-Apr-16** | Daniel Cham, MD | Covina, CA | 13 years |
| **20-Apr-16** | Matthew Cole, MD | San Diego, CA | time served |
| **29-Apr-16** | Edward Ridgill, MD | Ventura, CA | 5 years |
| **13-Jun-16** | Victor Boon Huat Siew, MD | Laguna Beach, CA | 70 months |
| **7-Jul-16** | Paul Woodward, MD | Napa, CA | 5 years probation |
| **7-Sep-16** | Megan Jo Johnson, MD | Chico, CA | 3 years probation |

| | | | |
|---|---|---|---|
| **6-Sep-16** | Michael Louis Streams, MD | Culver City, CA | Felony conviction; surrendered license |
| **20-Sep-16** | Steven Keith Mangar, MD | Salinas, CA | Surrenedered license |
| **18-Nov-16** | Washington Bryan, MD | Westwood, CA | 33 months |
| **30-Nov-16** | Naga Raja Thota, MD | El Cajon, CA | 2 years |
| **19-Jan-17** | John Oruyopita Dimowo, MD | Norco, CA | 7 years probation |
| **16-May-17** | Kiansi Blaise Boni, MD | Oxnard, CA | Revoked license |
| **19-May-17** | Jasna Mrdjen, MD | Mountain View, CA | 4 years |
| **18-May-17** | Kimberly T. Le, MD | Sacramento, CA | License Suspension |
| **21-Jun-17** | William Lee Matzner, MD | Simi Valley, CA | 60 months probation |
| **13-Jul-17** | Jeffrey Olsen, MD | Laguna Beach, CA | trial May 5, 2020 |
| **13-Nov-17** | Ernestina Maria Howell Saxton, MD | Fresno, CA | 5 years probation |
| **7-Sep-18** | Maria Isabel Aruiza Bacay, MD | Manteca, CA | 5 years probation |
| **10-Sep-18** | Harold S. Budram, MD | Shasta Lake, CA | 5 years probation |
| **22-Feb-19** | Daniel George Clark, MD | Auburn, CA | Surrendered license |
| **1-Mar-19** | Philipp Leo Bannwart, MD | Walnut Creek, CA | Surrendered license |
| **10-Apr-19** | Robert M. Littman, MD | La Mesa, CA | Surrendered license |
| **12-Apr-19** | Frank D. Gilman, MD | San Diego, CA | Surrendered license |
| **8-May-19** | Guido James Gores, MD | San Francisco, CA | MBC Accusation filed |
| **16-May-19** | John Courtney Dozier, MD | Susanville, CA | MBC Accusation filed |
| **15-Jun-19** | Denise Anh-Duong Phan, MD | Van Nuys, CA | MBC Accusation filed |
| **9-Jul-19** | Jay Milton Beams, MD | Susanville, CA | 5 years probation |
| **1-Aug-19** | Ilona Sylvester, MD | Oxnard, CA | 3 years probation |
| **9-Aug-19** | Wendell Mark Street, MD | Victorville, CA | Pled guilty |
| **15-Aug-19** | Philip Albert Sanderson, MD | Solana Beach, CA | Surrendered license |
| **15-Oct-19** | Robert Paul Zgliniec, MD | Poway, CA | Surrendered license |
| **6-Nov-19** | Monte I. Lieberfarb, MD | Willits, CA | Surrendered license |
| **12-Nov-19** | David H. Betat, MD | Lakeport, CA | Second Amended Accusation filed |
| **5-Dec-19** | Edmund Peter Kemprud, M.D. | Dublin, CA | Indicted |
| **6-Dec-19** | Bradley Howard Chesler, MD | San Diego, CA | 3 years probation |
| **16-Dec-19** | Jonathan David Rand, MD | Marina Del Rey, CA | Surrendered license |
| **31-Dec-19** | John Winthrop Pierce, MD | San Francisco, CA | Surrendered license |
| **10-Feb-20** | John Xiao-Jiang Qian, MD | San Diego, CA | 5 years probation |
| **20-Feb-20** | Mark Scheier, MD | La Palma, CA | 5 years probation |

**2. *Los Angeles, California (Pharmacist No. 8)***

400. Pharmacist No. 8 was a Staff Pharmacist at a number of different CVS stores in the Los Angeles area from 2008 to 2015. She initially worked at the store in Brentwood at 11941 San Vicente Blvd for a few years. She then worked as a floater in a number of different stores in the west L.A. During her last few years, she worked at the CVS at 23805 W. Malibu Road in Malibu.

401. She was pressured by her CVS store manager and district managers to fill prescriptions she did not feel comfortable filling, including controlled substances. She had been working at a Longs Drugs store in Brentwood when CVS acquired the Longs chain of pharmacies in 2008. The store where she worked became a CVS, and CVS sent a Company trainer to teach the employees how to use the CVS computer system and about CVS practices and procedures.

402. Right away, she learned CVS's top priority was profits and the pharmacy was expected to sell as many prescriptions as possible. When employees in her store had questions or concerns about the way CVS wanted them to do something, the trainer was not interested. "His across-the-board comment was, '[i]f you don't do it the CVS way or do it at their [CVS] speed, we'll find someone else who will,'" Pharmacist No. 8 said.

403. The new regime began to interfere in the dispensing process to a level that frustrated and concerned her. Pharmacist No. 8 said her store manager and district manager pressured her at times to fill prescriptions when she was not comfortable with filling them. She said this was done in general for all prescription types and was not limited to controlled substances.

404. She described an incident that involved a controlled substance, which occurred early in her tenure as a CVS employee. An extremely aggressive woman had come into the store with a prescription for methadone, which the pharmacy did not dispense often. By law, only people in detox programs are supposed to have a prescription for methadone, Pharmacist No. 8 said. The

woman did not appear to be in a program, and Pharmacist No. 8 wanted to call the woman's doctor to find out why she was prescribed the drug.

405. "I wanted to question the doctor and ask the doctor some questions," Pharmacist No. 8 said. The delay aggravated the woman, who complained to the store manager. "It took a few days for the answer to come back," she said. "That's why she was so unhappy and agitated."

406. In response to the woman's complaint, she began to get pressure from both the store manager and the district manager about filling the prescription.

407. Even though her store manager was not a pharmacist, she found herself having to answer to or take orders about pharmacy operations nonetheless. "The front store manager has nothing to do with the pharmacy," Pharmacist No. 8 said. But CVS "gives a lot of power to the store manager, and the front store manager ends up bossing the pharmacist around."

408. In the case of the methadone prescription, the store manager approached her to say: "We don't know why you're holding this up." When she explained she was waiting for a response from the doctor, the store manager continued to urge her to fill it. "The company doesn't want to hear it," Pharmacist No. 8 remembered. "The store manager didn't care. He said, 'Get on with it. Give it to them.'"

409. She subsequently received a call from the district manager asking why she was holding up the prescription and also told her to fill the prescription. She did. Pharmacist No. 8 said it was her "welcome to CVS" moment when she realized the new regime's top priority was the bottom line. "They want the business, they want the sale, they want the revenue," she said.

410. After initially filling the methadone prescription, she did not keep the store stocked with the methadone because if the pharmacy did not fill it within 30 days, she had to return it to CVS distribution – which was a time-consuming hassle.

411. When the customer came in for a refill, therefore, the methadone was not available immediately and had to be ordered. This, too, aggravated the woman who complained again to the store manager. Yet again, she was pressured by her store manager and district manager to keep the store stocked with methadone for the woman.

412. CVS understaffed its pharmacies, which impacted pharmacists' ability to catch red flags that indicate inappropriate controlled substance prescription. When the Longs Drug store where Pharmacist No. 8 had worked was acquired by CVS, the Company began to cut its staff.

413. Prior to the CVS acquisition, this high-volume store had four pharmacists on staff and usually had two to three pharmacists on duty each day with significant shift overlaps, Pharmacist No. 8 said. At their busiest times, they would have three pharmacists working at the same time.

414. Each day, they also had five to six pharmacy technicians and two clerks working the cash registers. Gradually, however, the Company began to whittle that staff down despite the growth in prescription volume, Pharmacist No. 8 said.

415. For example, when a technician would quit or transfer to a different store, the Company would tell the pharmacy they did not need a replacement. "They gradually every year do a little trim and trim and trim," Pharmacist No. 8 said. "To be honest, it's a part of their psychology. They know if they slowly trim away at you, they know you will slowly adjust. They slowly push you and snip at every little corner."

416. By the time she left the Brentwood store out of frustration with its operations, she said the pharmacy typically did not have more than two pharmacists working each day with only a small window of overlap. (A 7 a.m. to 3:30 p.m. shift and a 1:30 p.m. to 10 p.m. shift.)

417. The number of pharmacy technicians and clerks had also shrunk significantly, Pharmacist No. 8 said. "My staff was cut in half," she said. CVS also eliminated the clerk position

and wanted only pharmacy technicians working alongside pharmacists. “They wanted an employee who could literally do everything,” she said.

418. With the deep cuts in staff, Pharmacist No. 8 said it was impossible to do everything CVS wanted pharmacists to do. Technicians handle much of the busy work in the pharmacy so pharmacists can focus on the job of checking prescriptions for accuracy, safety and legitimacy. When the pharmacy had fewer technicians, the pharmacists must do much of the busy work and have less time for these responsibilities.

419. Furthermore, while CVS was cutting staff, the Company was also increasing the number of tasks it expected pharmacists to do, such as calling customers to refill and pick up their prescriptions and doing immunizations.

420. After leaving the Brentwood store, she saw the same understaffing situations at the other CVS stores where she worked. The understaffing situation at CVS pharmacies impacted the pharmacists’ ability to catch inappropriate prescriptions for controlled substances. “You have less time to look at a prescription” for “certain characteristics of a prescription that flag it as being, for lack of better term, fishy,” Pharmacist No. 8 said.

421. The Company did not create a working situation where pharmacists had enough time to properly vet prescriptions. “In the 60 seconds you have with this prescription, or if you’re lucky five minutes, that’s the time period you have to make the judgment call,” Pharmacist No. 8 said. That did not give pharmacists much time to take steps to inquire about the prescription, the patient’s diagnosis, the patient’s history, or examine potential red flags of diversion.

422. She also noted that CVS’s cutting back on the overlapping shifts for pharmacists often left pharmacists without a second pair of eyes on a prescription that might seem odd. “When I look at something, and I have questions and I have issues, I have (previously) two pharmacists to show it to,” Pharmacist No. 8 said. “That you completely lost” when CVS took over Longs

Drugs. She found herself having to call pharmacists at other stores when she wanted second opinions.

423. Asked what CVS could have done to better stem the flow of inappropriate opioid prescriptions from going out the door, Pharmacist No. 8 said, “staffing.”

424. She also noted that when a pharmacist is working alone without a technician, that pharmacist is doing the “double checking” for accuracy step. Such a system is typically and ideally designed for two people, Pharmacist No. 8 said. One person counts out the pills and a second person with fresh eyes checks it for accuracy. Yet CVS had pharmacists working alone and double-checking their own counts. “If two people look at a prescription, and two people lay eyes on a prescription, there’s a much higher success rate of mistakes being caught,” she said.

425. Salaries and job security were dependent on meeting CVS Metrics, which included the speed at which pharmacists filled prescriptions and their prescription volumes. Job performance reviews at CVS were based on Metrics such as how fast and how many prescriptions she filled, Pharmacist No. 8 said: “Your pay is based on that. Your wage increase, when they give you a raise, they pull out a folder of all these numbers they measure you by.”

426. Those Metrics included fill-rates, prescription volume, how many phone calls made to customers for refills or to pick up their prescriptions, immunizations and other tasks unrelated to ensuring the safety of the patient. “They just measure Metrics – that’s all the company is about,” Pharmacist No. 8 said. “How many prescriptions can you handle in an hour?”

427. She said CVS also used its Metrics to terminate their employment. “When your scanning rate isn’t at a certain level then they get rid of you,” Pharmacist No. 8 said. “They are a very ageist company. Most of the older pharmacists, they aged out of it. They can’t scan at that type of rate” which CVS expected.

**3. *Orange County, California (Pharmacist No. 11).***

428. Pharmacist No. 11 worked as a pharmacist for CVS from 2000 to 2017. She worked at approximately 15 CVS pharmacies in the south Orange County area in California. She explained that as a staff pharmacist, CVS rotated you quite often, about every 6 months. She worked the majority of the time as a staff pharmacist, but also was pharmacy manager at times as well. At the Mission Viejo store, she estimated that the prescription business was 60% controlled substances. At another store, she estimated that 1/3 of her patients were on Norco.

429. It was typical for her to fill 30 to 70 prescriptions per hour. At the higher end, she saw stores filling about 4,000 prescriptions per week. "You're like a robot. You fill without checking." Pharmacist No. 11 said that pharmacists were under so much pressure and were required to do "10,000 things at once." Often times, the prescriptions just came through electronically and she did not even see the patients before the script was filled. This was very bad because she felt that looking at a patient is often a very good way to tell if they are addicted or drug seeking. She squarely put the blame on CVS for the burdens put on pharmacists.

430. Pharmacist No. 11 said that CVS provided no training to its pharmacists on how to evaluate prescriptions. The only information on how to evaluate prescriptions she got were the occasional emails from the Board of Pharmacy (BOP). The California BOP had a checklist of things that pharmacists were supposed to check before filling a prescription. But CVS left it to the pharmacists and did not provide guidance. Rather, CVS made it a "gray area" in its operations. In the gray area, CVS "pressured to fill if you [the pharmacist] could not decide. CVS's idea is to not turn away patients."

431. She recalled a situation in which a patient was flying back to California from the east coast to visit a particular doctor to have his pain meds prescribed, and which he would then

fill at her CVS store. Dispensing to a patient so far away from the doctor and pharmacy was against BOP regulations, but her manager did not care and pressured her to fill the prescriptions anyway.

432. She remembered one particular bad doctor: Dr. Pham. Dr. Pham was prescribing excessive amounts of opioids to many patients. Yet, Pharmacist No. 11 said that the CVS stores she worked at were filling his prescriptions “right and left.” Eventually, CVS blocked filling for Dr. Pham once he was arrested.

433. Many of Dr. Pham’s patients were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $94,117 in claims for CII drugs he had prescribed:[296]

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| AMPHETAMINE SALT COMBO | 17 | 915.89 |
| HYDROCODONE-ACETAMINOPHEN | 538 | 16,269.63 |
| MORPHINE SULFATE | 23 | 1,750.06 |
| MORPHINE SULFATE ER | 71 | 4,258.2 |
| OXYCODONE HCL | 221 | 12,122.12 |
| OXYCODONE-ACETAMINOPHEN | 120 | 7,729.31 |
| OXYCONTIN | 30 | 10,874.85 |
| SUBOXONE | 55 | 28,248.96 |
| **Grand Total** | **1,171** | **$94,117.14** |

[296] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

434. Dr. Pham was arrested by the Drug Enforcement Administration on December 18, 2018 on federal charges that allege he illegally distributed opioid and other powerful narcotics by writing prescriptions for "patients" without medical examinations and to at least five individuals who suffered overdose deaths.[297]

435. Four CVS pharmacists, including her, were cited by the Board of Pharmacy for filling fentanyl patches prescriptions for a dentist. A dentist was improperly prescribing fentanyl patches and the CVS where she worked filled them. Pharmacist No. 11 said that there was just simply no time to properly vet the prescriptions so those ones slipped past and were filled. She appealed the fine from BOP.

436. She explained how addicts and others would know when to come to the pharmacy when it was easier to get prescriptions filled. Often the addicts would come after 5 p.m. or during the weekend so that doctors' offices would be closed and the prescriptions could not be checked. They also often came in overnight when single pharmacists were working and would be belligerent to bully the lone pharmacist into filling prescriptions. She felt that in those situations the pharmacist almost had to dispense because "how else do you deal with that problem when people are standing there threatening you." CVS did nothing to help with these issues. She complained about the lack of staffing to the Board of Pharmacy, but to no avail.

437. There was one particular patient that she remembered who was a healthy-looking male in his thirties who had a prescription for Dilaudid, a powerful opioid. The prescription did not make sense to the pharmacists, but because the patient would come in at night when there was

---

[297] Press Release, U.S. Attorney's Office, Central District of California, *O.C. Doctor Arrested on Federal Narcotics Charges that Allege Prescriptions to 'Patients' who Suffered Fatal Overdoses* (Dec. 18, 2018) https://www.justice.gov/usao-cdca/pr/oc-doctor-arrested-federal-narcotics-charges-allege-prescriptions-patients-who-suffered.

only a single female pharmacist working and he would threaten them they filled the prescriptions. This happened multiple times until a male co-worker was there one night and told the customer to leave.

438. Pharmacist No. 11 felt lots of pressure to fill every prescription. She felt that "she could not refuse a patient's prescription. It was against policy." She also felt that if you started to refuse to fill there were repercussions. "Every time we refused something there was a consequence." For example, if you were not filling everything quickly and meeting your numbers, or you were otherwise raising concerns about prescriptions, you would get the number of hours you were given cut, you would be put on bad shifts (nights, weekends, etc.), or otherwise be given a hard time by management. "If you aren't fast enough, you didn't get hours."

439. CVS just cared about its bottom line. "All CVS wanted was numbers and profit." Things like calling doctors and doing due diligence just takes too much time and cuts into the number of scripts that can be filled. "There were many instances we filled where should not have." She was "110% sure" that CVS filled inappropriate or medically unnecessary prescriptions.

440. CVS was extremely concerned about losing customers to other pharmacies. If a pharmacist refused to fill a prescription, then the patient would complain and the pharmacist would hear about it from the district manager. "The customer was king." Even if there was a fake prescription and a pharmacist filled it, "CVS didn't care." It only cared if the pharmacist was cited by BOP.

441. Pharmacist No. 11 said that McKesson would have to stop shipments to the stores she worked at from time to time because they had ordered too much. Also, before hydrocodone was reclassified from a CIII to a CII, it was "flowing like water."

442. She felt that CVS should have been much more careful with its dispensing. "This is people's lives."

### C. Specific Examples of Unlawful Dispensing Conduct: Florida

#### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Florida*

443. Florida has been a key supplier of diverted powerful prescription opioid medications that supplied not only users in Florida, but throughout East Coast.[298] From 2003 to 2010, Florida experienced a proliferation of "pill mills," a category that includes physicians, pain clinics, and other providers that dispense large quantities of prescription drugs, typically for cash only, outside the scope of standard medical practice.[299] By 2010, 90 of the 100 doctors purchasing the most oxycodone nationwide were practicing in Florida.[300] Accompanying increases in pill mills and opioid prescribing was a rapid rise in mortality from prescription opioid overdoses in Florida.[301]

444. Despite having some 875 stores located all over the State of Florida, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

445. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them

---

[298] Aric Chokey, Skyler Swisher, *5.6 billion opioid pills flooded the state, and rogue South Florida doctors helped get them on the streets*, South Florida Sun Sentinel (July 27, 2019), https://www.sun-sentinel.com/news/florida/fl-ne-opioids-flood-florida-data-20190726-3gltamcwojbltehe45aj73fyoy-story.html.

[299] Malbran P., *What's a pill mill?*, CBS News (May 31, 2007) http://www.cbsnews.com/news/whats-a-pill-mill.

[300] *Office of National Drug Control Policy, Fact sheet: prescription drug monitoring programs*. (2011) http://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/pdmp_fact_sheet_4-8-11.pdf.

[301] Centers for Disease Control and Prevention, *Drug overdose deaths—Florida, 2003–2009,* 60 Morb. and Mort. Wkly. Rep. 869–872 (2011).

later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| **23-Mar-06** | Mario Diaz, MD | Miami, FL | 30 months |
| **4-Apr-06** | Megaly Bethencourt, MD | Miami, FL | 2 years probation |
| **20-Apr-06** | Carlos Manuel Barrera | Miami, FL | 3 years probation |
| **5-May-06** | Jean Dominique, MD | Tampa, FL | 5 years probation |
| **25-Jul-06** | Augustin Castellanos, MD | Palm Beach Gardens, FL | 36 months |
| **30-Aug-07** | John Durfey, MD | Panama City, FL | 240 months |
| **27-Jul-09** | Robert L. Ignasiak, MD | Freeport, FL | 292 months |
| **19-Aug-09** | Craig Bammer, DO | Gulfport, FL | 17 years |
| **11-Sep-09** | Kevin Denny, MD | Tierra Verde, FL | 70 months |
| **2-Oct-09** | John Rew, MD | Tampa, FL | 3 years probation |
| **15-Oct-10** | Jeffrey Friedlander, MD | Tampa, FL | 9 years |
| **18-May-11** | Cesar Deleon, MD | Lake Worth, FL | |
| **24-May-11** | Robert Bourlier, MD | Destin, FL | 30 years |
| **18-Aug-11** | Arthur Carl Haspel, DPM | Boca Raton, FL | 7 years |
| **23-Aug-11** | Beau Boshers, MD | Palm Beach Gardens, FL | 78 months |
| **23-Aug-11** | Michael Aruta, MD | Boca Raton, FL | 72 months |
| **23-Aug-11** | Roni Dreszer, MD | Sunny Isles, FL | 72 months |
| **23-Aug-11** | Patrick Graham, MD | Boca Raton, FL | 4 years |
| **23-Aug-11** | Daniel Hauser, MD | Hollywood, FL | 6 months |
| **23-Aug-11** | Robert Meek, DO | Davie, FL | 66 months |
| **23-Aug-11** | Vernon Atreidis, MD | Ft. Lauderdale, FL | 66 months |
| **23-Aug-11** | Augusto Lizarazo, MD | Jupiter, FL | 36 months home con. |
| **23-Aug-11** | Irwin Beretsky, MD | Boca Raton, FL | |
| **23-Aug-11** | Jacobo Dreszer, MD | Sunny Isles, FL | |
| **2-Sep-11** | Steven Pearlstein, MD | Coral Springs, FL | 12 months |
| **16-Aug-12** | Michael Fronstin, MD | West Palm Beach, FL | |
| **16-Aug-12** | Adeline Essian, MD | Pompano Beach, FL | |
| **16-Aug-12** | Khanh Van Kim Duong, MD | Pompano Beach, FL | |
| **5-Sep-12** | John Anthony Gianoli, MD | St. Petersburg, FL | 5 years |
| **27-Nov-12** | Terrie Jaime, RN | Apopka, FL | “ year” |
| **5-Feb-13** | Ihad "Steve" Barsoum, PharmD | Lutz, FL | 17 years |

| | | | |
|---|---|---|---|
| **3-Jul-13** | Vijay Chowdary, MD | Boca Raton, FL | |
| **16-Jul-13** | Scott Becker, MD | Pembroke Pines, FL | 70 months |
| **1-Aug-13** | Cynthia Cadet, MD | Parkland, FL | 66 months |
| **1-Aug-13** | Joseph Castronuovo, MD | Key Largo, FL | 18 months |
| **24-Apr-14** | Stephen Anthony, MD | Davie, FL | 3 years |
| **2-Jun-14** | Thomas James Rodenberg, MD | Pompano Beach, FL | 220 months |
| **13-Jun-14** | Christopher Wayne, DO | Miami Beach, FL | 70 months |
| **9-Jul-14** | Michael Windley, DVM | Cantonment, FL | 20 months |
| **23-Jul-14** | Martha Otano, PharmD | Cape Coral, FL | 3 years |
| **24-Jul-14** | Ronald John, MD | Brandon, FL | 20 years |
| **12-Feb-15** | Jorge Otano, PharmD | Cape Coral, FL | 3 years |
| **13-Mar-15** | Russell Sachs, MD | Green Cove Springs, FL | 2 years |
| **1-May-15** | Richard Vitalis, DO | North Ft. Lauderdale, FL | |
| **27-May-15** | Lynn Averill, MD | Ft. Lauderdale, FL | |
| **8-Jun-15** | Ibem Borges, MD | Orlando, FL | |
| **6-Jul-15** | Brian C. Weller, PharmD | Melbourne, FL | 8 years |
| **23-Jul-15** | Fred Joseph Turner, MD | Sarasota, FL | 151 months |
| **31-Aug-15** | Armando Solis, MD | Miami Beach, FL | 46 months |
| **12-Jan-16** | Jacinta Irene Gillis, MD | Fort Myers, FL | 30 years |
| **21-Mar-16** | Valentine Okonkwo, PharmD | Orlando, FL | 24 years, 4 months |
| **24-May-16** | Kim Xuan Feldman | Tampa, FL | 4 years |
| **25-May-16** | Edward Neil Feldman, MD | Tampa, FL | 25 years |
| **12-Jul-16** | Thomas Merrill, DO | Panama City, FL | Life |
| **12-Jan-17** | Michael Morgan Dietch | Port Orange, FL | 135 months |
| **25-Jan-17** | John Peter Christensen, MD | West Palm Beach, FL | 4 years |
| **5-Apr-17** | Peter Katz, MD | Boynton Beach, FL | |
| **15-Jun-17** | William Ouw, MD | Pompano Beach, FL | 22 years |
| **30-Aug-17** | Anil Sahijwani | Tampa, FL | 45 months |
| **22-Jun-18** | John M. Gayden, MD | West Melbourne, FL | 19 years |
| **20-Jul-18** | Jeffrey John Abraham, MD | Tampa, FL | 36 months probation |
| **1-Aug-18** | Barry Schultz | West Delray Beach, FL | 157 years |
| **24-Jan-19** | Michael T. Harris, MD | Gulf Breeze, FL | Pled Guilty |
| **30-Jan-19** | Jayam Krishna Iyer, MD | Clearwater, FL | 6 months |
| **7-Feb-19** | Victor Hugo Espinosa, MD | Ft. Lauderdale, FL | Pled Guilty |
| **7-May-19** | Marta Elena Farinas, MD | Miami Beach, FL | |
| **29-May-19** | Kendrick Eugene Duldulao, MD | Tampa, FL | Convicted |
| **29-May-19** | Medardo Queg Santos, MD | Lakeland, FL | Convicted |
| **6-Jul-19** | Johnny Clyde Benjamin, MD | Vero Beach, FL | Life |
| **26-Sep-19** | Robert Patrick Jensen, MD | Gulf Breeze, FL | Indicted |
| **26-Nov-19** | Jeanne E. Germeil, MD | Aventura, FL | 210 months |

| | | | |
|---|---|---|---|
| **17-Dec-19** | Rodolfo Gonzalez-Garcia, MD | Weston, FL | 96 months |

### 2. *Miami, Florida (Pharmacist No. 6)*

446. The outcomes of the opioid epidemic in Florida, including the City of Miami, have been catastrophic — and getting worse. In 2016, the City of Miami saw 641 opioid-related overdoses, up nearly 20 percent from the year before. In 2016, the City of Miami Department of Fire-Rescue responded to 1,717 calls that involved Naloxone, an antidote to opioids, which increased by over a thousand calls from 2015, when there were 668 calls that involved Naloxone.

447. In the City of Miami alone, 541 people died between 2014-2017 after ingesting fentanyl or similar variants, including 156 individuals in the first ten (10) months of 2017.[302]

448. The majority of patients seeking treatment for opioid and heroin addiction in treatment centers in Miami started with an opioid prescription for pain.

449. Adding to the surge of pain killers that has been inundating Miami-Dade County have been the 83 CVS pharmacies there, which from 2006 to 2012 dispensed some 39,052,025 doses of opioids or a total of 1,231,951,695 MME, making CVS by far the largest dispenser of opioids in Miami-Dade County. That means that at the highest bounds of the recommended MME by the CDC (90 MME/day), the CVS stores every day for seven years dispensed enough opioid prescriptions for an average of 5,367 maximum dosage regimens, fueling rampant addiction throughout Miami-Dade County.

450. According to Pharmacist No. 6, who worked at the Miami CVS pharmacy located at 11890 Biscayne Blvd. from 2010 to 2011 and the Sunny Isles store at 168509 Collins Avenue from 2011 to 2013, what CVS expected of them was impossible to accomplish with the staff that

[302] David Ovalle, *In the middle of an opioid crisis, cops are arming themselves with a life-saving drug*, Miami Herald (Oct. 8, 2017), http://www.miamiherald.com/news/local/community/miami-dade/article177505476.html.

was provided by the Company. She often did not have time to eat lunch and barely had time to use the restroom during a shift. "It was crazy," she said. Overworked, understaffed pharmacists were under high expectations for meeting CVS Metrics, which created an environment that was primed for medical errors.

451. CVS pharmacies kept track of the prescriptions dispensed and the pharmacy's inventory of controlled substances on a handwritten log. The controlled substance log was kept in a binder at each pharmacy, Pharmacist No. 6 said. At the front of the binder was a do-not-fill list of doctors who had been identified as problematic for writing inappropriate prescriptions.

452. She was unaware of any policies at CVS regarding what would happen if a pharmacist filled prescription for a doctor on the list. Other than the list provided in the controlled substance binder, CVS did not require, suggest or facilitate a system for pharmacists to keep a list of doctors who were writing inappropriate prescriptions that were showing up in their stores, Pharmacist No. 6 said.

453. Nor did CVS require, suggest, or facilitate a system for pharmacists to share lists or names they developed of doctors identified or suspected of writing inappropriate prescriptions, this former Miami CVS pharmacist said.

**3. *Plant City, Florida (Pharmacist No. 2)***

454. Plant City, Florida (located in Hillsborough County) is a town of just under 35,000 people some 30 miles from Tampa. It is known as the Winter Strawberry Capital of the World and hosts the annual Florida Strawberry Festival. It has also been impacted by the opioid crisis. In 2017, there were 236 opioid-related deaths in Hillsborough County, or 16.8 deaths per 100,000

residents.[303] Some 3.67 percent of Hillsborough County residents over the age of 12 reported in 2014 the non-medical use of opioids and 2.67 percent were addicted.[304] According to the CDC, the annual prescribing rate in 2010 for Hillsborough County was 104.3 opioid prescriptions per 100 residents (one opioid prescriptions for every man, woman and child in the county), well above the national average for 2010 of 81.2, making it a "hotspot" area nationally. By 2017, the annual prescribing rate for Stephens County was 60 opioid prescriptions per 100 residents, still above the national average, 58.7 percent.

455. The CVS Pharmacy at 403 N. Alexander Street in Plant City, Florida helped fuel the opioids problem in Hillsborough County, from 2006 to 2012 dispensing 3,220,272 doses of opioids or a total of 34,945,059 MME. That means that at the highest bounds of the recommended MME per day (90 MME/day), the CVS store in Plant City every day for seven years dispensed enough opioid prescriptions for an average of 152 maximum dosage regimens, fueling rampant addiction throughout the area.

456. Pharmacist No. 2, who managed the Plant City CVS from 2013 to 2017 said that "[t]hey had all the Metrics for measuring every step you do." As an example, she described how the Company expected its pharmacy staff to input active prescriptions being filled. Initially, staff could input a "T" for time, to allocate a set delivery time, or 'W' for wait. "If they were waiting, we could put W15 for 15 minutes," she said. "Then they just wanted us to put 'W,' and the computer would calculate."

457. The problem with that, Pharmacist No. 2 said, was the computer system did not allow for variables of any kind. If a pharmacist completed the process in 11 minutes, but the

---

303 amfAR, *Opioid & Health Indicators Database*, https://opioid.amfar.org/FL.

304 *Id.*

computer system estimated it would take 12 minutes, and the customer had decided to walk around the store and did not pick up their order for 15 minutes, then the pharmacist would get flagged for not meeting a specified deadline. "They measure everything, and then you get a score," Pharmacist No. 2 said. "How many prescriptions you got within the wait time. You got docked (on your) weekly score on that" if the customer did not pick up their order within the time allocated by the computer.

458. She does not recall CVS having any specific training about how to handle opioids or what to do if a physician was writing or a customer was seeking inappropriate prescriptions. Pharmacist No. 2 said there was nothing in the CVS system to stop a pharmacist from dispensing excessive amounts of opioids.

459. At the Plant City CVS, only recently did they begin to keep a list of doctors that corporate CVS would not let them fill for, but it was limited. Toward the end of her time working at CVS, the list was provided electronically. Before there was a binder and they had to put their papers in the book. Now they are "electronic" with the computer doing that all automatically. She recalls there being only 5 or 6 physicians on the "do not fill" list, but only 2-3 times did she remember that the CVS computer system told her not to fill for a doctor.

460. There were a few doctors that CVS would not let them fill. These were generally physicians whose DEA number had been revoked. "That would kick them out anyway." There was nothing in the CVS system to stop pharmacists from filling prescriptions for doctors not on the in-store list.

461. According to Pharmacist No. 2, there was no coordination from store to store. So, customers could (and did) shop at other pharmacies and find someone to fill it. "99% of the time we would just say that it was out of stock" and suggest the customer go to a different pharmacy to get the opioid prescriptions. Pharmacists were not supposed to do that, but if they told customers

that they were not comfortable then "[w]e would have to talk to them forever, and we were under pressure to fill." This then encouraged customers to shop around and look at other pharmacies.

462. Pharmacist No. 2 said that, when you look at a patient's profile on the CVS system, it shows when they filled at a CVS, but there was not a way to mark visits when the prescription was not filled, so she could not tell if her pharmacy was the 1st or 30th pharmacy that the customer had seen.

463. They were under considerable pressure to fill scripts quickly. In order to check the EFORCSE system (Florida's PDMP system), she would need at least 10 minutes to check that and other databases. Realistically, though, given her workload, she generally only had 3-4 minutes to fill a script. This affected their ability to do due diligence on controlled substance prescriptions, which she acknowledged lead to bad script filling. She also stated that she stopped checking EFORCSE for some regulars and if she had she would have likely noticed that they were filling at multiple stores.

464. CVS had no requirement that pharmacists must check EFORCSE. They were just required to check the profile on the store website. The CVS system would only lock customers out if they tried to refill the same prescription early. Drug seekers knew how to get around the refill too early limit. Pharmacist No. 2 said they knew that, if the new script was a slightly different strength, the system did not flag that as a problem.

**4. *Tampa, Florida (Pharmacists No. 2 and No. 12)***

465. Nationally, between 2006 and 2012, pharmacies bought enough opioids to give everyone in the country 36 pills per year. The rate was even higher in and around Tampa Bay — Citrus, Hernando, Pasco, Hillsborough, Pinellas, Manatee and Sarasota counties all received more

per person than the national average. Tampa, Florida's third-largest city by population, ranked first in the total number of pills — receiving 410 million tablets in the period.[305]

466. Contributing to the flood of opioids that has been drowning Tampa and Hillsborough County have been the forty-one CVS pharmacies there, which from 2006 to 2012 dispensed an incredible 59,719,405 doses of opioids or a total of 770,369,889 MME, making CVS by far the largest dispenser of opioids in Hillsborough County. The Hillsborough CVS stores were dispensing an average of 301,515 MME per day. That means that at the highest bounds of the recommended MME by the CDC (90 MME/day), the CVS stores in Hillsborough County every day for seven years dispensed enough opioid prescriptions for an average of 3,350 90 MME dosage regimens, feeding widespread addiction throughout the area.

467. According to Pharmacist No. 12, who worked between 2012 and 2014 at the 5632 Gunn Highway CVS in Tampa, in addition to not having a blanket policy for rejecting prescriptions, he also felt all alone when he had to deal with hostile and potentially dangerous drug seekers when their prescriptions were rejected. Every day at the store on Gunn Highway in Tampa, he saw a lot of suspicious prescriptions for Schedule II controlled substances – OxyContin, Dilaudid, Percocet, etc.

468. Some of the people who came in with suspicious prescriptions were strung out, sketchy and scary, he said. Rejecting their prescriptions was stressful because he did not know how they might react, and often they did not take no for an answer. "I would never feel comfortable because there was tension," Pharmacist No. 12 said.

[305] Langston Taylor, *5 takeaways from new data on Florida's opioid crisis*, Tampa Bay Times (July 26, 2019), https://www.tampabay.com/florida-politics/buzz/2019/07/26/5-takeaways-from-new-data-on-floridas-opioid-crisis/.

469. He also felt threatened by some of the customers. "There were times I felt it was dangerous, but I would say no," Pharmacist No. 12 said. "I did my best to assert my professional judgment, but I was nervous constantly. I was scared something would happen. You would feel there was no one there to help you," he said. "That would be a daily thing."

470. When he started working at the Gunn Highway store in Tampa, he began to encounter a lot of customers who brought in suspicious prescriptions for controlled substances that he rejected. When he checked their records in the CVS system, he was surprised to discover the store had been previously dispensing those prescriptions to these customers. Pharmacist No. 12 said that made it much more difficult to reject the prescription because the customer would demand to know why and argue they had the prescription filled there before.

471. The Tampa stores where he worked had very high numbers of customers seeking inappropriate prescriptions compared to the prior CVS store where he worked. He said many of them had been receiving inappropriate prescriptions before he started there.

472. Some mornings, he would arrive to find a long line of customers with controlled substance prescriptions waiting for the pharmacy to open on the day that controlled substance was delivered. "The clientele would be established," Pharmacist No. 12 said. "I did come across situations in which the clientele filling their CIIs [Schedule II drugs] at the store would know already when the deliveries were coming in. They would already be waiting at 9am in the morning."

473. Considering the lack of support CVS provided to its pharmacists in regard to rejecting suspicious prescriptions, he concluded the Company cared more about prescription volume than it did about ensuring inappropriate drugs were not dispensed. "I never felt like the company was backing us up. Volume was their biggest thing. They wanted prescriptions filled."

474. A former CVS pharmacy manager, Pharmacist No. 2, who worked at the Tampa pharmacy on 4001 E. Busch Blvd between 2012 and 2015, said she sometimes filled-in for the pharmacist at the store located at 2911 E. Fowler Ave. When she was at the Fowler store, a patient brought in a prescription from a doctor she recognized because she had filled prescriptions for his patients at her Busch store. Pharmacist No. 2 was surprised to discover that the doctor was on the Fowler store pharmacist's no-fill list. "He was on their list at that particular store where I was filling in," she said. "The tech told me, 'We don't take scripts from him.'" His name was Dr. Abd Benni, a pain management doctor currently operating a clinic near Tampa in Brandon, Florida.

475. Pharmacist No. 2 had never received a call, an email or any type of communication from a pharmacist at the Fowler store or at any other CVS store that Dr. Benni was on their do-not-fill list. Dr. Benni was also not on the do-not-fill list provided by CVS. "He wasn't on the list CVS was passing around," Pharmacist No. 2, said. She did not understand why Dr. Benni had been placed on the list.

476. Many of Dr. Benni's patients were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $2,150,533 in claims for CII drugs he had prescribed:[306]

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| ACETAMINOPHEN-CODEINE | 41 | 1,256.75 |
| BUTALB-CAFF-ACETAMINOPH-CODEIN | 13 | 1,084.58 |
| BUTALBITAL-ACETAMINOPHEN-CAFFE | 115 | 4,517.88 |

[306] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

| | | |
|---|---|---|
| EMBEDA | 79 | 26,725.42 |
| FENTANYL | 740 | 91,642.31 |
| HYDROCODONE-ACETAMINOPHEN | 4,002 | 134,405.97 |
| HYDROMORPHONE ER | 163 | 83,787.06 |
| HYDROMORPHONE HCL | 1,253 | 84,442.77 |
| METHADONE HCL | 2,230 | 32,292.04 |
| MORPHINE SULFATE | 640 | 21,285.57 |
| MORPHINE SULFATE ER | 2,656 | 207,817.31 |
| OPANA ER | 181 | 88,425.12 |
| OXYCODONE HCL | 4,877 | 263,893.74 |
| OXYCODONE HCL ER | 46 | 29,996.00 |
| OXYCODONE HCL-ACETAMINOPHEN | 337 | 25,295.96 |
| OXYCODONE-ACETAMINOPHEN | 4,004 | 298,423.84 |
| OXYCONTIN | 745 | 461,249.6 |
| OXYMORPHONE HCL | 52 | 28,502 |
| OXYMORPHONE HCL ER | 45 | 22,247.76 |
| SUBOXONE | 521 | 239,829.28 |
| VICODIN HP | 22 | 3,412.76 |
| **Grand Total** | **22,762** | **$2,150,533.72** |

477. Job performance was partially based on how many prescriptions were filled. When she went in for her annual job performance review, the Company based it on detailed reports on an extensive list of Metrics CVS tracked for her store and her work. "It was based on your prescription volume, the number of scripts you got, the amount of money or profit you made, a ton if that, Key Performance Metrics," Pharmacist No. 2 said. "Contacting doctors for refill follow ups, contacting patients about gaps in care, they had Metrics for all that."

478. CVS also had Metrics for the number of flu shots the pharmacy did, how quickly the pharmacy filled prescriptions, whether the pharmacy filled scripts within 15 minutes for patients who are waiting in the store, how many patients were contacted to refill their prescriptions, and more. Pharmacist No. 2 said the Metrics determined if and how much of a raise and a bonus she and other employees got. The Company's expectations and Metrics kept pharmacists under constant, intense pressure to meet those goals. They had no metric for ensuring only appropriate prescriptions were filled, however.

**5. *Weston, Florida (Pharmacist No. 12)***

479. The Weston, Florida website describes it as "one of the top cities in the country in which to live" and "picture perfect in every way."[307] But Weston sits in Broward County, Florida, the center of the opioid epidemic that has plagued Florida. South Florida, and Broward County in particular, have suffered some of the largest numbers of opioid overdose deaths in the country.

480. In 2016 alone, 582 people died in Broward County due to an opioid overdose—on average, more than ten people per week.[308] The startling number of overdose deaths is only one way to measure the pervasive and unprecedented manner opioids have affected Broward County.

481. Statistics for January through December 2016 from the District 17 Office of Medical Examiner and Trauma Services, which includes Broward County, reveal that of the drug overdose deaths examined, 109 involved oxycodone, 21 involved hydrocodone, 14 involved

---

[307] The City of Weston Florida, About Weston, https://www.westonfl.org/about/about-weston.

[308] Press Release, *Alarming Number of People Overdosing on Opiates in Broward*, Broward County (Apr. 5, 2017), https://webapps.broward.org/newsrelease/View.aspx?intMessageID=10372.

methadone, 193 involved morphine, 154 involved fentanyl, and 180 involved heroin, and those numbers are rising.[309]

482. According to the Florida Medical Examiners Commission, synthetic opioids like fentanyl and carfentanil killed more than 850 people in the first half of 2016— more than any other drug.[310] In 2016, Broward County suffered at least 53 deaths linked to carfentanil, more than any other county in the nation.[311]

483. CVS did little to control the opioids being dumped into Broward County. According to Pharmacist No. 12, who worked at the Weston CVS from 2011 to 2012, CVS had no blanket policies that set specific benchmarks for when pharmacists must reject a prescription for a controlled substance. That means each pharmacist had his/her own standards, something Pharmacist No. 12 said drug seekers took advantage of. When one pharmacist rejected a prescription, drug seekers would continue going to one pharmacist after another until one of them filled the prescription, he said.

484. Pharmacist No. 12 said, if CVS had implemented "something concrete and official from the company," that would have helped prevent drug seekers from obtaining inappropriate subscriptions. "It would have helped out," he said. "It would have discouraged people from trying to fill faulty prescriptions." He said a clear and strict policy for when a prescription must be

---

309 *Drugs Identified in Deceased Persons by Florida Medical Examiners*, Medical Examiners Commission 2016 Annual Report, Florida Department of Law Enforcement (Nov. 2017), https://www.fdle.state.fl.us/MEC/Publications-and-Forms/Documents/Drugs-in-Deceased-Persons/2016-Annual-Drug-Report.aspx.

310 Peter Haden, *Florida Governor Scott Signs Tough Fentanyl Law In West Palm Beach*, WLRN (July 11, 2017), http://wlrn.org/post/florida-governor-scott-signs-tough-fentanyl-law-west-palmbeach.

311 Jeff Tavass, Amy Viteri, WPLG Local 10 News, *Broward County warns of deadly synthetic drug* (Nov. 3, 2016), https://www.local10.com/health/broward-county-warns-of-deadly-drug-killing-local-residents.

rejected would make it easier for the pharmacists to do so. The pharmacists could simply tell the customer it was Company policy and the decision was not subjective.

485. Pharmacist No. 12 said, "[i]f [drug seekers] would have seen steadier or stronger protocols in regards to the controlled (substances)," they would have stopped trying to shop for a pharmacist who would fill their inappropriate scripts. He was frustrated that CVS did not have such blanket policies – for example, rejecting all prescriptions from a doctor located a certain number of miles away.

486. He said that the lack of policies was in line with what he felt was an "absence" of management at CVS regarding the task of rejecting prescriptions for controlled substances. "It felt like you were alone," Pharmacist No. 12 said. "It was basically our problem to handle. We would make the decision, a'd that was it. We didn't feel we had help or support from our managers." CVS left its pharmacists on their own to deal with rejecting prescriptions for potentially hostile and dangerous drug addicts on a daily basis without any in-store security.

## D. Specific Examples of Unlawful Dispensing Conduct: Kentucky

### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Kentucky*

487. The Commonwealth of Kentucky has been hit especially hard by the opioid epidemic, ranking fifth in the nation for opioid-related deaths in 2015. In 2015, 102 opioid prescriptions were written for every 100 Kentucky residents, 1.5 times the national average. In 2016 alone, there were 1,404 reported fatal drug overdoses in Kentucky—117 per month. Fentanyl was involved in 623—approximately 47%—of those deaths. In 2017, there were 1,565 fatal drug overdoses in Kentucky, which increased the average death rate to approximately 130 deaths per month.

488. In addition to opioid-related fatalities, the Commonwealth has suffered other serious injuries. Kentucky has seen a dramatic increase in opioid addiction, reflected, in part, in the increase in Medicaid spending for medications to treat such addiction, which doubled in just two years—from $56 million in 2014 to $117 million in 2016.

489. Children are especially vulnerable to the opioid epidemic. In just one 12-month period, between August 1, 2014 and July 31, 2015, 1,234 infants in Kentucky were born addicted to opioids, more than 100 newborns per month. Many of these infants must be treated in neonatal intensive care units while they painfully withdraw from the drugs. Children also suffer when removed from their homes due to their parents' opioid abuse and addiction.

490. Kentucky has had one of the highest rates of pregnant women using opioids in the country. In 2014, the Commonwealth had the third-highest rate of pregnant women with opioid use disorder. In 2017, the number of babies born with NAS in the Commonwealth had increased by 375% since 2007.

491. Despite having 80 pharmacies located all over the Commonwealth of Kentucky, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities in Kentucky.

492. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| Date | Name | City | Prison |
|---|---|---|---|
| **26-Oct-09** | Milton Lee Brindley, MD | Augusta, KY | 71 months |
| **14-May-10** | Stanley Naramore, MD | Cincinnati, OH | 48 months |
| **12-Dec-11** | Richard Albert, MD | Paintsville, KY | 75 months |
| **3-Aug-12** | Michael D. Leman, owner | Lexington, KY | 15 years |

| | | | |
|---|---|---|---|
| **18-Dec-12** | Clara Rodriguez-Iznaga, MD | Plantation, FL | 20 years |
| **14-Jan-13** | Ernest William Singleton, MD | Springfield, KY | 20 years |
| **18-Jun-13** | Gregory B. White | Georgetown, KY | 2 years |
| **18-Dec-13** | Charles Tenhet, PharmD | London, KY | 10 years |
| **1-Aug-14** | Tammy Cantrell, MD | Paintsville, KY | 9 years |
| **1-Aug-14** | Shelby Lackey | Paintsville, KY | 97 months |
| **29-Aug-14** | Rano Bofill, MD | Paintsville, KY | 4 years |
| **10-Sep-14** | Beverly Lockhart, Pharm Mgr | Pikesville, KY | 72 months |
| **30-Mar-15** | Ronald Hungerbuhler, DDS | Corbin, KY | 1 year |
| **16-Jun-15** | Charles Fred Gott, MD | Warren County, KY | 8 years |
| **13-May-16** | James Guerrero, MD | Louisville, KY | 8 years |
| **1-Jul-16** | Sean P. McDonald, MD | McCracken County, KY | Probation |
| **11-Jul-16** | Alan Craig Schold | Georgetown, KY | |
| **1-Apr-17** | Clelia Hayes, MD | Tompkinsville, KY | 1 year |
| **24-Apr-17** | Ezekiel O. Akande, MD | Somerset, KY | 5 years |
| **5-Jun-17** | George Kudmani | Louisville, KY | 48 months |
| **30-Jun-17** | Lonnie Hubbard, PharmD | Berea, KY | 30 years |
| **29-Sep-17** | James Chaney, MD | Hazard, KY | 180 months |
| **26-Apr-18** | Alan Arnold Godofsky, MD | Cincinnti, OH | 5 years |
| **7-May-18** | Fred Gott, MD | Bowling Green, KY | 96 months |
| **10-Aug-18** | Roy D. Reynolds, MD | Franklin, KY | 50 months |
| **17-Apr-19** | Raymond Noschang, MD | Sycamore Township, KY | |
| **19-Apr-19** | Christopher Nelson, MD | Louisville, KY | |
| **30-Apr-19** | Curtis Edens, MD | Louisa, KY | 2 years probation |
| **29-Jul-19** | Michael Lee Cummings, MD | Albany, KY | 30 months |
| **26-Oct-09** | Milton Lee Brindley, MD | Augusta, KY | 71 months |
| **14-May-10** | Stanley Naramore, MD | Cincinnati, OH | 48 months |
| **12-Dec-11** | Richard Albert, MD | Paintsville, KY | 75 months |
| **3-Aug-12** | Michael D. Leman, owner | Lexington, KY | 15 years |
| **18-Dec-12** | Clara Rodriguez-Iznaga, MD | Plantation, FL | 20 years |
| **14-Jan-13** | Ernest William Singleton, MD | Springfield, KY | 20 years |
| **18-Jun-13** | Gregory B. White | Georgetown, KY | 2 years |
| **18-Dec-13** | Charles Tenhet, PharmD | London, KY | 10 years |
| **1-Aug-14** | Tammy Cantrell, MD | Paintsville, KY | 9 years |

| | | | |
|---|---|---|---|
| **1-Aug-14** | Shelby Lackey | Paintsville, KY | 97 months |
| **29-Aug-14** | Rano Bofill, MD | Paintsville, KY | 4 years |
| **10-Sep-14** | Beverly Lockhart, Pharm Mgr | Pikesville, KY | 72 months |
| **30-Mar-15** | Ronald Hungerbuhler, DDS | Corbin, KY | 1 year |
| **16-Jun-15** | Charles Fred Gott, MD | Warren County, KY | 8 years |
| **13-May-16** | James Guerrero, MD | Louisville, KY | 8 years |
| **1-Jul-16** | Sean P. McDonald, MD | McCracken County, KY | Probation |
| **11-Jul-16** | Alan Craig Schold | Georgetown, KY | |
| **1-Apr-17** | Clelia Hayes, MD | Tompkinsville, KY | 1 year |
| **24-Apr-17** | Ezekiel O. Akande, MD | Somerset, KY | 5 years |
| **5-Jun-17** | George Kudmani | Louisville, KY | 48 months |
| **30-Jun-17** | Lonnie Hubbard, PharmD | Berea, KY | 30 years |
| **29-Sep-17** | James Chaney, MD | Hazard, KY | 180 months |
| **26-Apr-18** | Alan Arnold Godofsky, MD | Cincinnati, OH | 5 years |
| **7-May-18** | Fred Gott, MD | Bowling Green, KY | 96 months |
| **10-Aug-18** | Roy D. Reynolds, MD | Franklin, KY | 50 months |
| **17-Apr-19** | Raymond Noschang, MD | Sycamore Township, KY | |
| **19-Apr-19** | Christopher Nelson, MD | Louisville, KY | |
| **30-Apr-19** | Curtis Edens, MD | Louisa, KY | 2 years probation |
| **29-Jul-19** | Michael Lee Cummings, MD | Albany, KY | 30 months |
| **17-Oct-19** | Mohammed A.H. Amzumder, MD | Prestonburg, KY | Pled guilty |
| **11-Mar-20** | Peter Steiner, MD | Louisville, KY | Pled guilty |

**2.** ***Flatwoods, Kentucky (Pharmacist No. 13)***

493. Flatwoods has a population of 7,423 and is the largest town in Greenup County, Kentucky. The name "Flatwoods" comes from the area's original topography, a belt of flat wooded land, approximately 650 feet in elevation, running parallel to the Ohio River.[312]

[312] Welcome to Flatwoods, Kentucky, https://www.flatwoodsky.org/.

494. Flatwoods has been at the epicenter of the opioid epidemic in the U.S. The CVS store in Flatwoods is across the Ohio River from Southern Ohio, not far from the cities of Ironton and Portsmouth, towns well known for attracting pill mill physicians. It is like the area has had a "pharmaceutical atom bomb" dropped on it, according to a local public health nurse, which has brought the county to the verge of complete social collapse.[313]

495. According to DEA ARCOS data, the CVS Pharmacy at 2409 Argillite Road, Flatwoods, Kentucky helped fuel the opioid problem in Flatwoods and Northeast Kentucky, from 2006 to 2012 dispensing 2,111,328 doses of opioids or a total of 29,663,553 MME. That means that at the highest bounds of the recommended MME per day (90 MME/day), the Flatwoods CVS store every day for seven years dispensed enough opioid prescriptions for an average of 129 maximum dosage regimens, fueling rampant addiction in this town of 7,423 people. This chart of ARCOS data graphically shows the volume of opioids dispensed at the Flatwoods CVS from 2006 to 2012:




313 Aaron Marshall, *Prescription drug epidemic brings Southern Ohio county to its knees*, Cleveland Plain Dealer (Feb. 7, 2011), https://www.cleveland.com/open/2011/02/prescription_drug_epidemic_bri.html.

496. Despite working at a pharmacy located at the epicenter of the opioid crisis, Pharmacist No. 13 (who worked at the Flatwoods CVS from April 2015 to August 2015) felt he was under corporate pressure to fill prescriptions without regard to whether they were inappropriate. “It was a factory,” he said. He was evaluated on how many prescriptions he checked an hour, how many he filled in an hour, how long it took to fill prescriptions, were they on time and other similar Metrics. The pharmacy was understaffed, he said, and he needed more help. “I was doing my job and somebody else’s too,” he said. “I couldn’t keep up.”

497. CVS provided no corporate training on warning signs of pill mill doctors, no guidance on what to do when a pharmacist was presented with a suspect prescription, nor did it maintain a list or database of suspected pill mill physicians.

498. He was not aware of any corporate training that outlined warning signs, or “red flags,” to help identify pill mill doctors or doctor-shopping patients. “They left it up to me, pretty much,” Pharmacist No. 13 said, describing the corporate attitude toward identifying pill mill doctors.

499. As a former high-volume CVS pharmacist, he summed up the corporate attitude to refusing to fill like this: “These doctors are licensed by the state government; they can prescribe whatever they want. . . . My job is not to second guess the doctor’s diagnosis. My job is to make sure the patients gets the right medication, the right dose. My job is to give you the medication that is prescribed to you by the doctor. If I do that, then I make money and my company makes money. If I don’t do that, then I run people off.”

500. After the Commonwealth of Kentucky instituted a PDMP database, he relied on its prescription monitoring program to identify problem patients and doctors.

501. He was aware of doctors who operated pill mills. Despite that, the Company did not maintain any list or database of suspected pill mill physicians, Pharmacist No. 13 said. He and

other pharmacists in the area relied on word-of-mouth to gather information about problem doctors.

### E. Specific Examples of Unlawful Dispensing Conduct: Maryland

#### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Maryland*

502. Maryland has not been spared by the scourge of opioids. In 2017, there were 1,985 overdose deaths involving opioids in Maryland—a rate of 32.2 deaths per 100,000 persons, which is twofold greater than the national rate of 14.6 deaths per 100,000 persons. The state ranks in the top 5 for opioid-related overdose death rates with the largest increase attributed to cases involving synthetic opioids (mainly fentanyl). From 2012 to 2017, the number of deaths involving synthetic opioids rose from 52 to 1,542 deaths. Drug overdose deaths involving prescription opioids also recently declined to 711 in 2017.[314]

503. Despite having some 200 stores located all over the State of Maryland, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

504. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| **Date** | **Name** | **City** | **Sentence** |
|---|---|---|---|
| **15-Jan-04** | DeWitt Webster, DDS | Hyattsville, MD | |
| **25-May-04** | Richard Schlesinger, MD | Owings Mills, MD | 3 yr probation |
| **12-Oct-06** | Callixtus Onigbo Nwaehiri, Owner | Jarrettsville, MD | |

[314] National Institute on Drug Abuse, Maryland Opioid Summary, https://www.drugabuse.gov/opioid-summaries-by-state/maryland-opioid-summary.

| | | | |
|---|---|---|---|
| **21-Feb-07** | Derek Curtis, DDS | Seabrook MD | 63 months |
| **12-Dec-08** | Steven Abiodun Sodipo, Owner | Forest Hill, MD | 60 months |
| **25-Jan-11** | Kenneth Riley, DDS | Catonsville, MD | 30 months |
| **14-Jun-12** | Joffre E. Robalino, MD | Columbia, MD | 1 yr, 1 day |
| **22-Aug-13** | David Russo, MD | Hagerstown, MD | 30 months |
| **12-Feb-14** | George Matthews, MD | Prince Frederick, MD | 2 years |
| **3-Nov-14** | John K. Yacoub, MD | Baltimore, MD | 1 yr, 1 day |
| **Feb-15** | William Crittenden, MD | Kensington, MD | 3 years |
| **13-Mar-15** | Donald Russell, MD | Waldorf, MD | 5 years |
| **May-15** | Bruce Kevin Davis, MD | Deale, MD | 5 years |
| **May-15** | Alex Mori, Owner | Nanjemoy, MD | 4 years |
| **28-May-15** | Joyce Vercauteren, Owner | Greenbelt, MD | |
| **Oct-15** | Gerald Wiseberg, MD | Timonium, MD | 1 yr, 1 day |
| **Oct-15** | Daniel Alexander, MD | Pikesville, MD | 18 months |
| **Oct-15** | Alina Resnick, Owner | Timonium, MD | 1 yr, 1 day |
| **11-Oct-15** | Sandeep Sherlekar, MD | Germantown, MD | deceased |
| **8-Aug-16** | Nicola Tauraso, MD | Frederick, MD | deceased |
| **8-Dec-16** | Michael Resnick, MD | Timonium, MD | 3 years |
| **10-Aug-17** | Hasan H. Babaturk, MD | Baltimore, MD | |
| **28-Feb-18** | Norman Rosen, MD | Towson, MD | |
| **28-Feb-18** | Howard Hoffberg, MD | Towson, MD | |
| **13-Mar-18** | Walter Moffett | Chestertown, MD | 5 years |
| **25-Apr-18** | Thomas Dalton, MD | Waldorf, MD | 4 years |
| **12-Jun-18** | Tomarco Harris, Owner | Baltimore, MD | 20 years |
| **3-Aug-18** | Kofi Shaw-Taylor | Glen Burnie, MD | 5 years |
| **15-Feb-19** | David Robinson, PharmD | Baltimore, MD | 51 months |
| **17-Jul-19** | William Soyke, PA | Hanover, PA | Pled guilty |

### 2. *Annapolis, Maryland (Pharmacist No. 14)*

505. Pharmacist No. 14 was a floater pharmacist at several CVS stores in the Annapolis, MD, area from August 2012 to October 2013.

506. She recalled a pill mill doctor from her time at CVS who was part of the Kure Pain Management clinic in the area. (Note: There is currently a Kure Pain Management clinic also known as KureSmart Pain Management located in Annapolis.) She recalled the majority of the prescriptions she saw from this pain management doctor were at the Riva Road CVS store where she worked as a floater, where she saw at least one prescription from him every day she worked

there. She also occasionally saw prescriptions from the same doctor at other CVS stores in the Annapolis area. The doctor typically prescribed oxycodone.

507. When she called the doctor's office to check the accuracy of a prescription he had written, the clinic would confirm it. Once a doctor's office confirmed the accuracy of the prescriptions, Pharmacist No. 14 said she had to fill it regardless of what she thought about it. "You would call about the prescription, and he would say, 'Yeah, that's correct,'" she said. "There was really nothing I could do…. You had to fill it."

508. Pharmacist No. 14 said prescriptions from this doctor were regularly dispensed at CVS under these circumstances. Asked if CVS ever told her or made clear that, even if a doctor confirmed a prescription was accurate, the pharmacist could still decline to fill it if the pharmacists thought it was inappropriate, she said no. She repeated that her hands were tied and she had to fill a prescription if the doctor confirmed it.

509. She brought up her concerns about the Kure Pain Management clinic doctor with her manager, but the manager told her there was nothing they could do in regards to rejecting it if the doctor confirmed the prescription.

510. CVS kept a hard copy list of Annapolis doctors who wrote opioid prescriptions that pharmacists were advised to look at closely. The Kure Pain Management doctor referred to above was on a list of names that the CVS pharmacies in Annapolis kept posted on the wall near a pharmacy computer where prescriptions were typed in, she said. The list was part of a memo that was sent to the pharmacies that included only Annapolis area doctors. Pharmacists were advised to "double check all" controlled substance prescriptions from the doctors on the list, Pharmacist No. 14 said.

511. The list was not kept in digital form in CVS's internal computer system, "CVS Live." There were also no alerts about closely examining prescriptions from those doctors within the CVS system, Pharmacist No. 14 said.

512. Doctors' names were only flagged within the CVS system if they had lost their DEA numbers. Pharmacist No. 14 said that was because the doctor's DEA license number would no longer be accepted in their system.

513. She described her time at CVS as traumatic because of the non-stop workload at understaffed pharmacies. She recalls being so busy she was unable to take bathroom breaks for long stretches of her shift. The work pace was so intense that pharmacists did not have time to stop and make follow-up on calls to doctors or do a "deep dive" to investigate a controlled substance prescription.

514. "If there was a medication I needed to follow up on with a physician, if I had a question, because of the volume it was hard," Pharmacist No. 14 said. She also noted if there was a spare few minutes in the day, pharmacists would take it to go to the bathroom. She said if she was waiting for a doctor's response on a controlled substance prescription before filling it, she would put the prescription on hold if the doctor did not call back during her shift.

515. Pharmacist No. 14 said that due to the workload and pace that other pharmacists might have missed red flags indicating an inappropriate prescription. The lack of staff at CVS impacted pharmacists' ability to investigate, authenticate and determine the appropriateness of controlled substance prescriptions.

## F. Specific Examples of Unlawful Dispensing Conduct: Michigan

### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Michigan*

516. In 2017, there were 2,033 overdose deaths involving opioids in Michigan—a rate of 21.2 deaths per 100,000 persons, which is higher than the national rate of 14.6 deaths per 100,000 persons. The greatest increase in opioid deaths was seen in cases involving synthetic opioids (mainly fentanyl), from 72 deaths in 2012 to 1,368 in 2017. Prescription opioid involved deaths also rose from 378 deaths in 2012 to 678 deaths in 2016 but saw a recent decline to 633 deaths in 2017.[315]

517. Despite having some 303 stores located all over the State of Michigan, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

518. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| Date | Name | City | Prison |
|---|---|---|---|
| 12-Apr-06 | Stuart W. Bilyeu, DO | Southfield MI | 5 years |
| 15-Apr-08 | Larry Curtis White, DO | Rochester, MI | 6 months |
| 14-Aug-08 | Mukunda Dev Mukherjee, MD | Flint, MI | 328 years |
| 29-Jan-09 | Paul Howard Emerson, DO | Taylor, MI | 12 years |
| 19-May-09 | Louis Cannella, MD | Menominee, MI | 48 months |
| 24-Sep-09 | Salahuddin S. Ahmad, MD | Ferndale, MI | 36 months |
| 1-Sep-10 | Philip Lafata, MD | Pigeon, MI | 3 years |
| 1-Sep-10 | Paul J. Nugent, PharmD | Caseville, MI | 3 years |
| 4-Jan-11 | Sohrab Shafinia, DO | Farmington Hills, MI | 78 months |
| 14-Sep-12 | Mikhayl Soliman, MD | Plymouth, MI | |
| 19-Mar-13 | Babubhai Patel | Detroit, MI | 17 years |
| 20-Mar-13 | Ahab Elmadhou, PharmD | Canton, MI | |

[315] National Institute on Drug Abuse, Michigan Opioid Summary, https://www.drugabuse.gov/opioid-summaries-by-state/michigan-opioid-summary.

| | | | |
|---|---|---|---|
| 10-Jul-13 | Anmy Tran, MD | Clinton Tnshp, MI | 60 months |
| 10-Jul-13 | Sanyani Edwards, MD | Southfield MI | fugitive |
| Sep-13 | John Chong MD | Coldwater, MI | 18 months |
| 15-Nov-13 | James D. Orr, PharmD | Grand Rapids, MI | $30,000 |
| 15-Nov-13 | Eugene A. Biegert, PharmD | Grand Rapids, MI | $15,000 |
| 15-Nov-13 | Thomas N. VerHage, PharmD | Kentwood, MI | $30,000 |
| 7-Mar-14 | Carl Fowler, MD | West Bloomfield, MI | 72 months |
| 7-Mar-14 | Mukesh Khunt, PharmD | Toronto, Ontario | 3 years |
| 30-Jun-14 | Ruben Benito, MD | Madison Heights, MI | 40 months |
| 20-Sep-14 | Lauran Bryan, MD | Detroit, MI | 1 year, 1 day |
| 6-Feb-15 | Waleed Yagmour, PharmD | Dearborn, MI | 6 years |
| 6-Feb-15 | Krina Patel, PharmD | Shelby Twp, MI | |
| 6-Feb-15 | Jayshriben Gandhi, PharmD | Canton, MI | |
| 6-Feb-15 | Adelfo Pamatmat, MD | Farmington Hills, MI | 19 years |
| 6-Feb-15 | John Geralt, MD | Beverly Hills, MI | 180 months |
| 6-Feb-15 | Malik Dababneh, MD | Oxford, MI | |
| 6-Feb-15 | Paul Kelly, MD | Bath, MI | 18 months |
| 6-Feb-15 | Ravi Iyer, MD | Novi, MI | |
| 6-Feb-15 | Muhammed Ahmed, MD | Ypsilanti, MI | |
| 6-Feb-15 | Timothy Spencer, PA | Inkster, MI | |
| 11-Feb-15 | Luis Collazo, MD | Farmington Hills, MI | plea bargain |
| 18-Mar-15 | William McCutcheon | Detroit, MI | 30 months |
| 18-Mar-15 | Anthony Conrardy, MD | Detroit, MI | 30 months |
| 16-Nov-15 | Hussein Awada, MD | Royal Oak, MI | 7 years |
| 1-Mar-16 | Abbey Akinwumi, MD | Detroit, MI | 8 years |
| 9-Mar-16 | Carlos Godoy, DC | Farmington Hills, MI | 1 year |
| 19-Apr-16 | Michael Weiss, MD | Troy, MI | |
| 12-Jul-16 | Oscar Linares, MD | Monroe, MI | 57 months |
| 8-Dec-16 | Fanny Dela Cruz, MD | Livonia, MI | 96 months |
| 15-Jun-17 | Sardar Ashrafkhan, MD | Ypsilanti, MI | 23 years |
| 8-Nov-17 | Mark Edward Brewster, MD | Traverse City MI | 10 months |
| 6-Feb-18 | Rodney Moret, MD | Madison Heights, MI | 75 months |

| | | | |
|---|---|---|---|
| 8-Feb-18 | Jennifer Franklin, MD | Oak Park MI | 33 months |
| 2-May-18 | Lillian Meghnot | Ann Arbor, MI | 1 year |
| 26-Jul-18 | Mark Buzzard, MD | West Bloomfield, MI | 72 months |
| 9-Mar-19 | Boris Zigmond, DC | West Bloomfield, MI | 15 years |
| 5-May-19 | John Shedd, PharmD | Albion, MI | 15 months |
| 5-May-19 | Terry Tooley, MD | Spring Harbor, MI | 15 months |
| 10-May-19 | Amanda Sheridan, Med Asst. | Hastings, MI | probation |
| 19-Jun-19 | Alex Kafi, MD | West Bloomfield, MI | 60 months |
| 4-Feb-20 | Spilios Pappas, MD | Detroit, MI | Guilty Verdict |
| 4-Feb-20 | Joseph Betro, MD | Detroit, MI | Guilty Verdict |
| 4-Feb-20 | Tariq Omar, MD | Detroit, MI | Guilty Verdict |
| 4-Feb-20 | Mohammed Zahoor, MD | Detroit, MI | Guilty Verdict |

### 2. *Ypsilanti, Michigan (Pharmacist No. 15)*

519. Ypsilanti is a city with a population of just 21,000 people. Ypsilanti is located 6 miles (10 km) east of Ann Arbor and about 18 miles (29 km) west of the Detroit city limits.

520. Ypsilanti and Washtenaw County have seen a dramatic increase in opioid overdose deaths, including prescription painkillers like OxyContin, fentanyl, methadone and Vicodin and street drugs like heroin.[316] Opioid overdose deaths in Washtenaw County have increased from 29 in 2011 to 81 in 2018.[317]

521. Adding to the surge of pain killers that has been inundating Ypsilanti and Washtenaw County have been the 13 CVS pharmacies in town, which from 2006 to 2012 dispensed 18,650,537 doses of opioids or a total of 208,588,956 MME, making CVS the largest dispenser of opioids in the County. That means that at the highest bounds of the recommended

[316] Health Dept., Washtenaw County, Michigan, *Opioid Data*, https://www.washtenaw.org/1921/Opioid-Data.

[317] *Id.*

MME by the CDC (90 MME/day), the CVS stores every day for seven years dispensed enough opioid prescriptions for an average of 1,159 maximum dosage regimens.

522. Pharmacist No. 15, who worked as a staff pharmacist at the Ypsilanti stores from 2006 to 2013, said that CVS did not have a list of doctors whose prescriptions pharmacists were not supposed to fill. If he called a doctor and the doctor verified that the prescription was legitimate, he would usually fill it. "It was left to the doctor," to decide what was appropriate for the patient, he said.

523. Pharmacist No. 15 said that he had been told people in the area liked to abuse the cough syrup by mixing it with purple soda to make the recreational drug known as "lean," "purple drank," or "sizzurp." He would call the doctor repeatedly to inquire whether the patients needed a gallon. Many of the doctor's patients visited his CVS pharmacy. "It was a lot [of customers] that got [the opioid cough syrup] repeatedly," Pharmacist No. 15 said. "The number of people in line fluctuated — I'm not sure if the doctor sent them to our store because he knew we would fill it for him. I felt worried, but he's a doctor, I'm just a pharmacist."

524. He recalled calling the doctor and each time the physician "acted like it was legit." In the summer, he said he called and said, "now it's summer and they still have colds? Do you need that much?" At that point the doctor told him he could cut back to a smaller amount of the cough syrup. "'No, you can cut back,' he said. I was leery, but I gave him the benefit of the doubt and still filled."

525. It was not unusual for people who had been prescribed controlled substances to wait outside the pharmacy until it opened. Lines frequently formed in the store, not just for controlled substances but for all sorts of prescriptions.

526. There were also other signs of suspicious customer activity. Pharmacist No. 15 recalled one set of patients who would routinely go through the drive through to fill one opioid

prescription. Then, the passenger would hop out and come in to fill an identical prescription. "One would fill, then go park and the other came inside," he said. "Both [prescriptions] were from the same doctor."

527. He said he filled prescriptions as long as when he called to verify the order with the doctor everything seemed above board. CVS did not have any policies stating to operate otherwise.

528. Pharmacist No. 15 also relayed that "[s]ometimes late at night some [customers] hung around and had people come to their car doors. I personally wouldn't fill for them after that." However, CVS did not have any policy preventing other pharmacists from filling for the patients who sold their medication in the parking lot.

### G. Specific Examples of Unlawful Dispensing Conduct: Mississippi

#### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Mississippi*

529. The State of Mississippi has felt the impact of the opioid scourge. As a single measure of that impact, opioids are by far the most commonly prescribed class of controlled substances in Mississippi. During 2017, over 3.1 million opioid prescriptions were dispensed in Mississippi, meaning over half of a million dosage units (*e.g.*, pills) were dispensed every day.[318] The rate of 92.9 opioid prescriptions per 100 persons is enough for each person in Mississippi to have an opioid prescription during 2017, compared to the average U.S. rate of 58.7 prescriptions, among the top five rates in the U.S. that year.[319]

---

[318] Prescriptions for Opioids in Mississippi: Numbers, Rates and Trend Analyses, 2012-2017, https://msdh.ms.gov/msdhsite/index.cfm/44,7764,382,pdf/Opioid_Rx_Rates_and_Trends_2012_2017.pdf.

[319] NIH Mississippi Opioid Summary, https://www.drugabuse.gov/opioid-summaries-by-state/mississippi-opioid-summary.

530. The volume of opioids flooding the State has had tragic consequences measured in human lives. The number of reported deaths due to overdose reached a total of 346 in 2017.[320] Opioids, including prescription opioids, fentanyl, heroin, and methadone, were involved in 180 (52.0%) cases.[321] The human toll on Mississippi's citizens is not only measured by these deaths, but by births as well. According to hospital data, from 2010 through 2015 the number of infant hospitalizations related to maternal use of narcotics increased by 46.3% between 2010 and 2015.[322]

531. Despite having some 57 stores located all over the State of Mississippi, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

532. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| Date | Name | City | Prison |
|---|---|---|---|
| **4-Feb-19** | Robert A. Wiemer, Jr., MD | Harrison County, MS | Indicted, awaiting trial |
| **21-Sep-06** | Edward T. Chwab, DO | Canton, MS | 22 months |
| **12-Feb-07** | Ted A. Glass, MD | Jackson, MS | 4 years probation |
| **20-Jun-05** | Richard A. Mazur, MD | Pass Christian, MS | 27 months |
| **17-Jun-18** | Albert Diaz, MD | Biloxi, MS | 42 months |
| **1-Apr-10** | Thomas Trieu, MD | Biloxi, MS | 8 years |
| **1-Apr-10** | Victoria Van, MD | Biloxi, MS | 1 year |
| **22-Sep-16** | Steven Tincher, MD | Brandon, MS | surrendered medical license |

[320] Drug Overdose Deaths in Mississippi, 2011-2017, https://msdh.ms.gov/msdhsite/index.cfm/44,7980,382,pdf/DrugOverdoseDeaths2011-2017.pdf.

[321] *Id.*

[322] Neonatal Hospitalizations Related to Substance Use in Mississippi: Surveillance Report, 2010-2017, https://msdh.ms.gov/msdhsite/index.cfm/44,8164,382,pdf/Neonatal_hospitalizations_2010-2017.pdf.

| | | | |
|---|---|---|---|
| **3-Oct-16** | Lawrence Stewart, MD | McComb, MS | 2 years probation |
| **21-Jan-16** | Steve Morris, III, MD | Waveland, MS | 37 months |

### 2. *Madison, Mississippi (Pharmacist No. 5)*

533. Pharmacist No. 5 was a pharmacist at the CVS in Madison, Mississippi from 2009 to August 2019. His store was located at 110 Colony Crossing Way, and he reported to District Manager Chris Cunningham. He quit at the end of August this year due to the stress of the impossible work expectations at CVS.

534. When he first started working at CVS in 2009, he recalls that his store had 200 hours each week for pharmacy technicians. Over the next several years, the prescriptions volume at the store increased to about 400 prescriptions a day.

535. CVS also added more and more tasks for pharmacists to do, such as administering flu shots and calling 150 customers each weekend with refill reminders. Despite the increasing number of prescriptions and work, however, CVS continued to cut the number of technician hours, Pharmacist No. 5 said. When he left, his pharmacy only had about 128 hours a week to staff technicians, he said.

536. What was worse than not having enough technician hours, Pharmacist No. 5 said, was working as the only pharmacist on duty during a shift. There was never any overlap of shifts for him and another pharmacist, which meant that he always had to handle every task that required a licensed pharmacist.

537. Pharmacist No. 5 said he often worked his entire 13-hour shift without breaks. "I have gone all day without sitting or eating," he said. On the days he did not eat, Pharmacist No. 5 said he was able to at least drink fluids to keep him going. But recently, he says, the Company has prohibited all eating and drinking in the pharmacy. "Without proper fluid and nutrition, it is impossible to do your job," he said.

538. The result of the severe understaffing created a factory-like atmosphere at the pharmacy where the conveyor belt of new prescriptions moved too fast and never stopped. He compared the experience to the *I Love Lucy* episode when Lucy worked at a factory packaging pieces of chocolate. The pieces rolled out too fast on the conveyor belt for her to handle, so she started to eat more and more of them in a doomed effort to keep up.

539. The situation at CVS was far from funny. “They have you pushing so hard that you’re just trying to get them out as fast as you can to survive,” Pharmacist No. 5 said of filling prescriptions. “That’s all you’re doing.” His pharmacy was so busy at times that both his technicians were stuck ringing up customers for long periods of time, leaving him alone to do everything else required to fill all of the incoming prescriptions. “You have so many damn prescriptions,” he said. “They are pushed at you and stacked up for you to do. You try to get things done as fast as you can to stay alive.”

540. He explained that when two pharmacists are on duty at the same time, one pharmacist can continue to work the line filling prescriptions if the other pharmacist needs to step away to call a doctor, talk to a patient or check the state’s PDMP database for a controlled substance prescription. At CVS, that was not an option.

541. Pharmacist No. 5 made clear how frustrated and angry he was (and still is) with CVS for the “impossible” work schedule and expectations. Everything pharmacists did during the day was tracked and pharmacists’ job reviews were based on how well they met the Company’s target Metrics. “Everything that happens is a metric,” he said. “The number of prescriptions you do for a certain length of time, the number of prescriptions that are a waiter, the number of prescriptions that are a waiter versus not a waiter,” Pharmacist No. 5 said. “The number of questions you ask a customer. The number of flu shots you gave. They know every phone call that

you make. It's timed. How long it takes to answer the phone, how long you stayed on the phone, and how long you put them on hold. It's beyond belief."

542. The Company also timed how long it took to fill prescriptions. When customers came into the store with a prescription and wanted to wait for it, the Company expected the pharmacy to fill it within 15 minutes. Pharmacist No. 5 said the Company's expectations for Metrics were "undoable."

543. "It was totally impossible to do what they expected of you," Pharmacist No. 5 said. Yet when he and others did not meet the Metrics, they were reprimanded and pushed to do better. "They write you up all the time," he said. "The indication there is that if you don't improve next year, you will probably not be there. How can you work when you know that?"

544. He said the stress of trying to meet impossible expectations while working severely understaffed everyday was a nightmare that "took years off my life. It's much worse than I'm telling you," he said. "And you have to do it every day. You wake up and go there every day to do it. It's not like someone is sick or somebody's mother died (and you're short-staffed). Every day is a bad day."

545. Asked if CVS management was aware of how understaffed the pharmacies were and the impact it was having on the pharmacy operations, Pharmacist No. 5 said: "My only real good answer to that is how could they not?" he said. "Everybody is complaining. Everybody is begging" for more help.

546. Customer complaints also increased, which he believes should have indicated to management that the staff was struggling under the workload. "We used to never get customer complaints," Pharmacist No. 5 said. "But now we get them all the time." He believes the lack of staff and intense time constraints put on pharmacists to fill prescriptions quickly, created an environment where pharmacists could not do their jobs properly.

547. In Mississippi, he said, if a new patient comes into the pharmacy with a controlled substance prescription or a regular patient comes in with a new prescription for a controlled substance, pharmacists are required to check the state PDMP database that tracks patients' controlled-substance prescriptions. But at CVS, he said there was often no time for that. Nor was there time to call the patient's doctor with any questions a pharmacist might have before filling it.

548. Pharmacist No. 5 used the *I Love Lucy* example again: "Let's say every twentieth piece of candy was a serious piece of candy you have to do something special with," he said. "But you have all these prescriptions coming at you. If you stop and do all these phone calls, you get further and further behind. You can't get to it. You can't do what you're supposed to because you don't have time."

549. Checking the state PDMP database can take 15 to 20 minutes, meaning he would have to take that length of time away from the never-ending conveyor belt of prescriptions that also demanded his attention. "From the time constraints, if you did do this (stop to vet a prescription), that means you'd be so far behind it would be twice as stressful," he said. "We are legally required to do certain things, and you're not able to do it because there is no time."

550. The same time constraints made it nearly impossible to stop and call doctors with questions about prescriptions.

551. The CVS where Pharmacist No. 5 worked was located in an affluent area, and he did not encounter many customers who appeared to have an addiction problem with opioids.

552. But he said the store did dispense "a lot of opioids," and they made up a significant proportion of the pharmacy's prescription volume. The opioids were typically prescribed after surgeries or for end-of-life/cancer pain.

553. It is possible that inappropriate controlled substance prescriptions were filled at his store because he did not have time to fully vet the prescription and patient. For example, if he did

not have time to check the database, he would not know if the patient is filling the same controlled substance prescription from another doctor in another pharmacy. “You can’t go through all the proper steps if you don’t have time,” Pharmacist No. 5 said.

554. “They keep telling us, ‘If you’re not comfortable, do not fill it no matter what. Use your professional judgment. Go through all the steps,’” Pharmacist No. 5 said. “But if you canIget to all the steps...” He likened it to the job of inspecting rides at a traveling carnival. “If you’re supposed to inspect every single car in every ride at the fair, and you’re the only person doing it, you’re probably not going to get to all of them, and clearly you’re going to miss some dangerous things happening,” he said.

555. Pharmacist No. 5 could not recall that CVS offered any training, instructions, or guidance about issues related to the opioid crisis. He said there were no classes or training about proper pain management treatments or how to spot inappropriate prescriptions.

## H. Specific Examples of Unlawful Dispensing Conduct: Ohio

### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Ohio*

556. The opioid epidemic in Ohio has been similarly disastrous. The CDC reports that, over the past six years, more than 7,272 Ohioans have died from overdoses of prescription opioids.[323] These statistics, however, may dramatically underestimate deaths from opioids because they ignore opioid-related complications to infectious diseases, such as pneumonia.[324]

---

[323] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics, *Multiple Cause of Death Data*, CDC WONDER, https://wonder.cdc.gov/mcd.html.

[324] Susan Scutti, *Opioid Epidemic may be underestimated, CDC report says*, CNN.com (Apr. 25, 2017), http://www.cnn.com/2017/04/24/health/opioid-deaths-cdc-report/index.html.

557. Ohio's prescription opioid deaths are now the highest in the country. In 2016, Ohio had more prescription opioid deaths than any other state in the nation, with one of every 11 deaths from prescription opioids in the United States occurring in Ohio.[325]

558. In 2016, prescription opioids caused the deaths of 2,875 Ohio residents, a 60% increase compared to 2015.[326] From 2004-16, 86.3% of all unintentional drug overdose deaths in Ohio involving specific drugs, including deaths from cocaine and many other drugs, involved opioids.[327]

559. In 2016 alone, 2.3 million Ohio patients ' roughly 20% of the State's population – were prescribed an opioid drug.[328] According to public data from the DEA, over 18.8 billion milligrams – over 20 tons – of prescription opioids were distributed in Ohio from 2013 to 2016.[329] These conclusions about the extent of opioid diversion are further supported by data from the Ohio Automated RX Reporting System ("OARRS") showing that in 2016, the "average" county in Ohio saw distributions of approximately 65 pills per person per year (including children) and several Ohio counties have seen annual distributions exceeding 100 opioid pills for every man, woman and child and 1,000 pills per user.

560. Despite having some 390 stores located all over the State of Ohio, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

---

[325] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics, *Multiple Cause of Death Data*, CDC WONDER, https://wonder.cdc.gov/mcd.html.

[326] *Id.*

[327] *Id.*

[328] Ohio Automated RX Reporting System, 2016 Annual Report, https://www.ohiopmp.gov/documents/Annual%20Report%20(2016).pdf.

[329] DEA, *ARCOS Retail Drug Summary Reports*, https://www.deadiversion.usdoi.gov/arcos/retail drug summary/.

561. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| Date | Name | City | Prison |
|---|---|---|---|
| 21-Aug-06 | David Albert Hoxie, MD | Waverly OH | 3 years |
| 6-Feb-08 | Donald Ray¼d Kiser | Marietta, OH | 7 1/4 years |
| 29-Jul-08 | Stanley Naramore, MD | Cincinnati, OH | 48 months |
| 12-Jun-09 | Walter Broadnax, MD | Cincinnati, OH | 5 years |
| 1-Feb-10 | Jorge A Martinez, MD | Boardman, OH | Life |
| 8-Nov-11 | Denise Huffman, owner | South Point, OH | 12 2/3 years |
| 21-Dec-11 | Victor Georgescu, MD | Wheelersburg, OH | Deceased |
| 1-Jan-12 | Brenda Banks, MD | Columbus, OH | 4 years |
| Jan-12 | Han M Yang, MD | Dayton, OH | |
| Apr-12 | Marcellus Gilreath, MD | Cleveland, OH | Plea |
| Apr-12 | Stephen Pierce, MD | Cincinnati, OH | |
| 1-May-12 | John Randy Callihan, owner | Portsmouth, OH | 5 years |
| 14-Oct-12 | George Marshal Adkins, MD | Wheelersburg, OH | 10 years |
| 26-Mar-13 | Darrell Hall, MD | Toledo, OH | 5 years |
| 29-Apr-13 | Kevin Huff, owner | Portsmouth, OH | 21.83 years |
| 4-Jun-13 | James Lassiter, MD | Findlay, OH | |
| 16-Jun-13 | Mark Fantauzzi, DO | Cincinnati, OH | |
| Mar-14 | Shannon L. Swanson, DO | Andover, OH | |
| 1-May-14 | John Dahlsten, MD | Cincinnati, OH | 4 months |
| 21-May-14 | Tracy Bias | West Portsmouth, OH | 14 years |
| 4-Jun-14 | Julia I. Lucente, MD | Dayton, OH | surr. License |
| 4-Jun-14 | Osama Salouha, PharmD | Lorain, OH | fugitive |
| 4-Jun-14 | Sbeih Sbeih, PharmD | Lorain, OH | fugitive |
| 4-Jun-14 | Julia Immaculata Lucente, MD | Dayton, OH | |
| 6-Jun-14 | Jorge Martinez, MD | Boardman, OH | Life |
| 28-Aug-14 | Syed Jawad Akhtar-Zaidi, MD | Solon, OH | Fugitive |
| 1-Oct-14 | Terry Dragash, MD | Pataskala, OH | 1 year |

| | | | |
|---|---|---|---|
| 3-Feb-15 | Adolph Harper, MD | Akron, OH | 10 years |
| 16-Mar-15 | Brian D. Heim, MD | Akron, OH | 63 months |
| 1-Jun-15 | Raymond Fankell, PharmD | Wheelersburg, OH | Plea |
| 18-Jun-15 | John Temponeras, MD | Wheelersburg, OH | |
| 17-Aug-15 | Paul Volkman, MD | South Point, OH | 4 life sentences |
| 10-Nov-15 | Gregory Ingram, MD | Ravenna, OH | 1 year |
| 24-Nov-15 | Christopher Stegawski, MD | Cleveland, OH | 13 1/3 years |
| 1-Dec-15 | Karen Climer, employee | Alexandria, OH | 6 months |
| 3-Dec-15 | David Rath, MD | Alexandria, OH | Deceased |
| 4-Apr-16 | Ronald Celeste, MD | Westlake, OH | 3 years |
| 30-Jan-17 | Kevin B. Lake, DO | New Albany, OH | 60 months |
| 7-Apr-17 | Margaret Temponeras, MD | Wheelersburg, OH | |
| 1-Jan-18 | Rodney Curtis, MD | Belmont City, OH | 6 months |
| 24-Jan-18 | Jayati Gupta Rakhim, MD | Moreland Hills, OH | |
| 14-Feb-18 | James Lundeen, MD | Portsmouth, OH | |
| 22-Mar-18 | Richard Rydze, MD | Pittsburgh, PA | 10 years |
| Jun-18 | Nelish Jobalia, Md | Cincinnati, OH | |
| 28-Jun-18 | Mike Jones, PA | Hamilton, OH | |
| 29-Jun-18 | Saad Sakkal, MD | Hamilton, OH | |
| 29-Aug-18 | David Kirkwood, MD | Dayton, OH | 70 months |
| Oct-18 | Shuresh Gupta, MD | Riverside, OH | |
| 12-Jul-19 | Frank Lazzerini, MD | Stark City, OH | 113 years |

**2. *Akron, Ohio (Pharmacist No. 16)***

562. Akron is the county seat for Summit County, which has declared that a state of emergency exists as a result of the opioid epidemic.[330]

563. Publicly available data suggests distribution of opioids to Summit County exceeded reasonable medical use and that opioids were likely diverted into Summit County. From 2010 to 2016, according to the state OARRS data, Summit County—with a population of 540,000 residents—averaged 36.4 million doses of opioids dispensed per year, with a high of 39.5 million. This is an average of 623 opioids per year and 67 opioids per person per year, both greater than the already high state average. The volume of opioids distributed in Summit County is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

564. Adding to the surge of pain killers that has been inundating Akron and Summit County have been the 20 CVS pharmacies in the County, which from 2006 to 2012 dispensed an incredible 39,244,221 doses of opioids or a total of 480,361,601 MME, making CVS by far the largest dispenser of opioids in the County. That means that at the highest bounds of the recommended MME by the CDC (90 MME/day), the CVS stores every day for seven years dispensed enough opioid prescriptions for an average of 2,089 maximum dosage regimens.

565. According to Pharmacist No. 16, who worked from 2015 to 2017 as a floater pharmacist around the Akron area, including Doylestown, Wadsworth, and (during her last six months at CVS, as a staff pharmacist at a CVS store on 4195 South Cleveland-Massillon Road in Norton), CVS did not keep lists of doctors who had been identified by its pharmacists for writing

[330] Jen Steer, Fox 8 Cleveland, *Summit County executive declares state of emergency over opioid crisis* (Oct. 25, 2017), https://fox8.com/2017/10/25/summit-county-executive-declares-state-of-emergency-over-opioid-crisis/.

inappropriate prescriptions. While at CVS, she would receive occasional memos from management about specific doctors who had been identified as writing inappropriate prescriptions, were under investigation or who had lost their license to prescribe. Pharmacists were told to stop filling prescriptions for these doctors.

566. But Pharmacist No. 16 does not recall CVS keeping a master list of these doctors in its internal systems. When doctors lost their licenses to prescribe, the pharmacists were informed by the State of Ohio Board of Pharmacy, she said. The announcement might also come through Company communications, she said.

567. CVS did not specifically encourage its pharmacists to share the names of doctors they had concerns about. Pharmacist No. 16 said she shared her concerns about a Cleveland area physician, Dr. Jerome Yokiel, with her colleagues.

568. She denied no prescriptions for a controlled substance during her time at CVS. "If I reject a prescription for pain, they (the patient) would complain to my manager. The manager would ask me why." If she did not have a "good explanation that it's not proper to sell it," her managers would come down hard on her, Pharmacist No. 16 said.

569. So, unless she had a very clear, black-and-white reason to reject the prescriptions, such as "it's too early to fill," or "it's an obvious fake," or there's an "interaction with another drug," she did not feel she had enough to defend her decision to deny if the customer complained and her manager questioned her about it.

570. She stated that CVS was more interested in prescription volume than in ensuring that inappropriate prescriptions for controlled substances were not be dispensed.

571. She saw and filled numerous opioid prescriptions at CVS from a pain clinic doctor who later lost his license. She recalled a Cleveland area pain management physician, Dr. Jerome Yokiel, who was a frequent prescriber of opioids who lost his license for what she thought was

inappropriately prescribing controlled substances. Dr. Yokiel had his license to prescribe controlled substances suspended in late 2017 because of his own use and addiction to opioids.[331] She recalls filling numerous controlled substance prescriptions from Dr. Yokiel at the CVS pharmacies where she worked.

572. Dr. Yokiel's prescriptions were usually for opioids and, typically, his patients came into the pharmacy with a combination of two to three prescriptions for controlled substances. She recalled seeing prescriptions and "Holy Trinity" combo prescriptions from this doctor five to 10 times a week. The most common drugs he prescribed were Percocet and hydrocodone. Pharmacist No. 16 said it was more common to see the two-combo prescription of an opioid with an anti-anxiety or sleeping medication such as Ambien. But Dr. Yokiel also wrote numerous combinations of three prescriptions. "There were a lot of muscle relaxant and anti-anxiety and opioid at the same time," she said.

573. Pharmacist No. 16 said she never refused to fill any of the prescriptions from Dr. Yokiel. She said Dr. Yokiel typically wrote prescriptions for a two-week supply, but that the dosage strengths tended to be on the higher side. "If Percocet is available in 2.5 (mg), 7.5 and 10, he would do 7.5 or 10," she said.

574. Many of Dr. Yokiel's patients were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $2,875,733 in claims for CII drugs he had prescribed:[332]

---

**331** Brie Zeltner, *Chronic pain patients struggle after Beachwood doctor suspended*, Cleveland.com (Aug. 26, 2018), https://www.cleveland.com/healthfit/2018/08/chronic_pain_patients_struggle.html.

332 This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| ACETAMINOPHEN-CODEINE | 138 | 3,407.95 |
| DURAGESIC | 104 | 63,525.77 |
| ENDOCET | 70 | 6,791.00 |
| FENTANYL | 2,092 | 242,132.11 |
| HYDROCODONE-ACETAMINOPHEN | 4,154 | 141,868.32 |
| HYDROCODONE-IBUPROFEN | 37 | 3,605.15 |
| HYDROMORPHONE ER | 17 | 17,307.51 |
| HYDROMORPHONE HCL | 982 | 25,767.87 |
| METHADONE HCL | 1,415 | 23,769.52 |
| MORPHINE SULFATE | 603 | 17,804.95 |
| MORPHINE SULFATE ER | 3,116 | 18,3935.8 |
| OPANA | 11 | 26,756.87 |
| OPANA ER | 296 | 183,869.01 |
| OXYCODONE HCL | 4,703 | 200,751.24 |
| OXYCODONE HCL ER | 54 | 38,717.87 |
| OXYCODONE HCL-ACETAMINOPHEN | 529 | 35,682.54 |
| OXYCODONE-ACETAMINOPHEN | 5,862 | 327,874.49 |
| OXYCONTIN | 2,357 | 1,192,553.76 |
| OXYMORPHONE HCL | 114 | 52,425.33 |
| OXYMORPHONE HCL ER | 75 | 21,842.28 |
| PERCOCET | 12 | 15,069.02 |
| ROXICET | 26 | 843.42 |
| SUBSYS | 11 | 49,431.35 |
| **Grand Total** | **26,778** | **$2,875,733.13** |

575. She first heard about Dr. Yokiel losing his license through word of mouth among colleagues. She then received notice from the Board of Pharmacy that he no longer had a license

to prescribe and that his prescriptions should not be filled. She had shared her concerns about Dr. Yokiel with colleagues. Yet she confirmed she did not reject any of his prescriptions and that she filled them throughout her time as a floater at CVS.

576. Dr. Jerome Yokiel, a medical doctor operating a pain management center in Beachwood, Ohio, had his license suspended indefinitely by the Medical Board, effective November 8, 2017.[333]

577. In her job evaluations at CVS, Pharmacist No. 16 said the top priority for assessing performance was the three top revenue streams for the pharmacies. "Prescription volume was number one," she said. In her job evaluations, "performance was really important," she said. Asked how the Company defined performance, she said revenue streams were the key. She said there was always pressure to increase the numbers to increase revenue streams.

## I. Specific Examples of Unlawful Dispensing Conduct: Tennessee

### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Tennessee*

578. Tennessee is among the hardest-hit states when it comes to the opioid crisis. The story of its impact is often told in numbers: 1,268 opioid overdose deaths in Tennessee in 2017; more than six million painkiller prescriptions in Tennessee in 2018.[334]

579. In 2015, Tennessee had the third highest prescription rate in the country[335] and one of the highest amounts of opioids prescribed per person in the country as measured in MMEs,

[333] State Medical Board of Ohio License Look-Up, https://elicense.ohio.gov/oh_verifylicensedetails?pid=a0Rt00000007yavEAA (last visited April 28, 2020).

[334] Tennessee Department of Health, *Tennessee Faces of Opioids*, https://www.tn.gov/tnfacesofopioids.

[335] U.S. Ctrs. for Disease Control and Prevention , Opioid Overdose, U.S. State Prescribing Rates, 2016, https://www.cdc.gov/drugoverdose/maps/rxstate20l6.html.

according to the CDC.[336] That same year Tennessee had 13,034 nonfatal overdose outpatient visits and 7,092 overdose inpatient stays.[337]

580. In 2016 alone, 7,636,112 opioids were prescribed in Tennessee. In 2016, there were 1,186 opioid-related overdose deaths in Tennessee – a rate of 18.1 deaths per 100,000 persons – higher than the national rate of 13.3 deaths per 100,000.[338]

581. Tennessee is ranked number six (6) in the nation for rates of opioid-related hospital admissions among senior citizens. In 2005, 467 out of every 100,000 Tennesseans aged 65 and older spent time hospitalized from opioid related use. By 2015, that rate had more than doubled to 1,055 out of every 100,000 Tennesseans aged 65 and older.[339]

582. Despite having some 150 stores located all over the State of Tennessee, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

583. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

---

[336] U.S. Ctrs. for Disease Control and Prevention, Vital Signs, Opioid Prescribing, https://www.cdc.gov/vitalsigns/opioids/infographic.html.

[337] Tennessee Department of Health, Data Dashboard, https://www.tn.gov/health/health-program-areas/pdo/pdo/data-dashboard.html

[338] Nat'l Institute for Health, Nat'l Institute on Drug Abuse, *Tennessee Opioid Summary*, Rev. March 2019) https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/tennessee-opioid-summary.

[339] Anita Wadhwani, *Opioid-related Hospitalizations More than Triple for Tennessee Seniors*, THE TENNESSEAN, (Oct. 14, 2017), https://www.tennessean.com/story/news/2017/08/13/opioid-related-hospitalizations-more-than-triple-tennessee-seniors/545556001/ (citing the U.S. Agency for Healthcare Research and Quality).

| Date | Name | City | Prison |
|---|---|---|---|
| 19-Sep-05 | Christopher W. Fletcher, MD | Nashville, TN | 3 years probation |
| Apr-07 | Joe P. Moss, MD | Franklin, TN | 18 months |
| 29-Sep-08 | Kelvin Lynn Douglas, MD | Jackson, TN | Time served |
| Nov-08 | Sanford K. Myers, MD | Knoxville, TN | 156 months |
| 14-Aug-10 | Larry Karr, MD | Hixson, TN | 108 months |
| 9-Mar-11 | Elisabeth Reimers, MD | Winchester, TN | 70 months |
| 28-Mar-11 | Samuel Ashby, MD | Fayetteville, TN | 108 months |
| 14-Apr-12 | Allen R. Walker, MD | Portland, TN | |
| 30-May-12 | Ihsaan Al-Amin, MD | Chattanooga, TN | 100 months |
| 8-Feb-13 | Larry E. Boatwright, PharmD | Germantown, TN | 15 2/3 years |
| Apr-13 | Thomas Patrick Brown, PharmD | Johnson City, TN | 5 years |
| 18-Apr-13 | Tamral Guzman, owner | Maryville, TN | 21 years |
| 4-Jun-13 | Robert D. McNeese, PharmD | Greenville, TN | 63 months |
| 7-May-14 | Randy Kincaid, owner | Maryville, TN | 69 years |
| 23-M'y-14 | Dustin Morgan, Owner's Son | Maryville, TN | 17 years |
| 24-Jul-14 | Michael Alan Patterson, MD | Bartlett, TN | 16 years |
| 19-Aug-14 | Sandra Kincaid, owner | Manchester, TN | 39 years |
| 5'Sep-14 | Wendi Henry, owner's daughter | Maryville, TN | 18 years |
| 16-Oct-14 | David Eric Brickhouse, PA | Maryville, TN | Deceased |
| 5-Nov-14 | Rosaire Michel Dubrule, MD | Tiptonville, TN | 12.5 years |
| 1-May-15 | Charles Larmore, NP | Chattanooga, TN | 13 years |
| 28-Aug-15 | Barbara Lang, owner | Chattanooga, TN | 280 years |
| 1-Oct-15 | Faith Blake, owner | Chattanooga, TN | 44 years |
| 1-Oct-15 | Jerome Sherard, MD | Chattanooga, TN | 5 years |
| Feb-16 | Sherry Barnett, NP | Jonesborough, TN | 2 years |
| 24-Mar-16 | Matthew Anderson, DCM | Lenoir City, TN | |
| 24-Mar-16 | David Florence, DO | Manchester, TN | |
| Oct-16 | Cynthia Clemons, NP | Knoxville, TN | |
| 4-Oct-16 | Sylvia Hofstetter, owner | Knoxville, TN | |
| 17-Nov-16 | James Brian Joyner | Maryville, TN | 70 months |
| 17-Nov-16 | Deborah G. Thomas, MD | Maryville, TN | 10 years |
| 13-Jan-17 | Jamie Chiles Cordes, NP | Maryville, TN | 54 months |

| | | | |
|---|---|---|---|
| 21-Jan-17 | Sherry Ann Fetzer, NP | Maryville, TN | 3 yrs probation |
| 21-Jan-17 | Buffy Rene Kirkland, NP | Maryville, TN | 2 years |
| 24-Feb-17 | Donna Jeanne Smith, NP | Maryville, TN | 2 years |
| 4-Mar-17 | Walter D. Blankenship, PA | Maryville, TN | 3 yrs probation |
| 24-Mar-17 | Don Robert Lewis, PA | Maryville, TN | 3 years |
| 14-Mar-18 | Abdeirahman Mohamed, MD | Morristown, TN | 36 months |
| 7-Nov-18 | Lawrence Joseph Valdez | Hendersonville, TN | |
| 13-Dec-18 | Samuel Orusa, MD | Clarksville, TN | |
| 17-Apr-19 | Timothy Abbott, DPM | Nashville, TN | |
| 17-Apr-19 | Darrell R. Rinehart | Columbia, TN | |
| 17-Apr-19 | Heather Marks, NP | Murfreesboro, TN | |
| 17-Apr-19 | Brian Richey, NP | Cookeville, TN | |
| 17-Apr-19 | Daniel Seeley, NP | Batesville, MS | |
| 17-Apr-19 | Jonathan White, NP | Tullahoma, TN | |
| 17-Apr-19 | John Polston, PharmD | Tompkinsville, TN | |
| 17-Apr-19 | Charles Brooks, MD | Maryville, TN | |
| 17-Apr-19 | Henry Babenco, MD | Paducah, KY | |
| 17-Apr-19 | Sharon Naylor, NP | Jacksboro, TN | |
| 17-Apr-19 | Alicia Taylor, NP | Oneida TN | |
| 17-Apr-19 | Gregory Madron, | Jacksboro, TN | |
| 17-Apr-19 | Harrison Yang, MD | Manchester, TN | |
| 17-Apr-19 | Glenn Bonifield, PharmD | Bells, TN | |
| 17-Apr-19 | Michelle Bonifield, PharmD | Bells, TN | |
| 18-Apr-19 | Alexander Alperovich, MD | Jackson, TN | |
| 18-Apr-19 | Jeffrey Young, NP | Jackson, TN | |
| 18-Apr-19 | Andrew Rudin, MD | Jackson, TN | |
| 18-Apr-19 | Thomas Kelly Ballard, MD | Jackson, TN | |
| 18-Apr-19 | Loran Karlosky, MD | Bells, TN | |
| 18-Apr-19 | Jay Shires, MD | Bells, TN | |
| 18-Apr-19 | Charles Alston, MD | Jackson, TN | |
| 18-Apr-19 | Britney Petway, NP | Jackson, TN | |
| 18-Apr-19 | Mary Bond, NP | Bells, TN | |
| 22-Apr-19 | Steven Mynat, MD | Knoxville, TN | |
| 22-Apr-19 | David G. Newman, MD | Knoxville, TN | |
| 9-Aug-19 | Timothy Dennis Gowder, MD | Hixson, TN | 21 years |
| 9-Aug-19 | Anwar Mithavayani, Owner | Boca Raton, FL | 25 years |

| | | | |
|---|---|---|---|
| 30-Aug-19 | Pete Anthony Tyndale, Owner | Hixson, TN | 29 years |
| 18-Oct-19 | Samuel Mcgaha, MD | Sevierville, TN | Pled Guilty |
| 18-Oct-19 | Frank McNiel, MD | Knoxville, MD | Pled Guilty |
| 29-Oct-19 | Hemal V. Mehta, MD | Brentwood, TN | Indicted |
| | | | |

### 2. *Lenoir City, Tennessee (Pharmacist No. 17)*

584. Lenoir City, Tennessee (located in Loudon County) has a population of 8,642 residents and sits on the outskirts of Knoxville. It is known according to the town website as the "Lake Capital of the South."[340] It also has had the unhappy distinction of being the location of some of the largest opioid pill mill operations in the U.S., and as a result has found itself in the middle of several massive civil and criminal investigations which to date have netted $1.45 million in civil recoveries and some 140 criminal indictments.[341]

585. According to DEA ARCOS data, the CVS Pharmacy at 570 Highway 321 North, Lenoir City helped stoke the opioid problem in East Tennessee, from 2006 to 2012 dispensing 4,133,827 doses of opioids or a total of 77,936,330 MME, making it the largest dispenser of opioids in the in Loudon County. That means that at the highest bounds of the recommended MME per day (90 MME/day), the Lenoir City CVS store every day for seven years dispensed enough opioid prescriptions for an average of 339 maximum dosage regimens, fueling rampant addiction in this town of 8,642 people. This chart of ARCOS data graphically shows the number of opioids dispensed at the Lenoir City CVS from 2006 to 2012:

[340] City of Lenoir City, http://www.lenoircitytn.gov/welcome/.

[341] Del Quentin Wilber, *12 million pills and 700 deaths: How a few pill mills helped fan the U.S. opioid inferno*, Los Angeles Times (June 14, 2019), https://www.latimes.com/nation/la-na-pol-pill-mills-linked-to-hundreds-of-deaths-20190614-story.html.




586. Despite the raging epidemic going on there, Pharmacist No. 17 (who worked at the Lenoir City CVS from 2003 to January 2018) said CVS provided limited information and training about how pharmacists should handle suspicious prescriptions. He said CVS could have done more to address the problem. CVS did not hold any specific meetings – CVS-wide or within districts or regions – to discuss the epidemic or the role CVS pharmacists could play in helping to address the problem. Nor did CVS set up any procedures for pharmacists to get together to discuss the problem, possible solutions or share information about what they were seeing in their stores.

587. This former Lenoir City CVS pharmacist said his pharmacy was a high volume pharmacy, filling about 600 prescriptions each day. On a typical day, he had to refuse about 10 prescriptions for controlled substances because he thought they were not legitimate.

588. He noticed that suspicious and inappropriate prescriptions began to flood into Tennessee CVS pharmacies from Florida. The prescribing doctor was located in Florida, and the patient was either from Florida, another state and sometimes local to his CVS pharmacy, Pharmacist No. 17 said. He recognized that the prescriptions were coming from pill mills because

of the drug combinations, amounts and obvious lack of need by the patient. After Florida, more and more pill mill prescriptions started coming into Tennessee CVS stores from Baltimore, he said. After a few years, the pill mills began to pop up in eastern Tennessee and he was seeing inappropriate prescriptions from doctors based locally or at least from nearby doctors.

589. While Pharmacist No. 17 said he would frequently refuse to fill these prescriptions, CVS did not have a blanket policy or procedure for when to reject a prescription, nor did CVS report (or require pharmacists to report) suspicious and inappropriate prescriptions to authorities.

590. Nor did CVS require pharmacists to collect information on any central database about doctors writing or customers seeking to fill suspicious or inappropriate prescriptions. Pharmacist No. 17 would put that doctor on a do-not-fill list that he kept informally at his pharmacy.

591. He did occasionally share his list with other pharmacists that were in his same district, alerting them that he had determined the doctor was inappropriately prescribing drugs. Pharmacist No. 17 said he never told any pharmacists they should not fill the doctors' prescriptions. Rather he simply let his colleagues know what he was seeing and his concerns about the doctors.

592. CVS did not ask or require pharmacists to keep such a list, nor did the Company require pharmacists to share it with their colleagues. Nor did CVS have a systematic internal Company process or policy for posting or sharing these types of lists or information among pharmacists, Pharmacist No. 17 said.

593. When he worked at other CVS stores, he recognized that some stores were regularly dispensing controlled substances to customers who did not have legitimate prescriptions. He often worked fill-in shifts at CVS pharmacies throughout eastern Tennessee during his 20 years at the Company.

594. At some of these stores, he would encounter a significantly higher number of customers seeking inappropriate prescriptions than at his home pharmacy. Pharmacist No. 17 said this occurred at CVS stores in Newport (CVS was the third highest dispenser of opioids in Cocke County with 2,568,525 dosage units and 44,756,212 MME), Chattanooga (CVS stores dispensed some 18,938,688 dosage units and 255,704,573 MME), Greenville (CVS was the fifth highest dispenser of opioids in Greene County with 2,927,798 dosage units and 42,499,295 MME) and Jefferson City (CVS was the fourth highest dispenser of opioids in Jefferson County with 3,078,402 dosage units and 54,814,488 MME).

595. Pharmacist No. 17 said that, while he would refuse to fill the suspicious prescriptions, other CVS pharmacists did not. It became clear to him that the regular pharmacists at the stores where he worked had been filling inappropriate prescriptions. Sometimes customers would complain when he refused to fill a prescription, claiming that the pharmacist who usually works at the store always filled it. From these comments and the number of customers coming into the store with suspicious prescriptions, he understood these stores had developed reputations as places that would fill inappropriate prescriptions – or at least were more likely to do so. There was no CVS requirement that he report such potentially illegal conduct to the DEA or other legal authorities.

596. When he first started working at CVS in 1998, he said the Company always provided sufficient staff in the pharmacies to handle the workload. But as the years passed, CVS began to cut staff more and more, particularly after the Company merged with Caremark (in 2007), Pharmacist No. 17 said. He recalled that after the merger "[o]ur workload greatly increased at the same time staffing levels decreased."

597. During the same time period of the opioid crisis, staffing levels at CVS pharmacies "were inadequate," Pharmacist No. 17 said. Staffing levels and workload had pharmacists

regularly filling at rates of more than one prescription a minute. "When you're filling more prescriptions with less man hours, each prescription or patient gets less of your time," he said. "That's just simple math."

598. Due to workload, pharmacists struggled to find the necessary time to fulfill their responsibility to counsel patients who received a new prescription. Pharmacists were so overloaded with work due to the lack of staff that they also had less time to look for or notice red flags about suspicious prescriptions for controlled substances. "There was less time for everything," he said. "Of course."

**3. *Thompson's Station, Tennessee (Pharmacist No. 18)***

599. Pharmacist No. 18 started working for CVS stores in the Columbia, Tennessee area as a cashier when she was in high school in 2000. During the next several years, she worked at CVS as a pharmacy technician, a technician lead, and a pharmacist intern while she was in pharmacy school. In July 2009 after obtaining her license as a pharmacist, she became a staff pharmacist at a CVS in Smyrna, Tennessee, at 14299 Old Nashville Highway off Sam Ridley Parkway. After working for about a year as a staff pharmacist, she was promoted to pharmacy manager and assigned to the Columbia, Tennessee store where she previously worked. The store was located at 627 James Campbell Boulevard. About two years later, she became the pharmacy manager at a CVS in Thompson's Station, Tennessee. She stayed in that position until she was fired from CVS in July 2018.

600. Before earning her license as a pharmacist in 2009, Pharmacist No. 18 worked as a pharmacy technician and pharmacist intern at the CVS in Columbia, Tennessee, at 627 James Campbell Boulevard. During that time period, she worked with a pharmacist at the store who was "a laid-back guy" and who filled any prescriptions that was valid.

601. She recalled that the pharmacist filled prescriptions for a Dr. Robert Delaplane, a general practitioner in nearby Chapel Hill, Tennessee, who was later investigated for his opioid prescribing habits. Dr. Delaplane wrote a lot of opioid prescriptions and prescriptions combinations for the "Holy Trinity" – an opioid, a benzo and a muscle relaxer – and he seemed to be prescribing the same drugs to numerous people.

602. She recalls Dr. Delaplane's patients coming into the CVS store in groups. "There were so many people, especially on a Saturday," Pharmacist No. 18 said. "They literally came in a line, three of them, with the same [Holy Trinity] triad of prescriptions." She did not feel comfortable filling the prescriptions, but the pharmacist was willing to do so.

603. Pharmacist No. 18 said pharmacists at the time in the early to late 2000s were less on guard about opioid prescriptions than they are now, so she did not want to criticize the pharmacist at the CVS in Columbia for his actions. "He didn't have any training on what to look for at all," she said, referring to the red flags indicating an inappropriate controlled substance prescription. If a patient came in with a valid prescription signed by a doctor, including from Dr. Delaplane, the pharmacist would fill it, she said. "He's in his 70s, and he has rapport with his patients," she said. "He's really easy going. He filled the prescriptions."

604. By the time she returned to the CVS in Columbia as a pharmacist in 2009, she believed Dr. Delaplane was out of business. She thought he was either retired or was forced out by the DEA.

605. According to a Disciplinary Action Report from 2007 about Dr. Richard Delaplane, he permanently surrendered his medical license in August of that year. The Board said Dr. Delaplane was disciplined for the following: "Unprofessional, dishonorable or unethical conduct; gross malpractice, or a pattern of continued or repeated malpractice, ignorance, negligence, or incompetence in the course of medical practice; dispensing, prescribing, or otherwise distributing

any controlled substance or any other drug not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity or disease, or in amounts and/or for durations not medically necessary, advisable or justified for a diagnosed condition; dispensing, prescribing or otherwise distributing any controlled substance or other drug to any person in violation of any law of the state or of the United States."[342]

606. Despite the 2007 disciplinary action, a Dr. Robert Delaplane appears to still operate a medical practice in Chapel Hill, Tennessee.

607. During the two years that she was pharmacy manager at the CVS in Columbia starting in about December 2010, she filled what appeared to be valid and legitimate prescriptions from a local general practitioner, Dr. Darrel Rinehart. Several years later, she heard that Rinehart had been investigated and "got in trouble" for his irresponsible opioid prescribing.

608. Pharmacist No. 18 said the prescriptions from Dr. Rinehart did not appear to be inappropriate when she saw them submitted to the CVS where she worked. She does not recall Rinehart prescribing a lot of opioids or in amounts that seemed problematic. She thought perhaps Rinehart's prescribing practices deteriorated over time and he became more reckless than he had previously been, which could explain why she did not see a lot of problematic prescriptions from him.

609. In April 2019, Darrel R. Rinehart, 63, of Indianapolis, Indiana, formerly of Columbia, Tennessee, was indicted on 19 counts of prescribing a Schedule II controlled substance outside the usual course of professional practice and without a legitimate medical purpose, between December 4, 2014 and January 21, 2016. According to the indictment, four patients died who were actively being treated by Dr. Rinehart. The indictment also alleged that on November

---

[342] Disciplinary Action Report, https://www.tn.gov/content/dam/tn/health/dar/DAR_July_2007.pdf.

27, 2018, the Tennessee Board of Medical Examiners suspended Rinehart's medical license until May 31, 2019, at which time his license was to expire and he would be prohibited from renewing it or applying for a new license. Numerous of his patients were Medicare beneficiaries. From 2013 to 2017, Medicare Part D plans paid some $495,415 in 9,433 CII prescriptions he had written:

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| AMPHETAMINE SALT COMBO | 104 | 9,337.46 |
| DEXTROAMPHETAMINE-AMPHETAMINE | 157 | 10,020.46 |
| ENDOCET | 95 | 10,384.64 |
| FENTANYL | 171 | 21,772.19 |
| HYDROCODONE-ACETAMINOPHEN | 4,255 | 100,871.49 |
| HYDROMORPHONE HCL | 47 | 452.14 |
| METHADONE HCL | 82 | 3,039.73 |
| METHYLPHENIDATE HCL | 68 | 5,385.36 |
| MORPHINE SULFATE | 119 | 2,857.54 |
| MORPHINE SULFATE ER | 483 | 56,979.96 |
| OPANA ER | 12 | 6,449.54 |
| OXYCODONE HCL | 2,116 | 119,031.89 |
| OXYCODONE HCL-ACETAMINOPHEN | 287 | 16,514.23 |
| OXYCODONE-ACETAMINOPHEN | 1,397 | 111,539.04 |

| | | |
|---|---|---|
| OXYCONTIN | 20 | 12,424.58 |
| OXYMORPHONE HCL ER | 20 | 8,355.35 |
| **Grand Total** | **9433** | **$495,415.6** |

610. She felt pressure not to deny opioid prescriptions because customers might transfer their other prescriptions to a different store. She felt pressure in her job to do so because the Company's priority was on maintaining and increasing prescription volume. She explained that local "mom and pop" pharmacies told patients they would fill their opioid prescriptions if the patients transferred all of their other regular medications to pharmacy. That competition put pressure on CVS pharmacists to fill opioid prescriptions so that the customer would not move their other prescriptions to another pharmacy, Pharmacist No. 18 said.

611. "At the end of the day, I always felt it was about the numbers," she continued. "It was always such a pressure about the Metrics. A constant reminder of, 'Oh, your sales are down. Your script count is down. You didn't meet your budget this week.'"

612. Pharmacist No. 18 said the pharmacists had a conference call every week with the district manager, during which "it was always about the Metrics. It was a constant reminder if you weren't hitting targets all the time," she said. "Does that put pressure on you to hit theItargets where you could... of course. If it meant filling that opioid prescription if there are five other prescriptions? Yeah, you fill them."

613. Asked what kind of training CVS provided to her and other pharmacists about dispensing controlled substances and spotting problem prescriptions, she could not recall anything.

614. Early in her time as a pharmacist at CVS, the Company engaged a third party to conduct audits of the prescriptions in the pharmacy to determine if they were abiding by DEA and state regulations. Pharmacist No. 18 said she and other pharmacists learned indirectly from this

process what the DEA and state required them to do with controlled substance prescriptions. CVS, however, did not provide the pharmacists with any specific training on it.

615. Pharmacist No. 18 noted that CVS sent out memos or emails to pharmacists about new laws and/or policies, but the Company so understaffed its pharmacies that she and others did not have time to read the notices fully.

616. She worked 13-hour shifts, usually by herself, at a pharmacy that filled as much as 2,400 prescriptions per week when she left CVS in 2018. During her tenure at the Thompson's Station store, she saw the prescription volume grow significantly, yet the Company did not increase her staffing and sometimes she lost staff. "There was never an increase in tech hours even with the growth we saw," Pharmacist No. 18 said. She had three full-time and two part-time pharmacy technicians on staff, but needed at least four full-time and three part-time technicians to operate the pharmacy in a more ideal way.

617. As a comparison, she is about to start working at a Kroger pharmacy that has the same prescription volume of about 2,400 a week. Yet the Kroger pharmacy has 12 technicians and three pharmacists on staff and usually has five technicians working at one time. At CVS, she never had more than three technicians working together on a shift and usually that was only for a few shift overlap hours.

618. The lack of staff at CVS kept her so busy she often did not have the time to do the things a pharmacist should do, such as counsel every patient who is prescribed a new medication. Instead, she was busy doing the work of a pharmacy technician. "I constantly felt I had to be doing the tech work, [which was] taking away from other things I could do as pharmacist," Pharmacist No. 18 said.

619. The lack of staff made it extremely difficult for pharmacists to have the time and focus to examine and verify prescriptions for controlled substances. The poor staffing situation

undermined her and other pharmacists' ability to spot inappropriate controlled substance prescriptions.

620. CVS's focus on filling prescriptions quickly for waiting patients also made it difficult to examine controlled substance prescriptions. Pharmacist No. 18 said CVS expected its pharmacies to fill waiting customers' prescriptions within 15 minutes. The Company tracked the fill-rates at each store and if they were meeting that 15-minute mark. CVS used those Metrics in job reviews of the pharmacists. "They were grading you on how fast you filled those prescription," she said. "We constantly had pressure on the metric they were grading you on."

621. But she pointed out how difficult it is to vet a controlled substance prescription in 15 minutes. Once the prescription is submitted, the technician has to print the label, find the pills on the shelves, and count out the proper number of the pills. Typically, Pharmacist No. 18 said, that takes about 10 minutes considering there are usually other prescriptions in the same cue that need attention from the technician to meet that 15-minute mark.

622. "By the time it got to me, it's already been 10 minutes," Pharmacist No. 18 said. "Then I have to call the doctor. Nine times out of 10 you have to leave a message, and it's unlikely they are going to call back right away." If the receptionist answers and is asked to verify the prescription, "they flip through the chart and give a diagnosis code. But the code could be for a common cough for all I know." She said it was "pretty much impossible" to reach and talk to a doctor to confirm a controlled substance prescription within 15 minutes.

623. Pharmacists also were expected to check the Tennessee PDMP database that tracked patients' controlled substance prescriptions before filling those prescriptions, but that too was time consuming. The pressure to fill quickly, especially knowing the Company would grade employees on their speed, undermined pharmacists' ability to catch inappropriate controlled substance prescriptions.

### 4. *Crossville, Tennessee (Relator)*

624. Relator Estright started as a pharmacy intern at CVS in May 2013, working in four different stores located in Birmingham, Alabama; Cookville, Tennessee; and Crossville, Tennessee. In July 2016 after graduating from pharmacy school, she became a staff pharmacist at a CVS in Tellico Plains, Tennessee, located at 9170 TN-68. In November 2016, she became the Pharmacy Manager of the Crossville CVS, which is located at 1026 West Ave. She was fired from CVS in late June 2019.

625. She worked at CVS stores located in mostly rural parts of Tennessee that were seeing a high rate of opioid use. The population she served was predominantly on TennCare, Tennessee's Medicaid program, or Medicare Part D. Very few of her customers had private insurance.

626. The area where she worked in Central and Eastern Tennessee has been experiencing significant problems with opioid addiction. The parking lot at the pain clinic in Crossville was always full, and a number of people from that pain clinic seemed to come into her Crossville CVS store around the same time to fill their opioid prescriptions.

627. Relator Estright saw an estimated one to ten questionable opioid prescriptions per day and filled about 25 to 30 opioid prescriptions a day. When she became the manager of the Crossville CVS, she learned that the pharmacy's distributor, Cardinal Health, had placed the store on its "watch list" because the store had been ordering too many oxycodone 15mg pills, and Cardinal had cut off the store's supply. For a time, the Crossville CVS could not order the drug. Relator believes the "watch list" was just for Cardinal and had nothing to do with the DEA.

628. Relator Estright understood that t[he] other Cookeville CVS on 10th Street was on the DEA watch list. Notwithstanding it being on the DEA watch list, District Manager Will Douglass told her he was not concerned about it.

629. Her CVS also filled a lot of opioid prescriptions from a pain clinic, LifeForce Pain Clinic, located at 74 Lebanon Highway in Carthage, Tennessee, about one hour from Crossville. Relator's CVS filled numerous prescriptions from the Clinic during her tenure at Crossville. The prescriptions were written by Matthew Miko, P.A. and Justin Kindrick, FNP, both of whom Relator believes were problematic and writing a lot of opioid prescriptions. The prescriptions from the Clinic were usually high doses of opioids and combinations of prescriptions.

630. Many of Nurse Practitioner Kindrick's patients were Medicare beneficiaries. During the time period 2015 through 2017, Medicare Part D plans paid some $1,402,199in claims for CII drugs he had prescribed:[343]

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| ACETAMINOPHEN-CODEINE | 14 | 172.36 |
| ENDOCET | 90 | 5,895.88 |
| EXALGO | 11 | 7,040.84 |
| FENTANYL | 917 | 86,027.17 |
| HYDROCODONE-ACETAMINOPHEN | 1,653 | 41,251.33 |
| HYDROMORPHONE ER | 54 | 34,377.76 |
| HYDROMORPHONE HCL | 49 | 855.16 |
| MORPHINE SULFATE | 75 | 1,915.52 |
| MORPHINE SULFATE ER | 3,343 | 160,666.92 |
| OPANA ER | 666 | 270,107.36 |
| OXYCODONE HCL | 5,171 | 163,490.05 |
| OXYCODONE HCL ER | 59 | 21,989.33 |
| OXYCODONE-ACETAMINOPHEN | 4,843 | 325,719.28 |

343 This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

| | | |
|---|---|---|
| OXYCONTIN | 662 | 236,449.74 |
| OXYMORPHONE HCL ER | 207 | 46,240.97 |
| **Grand Total** | **17,814** | **$1,402,199.67** |

631. Patients of the LifeForce Pain Clinic would also come in with additional prescriptions for other controlled substances. Usually, those were for a muscle relaxer, an anti-anxiety drug or gabapentin. Gabapentin was a very popular drug that is abused in Tennessee and can be used as a painkiller because it can cause the user to feel high. Relator rejected numerous prescriptions written at the LifeForce Clinic that she found problematic, but she and her store also filled a large number of them for regular customers. Many LifeForce customers who did not appear to have much money would drive the hour to the pain clinic to get their prescriptions.

632. In about March this year, Relator Estright learned that LifeForce only takes cash for appointments and does not accept payment by any form of insurance. The Clinic's website lists its fee schedule at $250 for a first visit and $150 for subsequent visits.[344] After learning that the Clinic only takes cash, she stopped filling prescriptions from the clinic.

633. In 20/20 hindsight saying, Relator believes she should have known that the clinic was problematic. But she was a new pharmacist, and she did not have any guidance from CVS what to look for and how to handle that types of situations.

634. Crossville also had a pain clinic in town called Advanced Spine and Pain, located at 181 Matherly St., Crossville, Tennessee 38555. Relator's CVS regularly filled prescriptions from the clinic, which as noted above was always crowded. The Advanced Spine doctor was Dr. David M. Arehart who specializes in anesthesiology and pain management. Arehart also has offices in Nashville and Kentucky.

[344] *See* LifeForce Pain and Wellness, https://www.lifeforcepainandwellness.com/the-practice.

635. Many of Dr. Arehart's patients, in both Tennessee and Kentucky, were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $233,524 in claims for CII drugs he had prescribed:[345]

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL COST ($) |
|---|---|---|
| ENDOCET | 12 | 923.96 |
| FENTANYL | 158 | 13,729.43 |
| HYDROCODONE-ACETAMINOPHEN | 1,954 | 54,603.78 |
| MORPHINE SULFATE ER | 331 | 29,088.76 |
| OXYCODONE HCL | 73 | 2,611.86 |
| OXYCODONE HCL-ACETAMINOPHEN | 56 | 3,143.47 |
| OXYCODONE-ACETAMINOPHEN | 1,145 | 78,958.71 |
| OXYCONTIN | 103 | 48,698.61 |
| OXYMORPHONE HCL ER | 11 | 1,766.26 |
| **Grand Total** | **3,843** | **$233,524.84** |

636. According to news reports, Advanced Spine and Pain abruptly closed its doors in August of this year after federal prosecutors accused its managing company of defrauding taxpayers by subjecting patients to unnecessary injections, drug tests and opioid prescriptions.[346] Coffey Family Medical Clinic in Oneida was also a part of the same company and abruptly closed in August as well. The South Carolina management company that operated both clinics, Oaktree

[345] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

[346] Brett Kelman and Gabe Cavallaro, *More Tennessee pain clinics shut down amid federal fraud investigation*, The Tennessean (Sept. 12, 2019), https://www.tennessean.com/story/news/health/2019/09/12/tennessee-pain-clinics-advanced-spine-and-pain-oaktree-medical-federal-fraud-investigation/2203231001/.

Medical Centre, has also shuttered at least 10 clinics in the Carolinas as well. Federal prosecutors in South Carolina who sued Oaktree earlier this year accused the company of a "series of elaborate and extensive fraud schemes" that maximized profits at the expense of patients and taxpayers. The lawsuit alleges that Oaktree and its owner, Daniel McCollum, D.C.M., used illegal kickbacks to incentivize medical professionals to overprescribe opioids and order "unreasonable" drug tests at the company laboratory, which inflated Oaktree's reimbursement from Medicare and Medicaid.[347]

637. At one point, CVS contacted Relator concerning an investigation of a local Crossville family practitioner, Dr. Maria Stubbs, who she thought may be prescribing irresponsibly. However, CVS did not keep list of problematic doctors, so she had no information from the Company about any concerns with Dr. Stubbs.

638. The call was from a CVS internal group, the "Pharmacy Practices Team," that investigated problematic doctors. Relator Estright shared her concerns that Dr. Stubbs was engaged in questionable prescribing. Even though Dr. Stubbs did not prescribe a lot of opioids, she did prescribe a lot of benzodiazepines with other drugs that were a dangerous combination if taken together. Some of the patients Dr. Stubbs put on benzodiazepines were also on pain pills from other doctors, and Relator believes the doctor probably was aware of it.

639. After her conversation with CVS investigators, during which she expressed her concerns about Dr. Stubbs, Relator never heard anything further, nor did she receive any alerts or instructions about closely watching or rejecting prescriptions from Dr. Stubbs.

640. In Relator Estright's experience, the CVS computer system would prevent pharmacists from filling prescriptions for doctors who had lost their DEA numbers. But CVS did

[347] *See United States ex rel. Donna Rauch, et al. v. Oaktree Medical Centre, P.C., et al.*, Consolidated Complaint in Intervention, No. 6:15-cv-01190 (D.S.C. May 30, 2019), https://www.documentcloud.org/documents/6391657-Oaktree-Federal-Lawsuit.html.

not keep any type of internal list of doctors that pharmacists had identified as problematic, but who were not under investigation or had not lost their DEA numbers.

641. CVS also did not provide a mechanism or encourage pharmacists to share such concerns among each other. Pharmacists could report problematic doctors to CVS, but the complaint only went forward if the district manager pushed it up the ladder. Relator Estright reported a doctor to her district manager, Will Douglass, but she never learned whether he ever passed it up the chain.

642. The doctor she reported, Dr. Victor Shada, had prescribed a large quantity of Percocet to an opioid naïve patient for a sunburn.

643. Relator Estright did not want to take on new opioid customers at her CVS, but her district manager Will Douglass pressured her to do so for the additional monthly prescriptions that an opioid customer would bring to the store. During her tenure as a pharmacy manager, other pharmacies in the area closed, including a nearby Rite Aid. When those pharmacies closed, the customers went to other pharmacies to fill all their prescriptions, including her CVS.

644. Cognizant that her pharmacy had been on Cardinal's watch list and that she already had a large number of opioid customers, she did not want to take on additional opioid customers so declined to fill a lot of the opioid prescriptions for new customers because she felt her store had enough patients that were on pain medications. She protested to Douglass that they already had enough people coming in seeking opioids and could not keep adding more and more telling him: "You can't have everyone on opioids in your pharmacy."

645. In addition to the patients coming from the closed pharmacies in the area, new people in the area were regularly being put on opioids, increasing the number of people seeking a pharmacy to dispense them. She sometimes told customers she did not have the pills in stock. At

other times she would tell them she did not think the prescription was legitimate and that she was not going to fill it for that reason.

646. After turning down a number of new customers with opioid prescriptions, Relator's district manager Will Douglass became aware of it, likely because the customers complained to CVS or posted complaints in online reviews. Douglass then began to pressure her to take on more of the pain patients, telling her: "We might be missing out on the rest of the prescriptions we can have for them as well."

647. Douglass wanted her to take on more pain patients with opioid prescriptions for the other monthly prescriptions they likely had. His goal was to increase script count: "I would really hate of we missed out on a [higher] script count for the store. I would hate if you didn't take on some of these patients. We can get some of the additional prescriptions, their maintenance medications… We're missing opportunity from these other pharmacies closing down."

648. Douglass told her if she was able to bump her "script count" from 2,500 to 3,000, she would get more staffing help in the store. Douglass wanted to increase the prescription count because it would increase the amount of bonus money he earned. Relator told him she was uncomfortable taking on more patients, but would take on more opioid patients if they had additional prescriptions to fill regularly, especially if they had Caremark insurance, which is owned by CVS.

649. After she opposed Douglass' pressure to take on more pain patients, as a pretext he fired her for taking a 10-minute lunch break, a break she needed but otherwise routinely did not get.

650. Her CVS was the highest volume store in the district. They filled about 2,500 prescriptions a week. Despite the high number of prescriptions filled at the store, she was always the only pharmacist on duty during her shift. When she first started as a pharmacy manager, she

typically had four pharmacy technicians on duty. Recently, however, CVS cut that to three technicians.

651. She worked 13-hour shifts and often did not have time to take a bathroom break. A lunch break was next to impossible.

652. The low level of staffing at CVS created an environment where mistakes were more likely to happen and undermined pharmacists' ability to catch inappropriate controlled substance prescriptions.

653. CVS expected pharmacies to fill prescriptions in 15 minutes or less for customers who are waiting. Given these pressures, no pharmacist would be able to check the Tennessee PMP database that tracked all patients prescription history, count the pills, verify the prescription and everything else required within 15 minutes, especially considering several other prescriptions needed to be filled at the same time.

654. Relator Estright's job as a pharmacist was in theory not only to check prescriptions for accuracy and legitimacy, but also to counsel patients. When a patient is prescribed a new medication, she was supposed to counsel that patient about the drug, the instructions for taking it and provide any pertinent warnings. However, they never had time to counsel patients.

655. Ideally, when a patient is first prescribed an opioid, the pharmacist would talk to the patient about how to take the drug, the dangers of overdose and addiction, and that unless they are in severe pain, a non-opioid pain killer might be a better treatment. For patients who had been on opioids for a long time and were not suffering from severe pain, ideally pharmacists would counsel them about weaning off of the drugs. There was not enough time for that.

656. CVS provided pamphlets on opioid use and addiction for pharmacists to hand out to patients, but she often did not even have time to do that either.

657. When she did slow the pace down at her pharmacy to ensure safety and accuracy, causing her store's fill-rate to fall below CVS expectations, her district manager called her to talk about improving those rates.

**J. Specific Examples of Unlawful Dispensing Conduct: Texas**

***1. CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Texas***

658. Texas has not escaped the prescription opioid crisis. The use of prescription opioids in Texas has skyrocketed. In 2014, for every 100 Texas residents, 67 opioid prescriptions were dispensed.[348] And in some Texas counties, the number of opioid prescriptions substantially exceed the actual number of county residents.[349]

659. From 1999 to 2015, Texas experienced a 3.5-fold increase in the number of opioid-related deaths.[350] In 2017, the Texas legislature found that deaths resulting from the use of opioids constitute a public health crisis and confirmed the State's compelling interest in closely regulating the prescribing of these drugs.[351] Almost 17,000 Texans have died in opioid-involved deaths.[352] The casualties continue to mount.

660. Despite having some 847 stores located all over the State of Texas, CVS's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

---

[348] Div. of Unintentional Injury, Ctrs. for Disease Control & Prevention, *Opioid Overdose: U.S. State Prescribing Rates, 2014* (July 31, 2017), https://www.cdc.gov/drugoverdose/maps/rxstate2014.html.

[349] *Id*.

[350] Ctr. for Health Statistics, Tex. Dep't of St. Health Servs, *Texas Health Data: Opioid-Related Deaths in Texas*, http://healthdata.dshs.texas.gov/Substance/Deaths (hereinafter Opioid-Related Deaths in Texas).

[351] 5 Tex. Occ. Code § 168.003.

[352] Opioid-Related Deaths in Texas, *supra* Note 259.

661. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| DATE | NAME | CITY | PRISON |
|---|---|---|---|
| 9-Oct-03 | Cordell Clark, MD | Dallas, TX | 10 years |
| 19-Mar-07 | Bernard Kornell, MD | Duncanville, TX | 10 years |
| 15-Jan-08 | Bruce Alexander Brown, MD | Frisco, TX | 6 months home confinement |
| Jun-08 | Harold Marshall, MD | Dallas, TX | 10 years probation |
| Sep-08 | Michael L. Williams, MD | Palestine, TX | 2 years home confinement |
| 18-Dec-08 | Callie Herpin, MD | Houston, TX | 120 months |
| Jun-09 | Kiran Sharma, MD | Webster, TX | 8 years |
| 1-Feb-11 | Arun Sharma, MD | Webster, TX | 15 years |
| 4-May-11 | Christopher L. Elder, MD | Houston, TX | 15 months |
| Jul-11 | Anthony F. Valdez, MD | El Paso, TX | 60 months |
| Sep-12 | Gerald Petrash, PA | Montgomery City, TX | |
| 22-May-14 | Mario Bertoni MD | Houston, TX | |
| 22-May-14 | Melanie Mencer Parks, MD | Houston, TX | 2 years |
| 16-Jul-14 | Lisa Hollier, PharmD | Sunnyvale, TX | 5 years |
| 16-Jul-14 | Nicolas Alfonso Padron | Garland, TX | 5 years |
| Oct-15 | Eiechi N. Oti, PA | Dallas, TX | 8 years |
| Feb-16 | Sameer Andoni Fino | Murphy, TX | Plea |
| 31-Mar-16 | Theodore Okechuku, MD | Dallas, TX | 25 years |
| 9-May-16 | John C. Esparza, PharmD | Granbury, TX | 72 months |
| 9-Jun-16 | Ronald M. Mansolo, MD | Leander, TX | plea |
| Aug-16 | Habiboola Niamatali, MD | Garland, TX | 78 months |
| 13-Feb-17 | David Devido, PharmD | Houston, TX | 60 months |
| 13-Feb-17 | Richard A. Evans, MD | Houston, TX | 60 months |
| 3-Apr-17 | Agnes Osire, PharmD | Houston, TX | 45 months |
| 3-Apr-17 | Richard Williams, MD | Houston, TX | 60 months |
| 26-May-17 | Richard Andrews, DO | McAllen, TX | 8 years |
| 26-May-17 | Muhammad Faridi, Owner | McAllen, TX | 108 months |
| 26-May-17 | Ndufola Kigham, PharmD | Desoto, TX | 27 months |
| 9-Jun-17 | Kumi Frompong, PharmD | Desoto, TX | 24 months |

| | | | |
|---|---|---|---|
| 30-Jun-17 | Fahim Ahmed Khan, MD | Houston, TX | 51 months |
| 25-Jul-17 | Alonzo Peters, MD | Houston, TX | Life |
| 26-Apr-18 | Jerome Pendleton, MD | Corpus Christi, TX | 5 years |
| 17-Jul-18 | Michael Pendleton, MD | Corpus Christi, TX | 5 years |
| 20-Sep-18 | Gazelle Craig, DO | Houston, TX | 420 months |
| 20-Sep-18 | Shane Faithful, Owner | Houston, TX | 420 months |
| Oct-18 | Chia Jean Lee, NP | Plano, TX | 16.5 years |
| Oct-18 | Theodore W. Taylor, MD | Plano, TX | 20 years |
| Feb-19 | Carlos Luis Venegas, MD | Dallas, TX | 13 years |
| 25-Mar-19 | Dennis D. Tedford, MD | Brownfield, TX | 5 years |
| 9-May-19 | Howard Gregg Diamond, MD | Sherman, TX | 20 years |
| 31-May-19 | Alfonso Luevano, MD | Carrizo Springs, TX | |
| 31-May-19 | Ofelia Martinez, Employee | Carrizo Springs, TX | |
| 28-Aug-19 | Manuel Bobmanuel, PharmD | Sugar Land, TX | |
| 28-Aug-19 | Ardella Fisher, NP | Tomball, TX | |
| 8/28/19 | Amish Kordia, PharmD | Pearland, TX | |
| 28-Aug-19 | Samson Alazar, PharmD | Missouri City, TX | |
| 28-Aug-19 | Kesha Lynette Harris, PharmD | Houston, TX | |
| 28-Aug-19 | Laurel Osazuwa, Owner | Houston, TX | |
| 28-Aug-19 | Barbara Marino, MD | Tomball, TX | |
| 28-Aug-19 | Bobby Hobbs, MD | Houston, TX | |
| 28-Aug-19 | James John Jackson, MD | Houston, TX | |
| 28-Aug-19 | Kondre Graves, Owner | Houston, TX | |
| 28-Aug-19 | Brandy LaDawan Fears, Owner | Houston, TX | |
| 28-Aug-19 | Arthur Billings, Owner | Missouri City, TX | |
| 28-Aug-19 | Frank Cooper, PharmD | Houston, TX | |

### 2. *Breckenridge, Texas (Pharmacist No. 3)*

662. The website for Breckenridge, Texas (county seat for Stephens County, Texas), population 5,780, describes it as a "progressive community with a great quality of life as well as extensive educational and business opportunities."[353] But, it too has been impacted by the opioid

[353] Welcome to Breckenridge, Texas, https://breckenridgetx.gov/.

epidemic. Some 4.39 percent of Stephens County residents over the age of 12 reported in 2014 the non-medical use of opioids and 2.3 percent were addicted.[354] According the CDC, the annual prescribing rate in 2012 for Stephens County was 152.9 opioid prescriptions per 100 residents (some 1.5 opioid prescriptions for every man, woman and child in the county), well above the national average of 81.3, making it a "hotspot" area nationally.[355] By 2017, the annual prescribing rate for Stephens County was 96.9 opioid prescriptions per 100 residents, still well above the national average, 58.7 percent.

663. The CVS Pharmacy at 1501 W. Walker in Breckenridge, Texas stoked the opioids problem in Stephens County, from 2006 to 2012 dispensing 2,947,563 doses of opioids or a total of 20,502,185 MME, making CVS the largest dispenser of opioids in the County. That means that at the highest bounds of the recommended MME per day (90 MME/day), the CVS W. Walker store every day for seven years dispensed enough opioid prescriptions for an average of 89 maximum dosage regimens, fueling rampant addiction in this town of 5,780 people.

664. CVS's failures under the CSA and state pharmacy laws and regulations have been at the center of the problem in Breckenridge. According to Pharmacist No. 3, a former manager of the Breckenridge CVS, management pressured her to fill controlled substance prescriptions. She did hear regularly from her district manager on the phone about once a month about customer complaints regarding her refusal to fill prescriptions. The district manager would grill her about it and pressure her to fill the prescription despite her concerns. Her district manager seemed to be more concerned with clearing a customer complaint off the books than about whether or not a prescription was legitimate. Customer complaints, Pharmacist No. 3 said, are counted as a negative

---

[354] amfAR, Opioid & Health Indicators Database, https://opioid.amfar.org/TX

[355] U.S. Ctrs. For Disease Control, Opioid Overdose, *U.S. County Prescribing Rates, 2017* https://www.cdc.gov/drugoverdose/maps/rxcounty2017.html.

mark in CVS Metrics for job performance evaluations of managers, she said, and she thinks her manager was more concerned about that.

665. CVS had a long list of Metrics, which CVS used when evaluating employee performance. For pharmacy managers, the Metrics included how many prescriptions were filled each week, the number of customer complaints and how quickly the pharmacy was filling prescriptions. When looking at how many prescriptions are filled each week, CVS also broke it down into days, hours and even seconds, Pharmacist No. 3 said. "They count how often you fill prescriptions," she said. "You can fill one prescription about every 20-to-30 seconds and that's considered slow." CVS also had requirements that the pharmacy fill prescriptions for waiting customers within a short 15 minutes or less window, Pharmacist No. 3 said.

666. According to this former Breckenridge CVS pharmacy manager, the constant need to meet Metrics created a high-pressure situation where pharmacists were busy trying to meet Company expectations and might not have the time or the attention available to look for and/or notice red flags indicating inappropriate prescriptions.

667. What's more, CVS did not provide enough staffing at the pharmacies to allow pharmacists the time and attention to fully do everything that is expected of them – such as counsel patients and pay close attention for red flags regarding controlled substance prescriptions. "If you do between 200 and 250 prescriptions a day… they can get prescriptions to go through without you noticing a problem," Pharmacist No. 3 said. "I hate to say that, and I wish I didn't have to but… many of the pharmacies do 500, 600 prescriptions a day. When they got them going through that fast, many things don't get caught." She felt that all the inappropriate prescriptions were "absolutely not" caught.

668. The Company did not keep an internal list of pill mill doctors who had been identified by pharmacists as problematic. Nor did CVS have an internal alert system about pill

mill doctors. She said CVS did not provide a method to input the doctor's name in the internal computer system so that it could be shared with all pharmacists at the Company.

669. Pharmacist No. 3 recalled that pharmacists were regularly fired for not meeting the Metrics. "If you didn't meet your Metrics, you would be let go." She also said that she does not recall any CVS pharmacist ever being fired for filling suspicious orders. "No. CVS didn't pay any attention to that."

670. Nor was there a policy at CVS that required its pharmacists to refuse to fill prescriptions from doctors who had been identified as a pill mill proprietor or someone who prescribed recklessly. "That would have been better," Pharmacist No. 3 said. "If all the pharmacies would start doing something like that, maybe we'd have a little bit of, I don't know, help working on our problem. Absolutely, if you shut off the doctors and the doctors don't have anyone who will fill, they'll just have to leave." Although several Breckenridge area doctors were prosecuted for writing inappropriate prescriptions, CVS never let them know of this. "CVS was concerned about things other than that," she said.

671. Pharmacist No. 3 said that Texas has a PMP to check the number of prescriptions that a patient has received. Not only did CVS fail to require pharmacists be registered with PMP, she said she got into trouble because checking the PMP affected her Metrics. Moreover, in order to use the PMP, she had to use a separate computer because it was not part of the CVS Rx system on her computer terminal. "You couldn't check PMP and keep up with the company's expectations with respect to Metrics," she said.

**3. *Southeast Texas (Pharmacist No. 19)***

672. Experts for years have pointed to the fact that Texas' opioid overdose rate is far below the national average, 5.1 deaths per 100,000 people compared with 14.6 deaths per 100,000

people in 2017 nationally, according to the National Institute on Drug Abuse's March report.[356] But, the impact of the opioid epidemic in Southeast Texas has exceeded the rest of the state. For example:

- **Brazoria County**. In 2017, 4.05 percent of Brazoria County residents over the age of 12 reported the non-medical use of opioids and 2.16 percent were addicted.[357] Brazoria County had 39 drug-related deaths, or 10.8 deaths per 100,000 residents.[358]
- **Fort Bend County**. 3.91 percent of Fort Bend County residents over the age of 12 reported in 2017 the non-medical use of opioids and 2.19 percent were addicted.[359] Fort Bend County had 41 drug-related deaths, or 5.4 deaths per 100,000 residents.[360]
- **Galveston County**. 4.05 percent of Galveston County residents over the age of 12 reported in 2017 the non-medical use of opioids and 2.16 percent were addicted.[361] Galveston County had 55 drug-related deaths, or 16.4 deaths per 100,000 residents.[362]
- **Harris County.** 3.91 percent of Harris County residents over the age of 12 reported in 2017 the non-medical use of opioids and 2.91 percent were addicted.[363] Harris County had 536 drug-related deaths, or 11.5 deaths per 100,000 residents.[364]

---

[356] Matt DeGrood, *Unlikely dealers drive local opioid trade, experts say*, Connection (June 28, 2019), https://www.connection.news/crime/unlikely-dealers-drive-local-opioid-trade-experts-say/article_af3db0ff-e76d-5e36-8ef3-54d242fc778d.html.

[357] amfAR, Opioid & Health Indicators Database, https://opioid.amfar.org/TX

[358] *Id.*

[359] *Id.*

[360] *Id.*

[361] *Id.*

[362] *Id.*

[363] *Id.*

[364] *Id.*

673. Pharmacist No. 19, who worked at 40 different stores in Southeast Texas in Brazoria County, Fort Bend County, Galveston County and Harris County between 2013 and 2015 said he saw inappropriate controlled substance prescriptions "at pretty much every pharmacy I worked at." He said they were coming from pill mills, pain clinics and patients who had multiple doctors. "They are out there," he said of the pill mills. "Some of these doctors, how they can sleep at night, I don't know."

674. He recalled a few of the CVS stores where he worked had a noticeable and consistent problem with suspicious and inappropriate prescriptions for controlled substances. At the Alvin, Texas CVS store (located in Brazoria County), he saw inappropriate prescriptions about two to three times a week. He also recalled more frequent inappropriate prescriptions at stores in Richmond (Fort Bend County) and Texas City (Galveston County).

675. Usually, Pharmacist No. 19 said, the problem prescriptions were for "the cocktail," the "Holy Trinity" combination of three drugs. The cocktail was a three-prescription combo for an opioid product such as hydrocodone, a muscle relaxant such as SOMA, and a benzodiazepine such as Xanax. He said the problem prescriptions usually came from doctors who worked at pain clinics and/or pill mills.

676. The CVS store in Texas City also seemed to have a significant problem with inappropriate prescriptions, but he noted Texas City is an industrial area where many customers had industrial labor jobs. Pharmacist No. 19 said the possibility that those customers had a higher rate of injuries that needed pain medications could have accounted for some of the high rate of controlled substance prescriptions there.

677. He found that some of the prescriptions there, however, were inappropriate, including prescriptions for the Holy Trinity cocktail. But when he called the doctors to discuss the

prescriptions, the doctors confirmed the patient's need and said "[w]e've always prescribed this way."

678. CVS did not maintain a list in its stores or in its internal computer system of doctors identified for writing inappropriate or reckless prescriptions, nor was there are requirement that they report suspected fraud or diversion.

679. At the 40 different CVS stores across Southeast Texas where Pharmacist No. 19 worked during his two and a half years, he does not recall seeing any lists at any of the individual stores of doctors who had been red-flagged for prescribing inappropriately. There was only informal knowledge of those doctors by individual pharmacists.

680. CVS also did not keep a list, however, of the doctors identified by individual stores for writing inappropriate prescriptions.

681. He said pharmacists did not have the ability to enter the doctor's name on the Company's internal database or an internal list so that the system would automatically alert other pharmacists of the doctor's inappropriate activities when a prescription came from that doctor. Pharmacist No. 19 said that if a patient repeatedly tried to get inappropriate scripts or repeatedly tried to refill controlled substances early, individual stores might put notes about it in the patient's digital profile in the CVS system.

682. CVS did not offer any classroom training or other training for pharmacists about how to identify inappropriate prescriptions or about how best to reject an inappropriate prescription.

683. At the 40 CVS stores in Southeast Texas where Pharmacist No. 19 worked, CVS kept pharmacists under an intense workload. He rarely had a lunch break (or any kind of break) and usually only when he worked long days of at least 10 hours. Most days, he ate a sandwich while standing at the computer typing in or checking prescriptions.

684. Often he was the only pharmacist in the store, even at stores that were doing 500 to 700 prescriptions a day. He was often completely alone and without technicians for several hours of a shift. Not infrequently, he would show up for work to find 100 prescription baskets on the counter waiting for someone to fill them.

685. In addition to keeping pharmacists under heavy workloads, CVS put pharmacists under further pressure by expecting them to meet strict fill-rate times and prescription volume Metrics. Pharmacists knew that their job evaluations were based on how fast the store was filling prescriptions and how many prescriptions they filled.

686. Overburdened with work and intensely pressured to do more and faster, pharmacists were more likely to miss red flags and fill inappropriate prescriptions. Under these circumstances, CVS created an environment in which pharmacists did not have the time or available attention to catch all the inappropriate prescriptions.

687. According to Pharmacist No. 19, the pressure put on pharmacists to fill more prescriptions as fast as possible dis-incentivized them to catch inappropriate prescriptions.

#### 4. *Brownsville, Texas (Pharmacist No. 20)*

688. Pharmacist No. 20 was a pharmacist and pharmacy manager for CVS for 10 years, from May 2009 to June 2019. She worked at stores in Brownsville, Fort Worth and Houston.

689. In order to make sure narcotics were kept in stock, she and other pharmacy managers were required to order opioids and other controlled substances once a week. Even if it was just one item, they had to order something or be reprimanded if they had not.

690. In that region, CVS had a system where any store's pharmaceutical inventory could be viewed by another store within a 10-mile radius. This presented a problem, as sometimes Pharmacist No. 20 would tell suspicious customers that the store was out of the narcotics they were seeking, even though CVS policy forbids that.

691. Although pharmacists were not supposed to tell customers that, some would in order to prevent confrontations. The problem arose when a pharmacist at a nearby store would tell a suspicious customer that a narcotic was out of stock, and then, using the CVS inventory database, refer them to her store. "The store down the street would see that our store has inventory of OxyContin so they would send that person over to my store without calling," Pharmacist No. 20 said.

692. These customer visits were sometimes made after hours – her pharmacy was open until midnight – when it was difficult to verify the prescription. "After everyone else closed, they would come to me," Pharmacist No. 20 said. "We couldn't verify the prescription and had to tell them to come back the next day."

693. During her 10 years at CVS, she saw a lot of customers who appeared to be drug abusers or pharmacy shopping. One pharmacy she managed, at 3811 Old Spanish Trail, was near Houston's Third Ward neighborhood, considered a high-crime area. Theft was common in that area.

694. At the pharmacy she managed in Brownsville at 7395 Padre Island Highway, a DEA agent reviewed pharmacy records in order to track a customer who was suspected of fraudulently seeking prescriptions. At this store, there were customers she believed were heroin abusers who tried to get prescriptions for narcotics filled. She refused to fill their prescriptions.

695. At the CVS where she worked in Fort Worth, she recalls seeing a lot of fraudulent prescriptions. Sometimes in the evening the store would get calls from people pretending to be doctors and calling in prescriptions for Tylenol 3 with Codeine, which at the time could be obtained without a Schedule II prescription.

696. She recalled one patient in a wheelchair whom she stopped filling for because he had also been getting scripts filled at a nearby Walgreens. She learned this from checking the state PMP database.

697. She recalled another incident when a "pop-up" appeared on the CVS database for one customer, advising against filling prescriptions for that person. She called police and the customer was arrested in the store.

698. Despite this environment and customer clientele, CVS provided no training or guidelines for when and how to refuse prescriptions. Instead, the Company focused on fill rate. "Just go go go, that's all they cared about," Pharmacist No. 20 said.

699. Despite this clientele, CVS cut staff at her pharmacies, even as prescription volumes rose, making it very difficult to conduct due diligence on opioid prescriptions. The corporation's cost-saving moves created a public health risk. She worked at stores that churned out 500 to 600 prescriptions a day with only one or two technicians to help. "That's a public health crisis," Pharmacist No. 20 said.

700. She frequently worked with only one technician to handle two full-service drive-throughs, two drop-off counters, three registers, and multiple inbound and outbound phone calls. She worked 12 to 14 hours a day, with sometimes only a canned health shake for lunch.

701. She saw at least 60 opioid prescriptions a day. These prescriptions took longer to fill because of the need to conduct due diligence. However, corporate management did not take opioid volume into account when preparing budgets for staffing.

702. The Company also did away with overlapping pharmacist shifts in order to save money. The week she resigned, she sold 2,700 prescriptions, with only 168 technician hours. Her store manager, Jason Monroe, threatened to write her up for going two hours over her technician

budget. "[W]e didn't have the help or the time needed to process each prescription correctly," Pharmacist No. 20 said.

703. It became difficult to take the time to check the state prescription monitoring program. "If patients were going to other doctors or pharmacies, we had no idea unless we took the extra 10 minutes to log in and check," she said. "We weren't able to verify prescriptions correctly."

704. Mistakes were bound to happen in such an environment and the Company did little to prevent them from happening. "They don't care about mistakes because mistakes are on your license," Pharmacist No. 20 said. "They were putting that burden on the pharmacist."

705. In one incident, pharmacy staff dispensed a blood pressure medication (lisinopril) instead of a generic ADHD medication (lisdexamfetamine) to a 9- or 10-year old boy. The technician put the prescription through and the pharmacist did not catch it.

706. At one of her stores, the volume was so large three safes were needed to store narcotics. At another, someone broke in through the drive through window and stole narcotics.

707. The store was on Old Spanish Trail was a pretty bad one for narcotics fraud. The store also got on the Texas Board of Pharmacy's watch list because of a theft. An employee had left the drive-through unlocked and someone broke in and stole hydrocodone and tramadol. She had to meet with state Board representatives every couple of months after that to show how the store was improving security issues.

708. The last CVS store at which she worked, at 10522 Spring Green Blvd. in Katy, maintained three safes of narcotics, all of which were added while she was working there. The safes contained morphine, Ativan, Adderall and other controlled substances.

709. She recalls filling prescriptions for a South Texas physician who was indicted in 2018. The physician's name was Jorge Zamora-Quezada. She was working at the CVS on 2121 West Trenton Road in Edinburg, near Brownsville, at the time.

710. In May 2018, Zamora-Quezada was indicted for his role in a $240 million health care fraud and international money laundering scheme. Zamora-Quezada, 61, of Mission, Texas, was charged in a seven-count indictment filed in the Southern District of Texas. He was charged with one count of conspiracy to commit health care fraud, five counts of health care fraud and one count of conspiracy to commit money laundering. From 2000 through 2018, Zamora-Quezada and his co-conspirators falsely diagnosed patients from the Rio Grande Valley, San Antonio, and elsewhere with various degenerative diseases, including rheumatoid arthritis.[365]

711. Many of Dr. Zamora-Quezada's patients were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $975,880 in claims for CII and CIII drugs he had prescribed:[366]

| Drug | Total Medicare Claims | Total Medicare Costs ($) |
|---|---|---|
| ACETAMINOPHEN-CODEINE | 4,379 | 95,700.47 |
| BUPRENORPHINE | 47 | 16,072.11 |
| BUTRANS | 2,005 | 78,7173.5 |

[365] Press Release, U.S. Department of Justice, S*outh Texas Doctor Charged with $240 Million Health Care Fraud and International Money Laundering Scheme* (May 14, 2018), https://www.justice.gov/opa/pr/south-texas-doctor-charged-240-million-health-care-fraud-and-international-money-laundering.

[366] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

| | | |
|---|---|---|
| HYDROCODONE-ACETAMINOPHEN | **3,796** | **76,934.39** |
| **Grand Total** | **10,227** | **$975,880.47** |

### K. Specific Examples of Unlawful Dispensing Conduct: Virginia

#### 1. *CVS failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Virginia*

712. Between 2007 and 2017, 4,929 Virginians have fatally overdosed on prescription opioids.[367] In 2017, 504 deaths in Virginia were attributable to prescription opioids (excluding fentanyl), more than in any previous year.[368]

713. Even when opioid users do not die from an overdose, they may require significant medical intervention and incur health care costs. One such cost is the immediate administration of Narcan (a brand of naloxone), which counteracts the effects of an overdose. Virginia reported 4,076 administrations of Narcan in 2016.[369]

714. The cost of distributing naloxone to emergency services personnel is significant. Since April 2016, the Commonwealth has spent over $1.046 million in state funds on naloxone kits for emergency use.

715. Despite having 349 stores located all over the Commonwealth of Virginia, CVS's gross inadequacies under the CAS in its obligations to investigate or halt dispensing of

[367] Va. Dep't of Health, Number and Rate of All Fatal Prescription Opioid (Excluding Fentanyl) Overdoses by Locality of Injury and Year of Death, 2007-2017, http://www.vdh.virginia.gov/content/uploads/sites/18/2019/07/Prescription-Opioids-Ex-Fentanyl.xlsx.

[368] *Id.*

[369] Va. Dep't of Health, *Virginia Opioid Addiction Indicators*, http://www.vdh.virginia.gov/data/opioid-overdose/.

inappropriate or medically unnecessary opioid prescriptions are underscored by the following examples of illegal prescribing and diversion activities in Virginia.

716. Not only did CVS conduct inadequate investigations, it knowingly and intentionally failed to report or halt inappropriate or medically unnecessary prescriptions. Indeed, none of the following health care professionals (many of whose prescriptions were filled at CVS pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by CVS despite their prescribing habits rising to a criminal level:

| Date | Name | City | Prison |
|---|---|---|---|
| 27-Nov-01 | Franklin Sutherland, MD | Grundy, VA | 70 months |
| 15-Nov-02 | Freeman Clark, MD | Bland County, VA | 6 years |
| 13-Jul-07 | William Hurwitz, MD | McLean, VA | 5 years |
| 18-Nov-08 | Ehteshaumul Hague, MD | Norfolk, VA | Plea |
| Aug-09 | James Stanley Ross | Clarksville, VA | 19 months |
| 15-Oct-09 | Sidney S. Loxley, MD | Chesapeake, VA | 77 months, deceased |
| 9-Nov-12 | Paul Boccone, Owner | Chantilly, VA | 15 years |
| 9-Nov-12 | Charles Brown, CFNP | Chantilly, VA | 5 years |
| Feb-13 | Linda Sue Cheek, MD | Dublin, VA | 33 months |
| 25-Apr-13 | Larren Wade, MD | Alexandria, VA | 70 months |
| Aug-14 | Derron McRae Simon, MD | Arlington, VA | 15 years |
| Sep-14 | Steven Collins, MD | Roanoke County, VA | 10 years |
| 23-Oct-14 | Robin Anne Krohn, Patient | Stafford, VA | 143 months |
| 26-Jun-15 | Nibedita Mohanty, MD | Stafford, VA | 4 years |
| 23-Mar-16 | Gloria Faye Kennedy, FNP | Richlands, VA | 46 months |
| 1-Feb-17 | Heatwole Stanley, MD | Lexington, VA | 3 year probation |
| 11-Aug-17 | Clarence Scranage, MD | Fredericksburg, VA | |
| 15-Dec-17 | Felix Eugene Shepard, MD | Norton, VA | 6 months |
| 7-Feb-19 | Dwight Bailey, MD | Lebanon, VA | 151 months |
| 13-Feb-19 | Frank Craig Purpera, | Blacksburg, VA | 20 months |
| 26-Apr-19 | Shriharsh L. Pole, MD | Woodbridge, VA | 7 years |
| 10-May-19 | Joel Adams Smithers, MD | Martinsburg, WV | |
| 19-Jul-19 | Una Fage Ford | Appalachia, VA | |
| 19-Jul-19 | Michael B. Ford | Appalachia, VA | |
| | Vasu Arora, MD | Grundy, VA | |

**2. *Lynchburg, Virginia (Pharmacist No. 4)***

717. Located in the foothills of the Blue Ridge Valley, Lynchburg with a population of just over 75,000 people is a metropolitan area surrounded by rural hill country — the type of regions seen throughout Appalachia where the opioid epidemic has been the most pervasive.

718. According to city public records, the Lynchburg Fire Department responded to a total of 91 overdose calls in 2017, and the Virginia Department of Health reported that 81 Lynchburg residents visited emergency departments because of overdoses. Whereas there were six deaths from opioid overdose in 2016 in Lynchburg, the VDH recorded seven deaths in the first seven months of 2017.[370]

719. The steady influx of opioids into Lynchburg in the past several few years has mirrored a larger national trend. The CDC uncovered in its most recent study on opioid abuse that the opioid epidemic — once seemingly restricted to rural counties — has flooded into cities and metropolitan areas.

720. In reality, opioid addiction is getting worse and on the verge of becoming a local public health emergency in Lynchburg. On any given day, sign-in sheets at the Lynchburg Treatment Center report that more than 300 patients are admitted into the facility. Most come in to receive medication that prevents withdrawal symptoms and relapses; others come in for counseling. In total, the Lynchburg Treatment Center has approximately 800 patients on file — too many people for the 20-person waiting room at the facility.[371]

721. Adding to the surge of pain killers that has been inundating Lynchburg have been the six CVS pharmacies in town, which from 2006 to 2012 dispensed an incredible 12,744,159

[370] Will Young, *The Opioid Epidemic in Lynchburg City: "It's here"*, Medium (June 11, 2018), https://medium.com/@weyoung8/the-opioid-epidemic-in-lynchburg-city-its-here-84c07b5eae40.

[371] *Id.*

doses of opioids or a total of 157,923,299 MME, making CVS by far the largest dispenser of opioids in Lynchburg and one of largest dispensers in the Commonwealth of Virginia. That means that at the highest bounds of the recommended MME by the CDC (90 MME/day), the CVS stores every day for seven years dispensed enough opioid prescriptions for an average of 686 maximum dosage regimens.

722. Pharmacist No. 4 who worked as a floater at the Lynchburg CVS stores from 2010 to 2016 specifically recalled that, despite concerns that some physicians may be prescribing inappropriate opioid prescriptions, CVS pharmacists dispensed opioids, nonetheless.

723. According to Pharmacist No. 4, Dr. Brenda Sue Waller, a Lynchburg physical medicine and rehabilitation specialist, was "notorious" in the region, he said. She was known for writing prescriptions for high doses of multiple opioids for people. Most of her patients appeared to be ambulatory and were not suffering from cancer, the disease that such narcotics were designed for.

724. Pharmacist No. 4 said he saw "hundreds" of questionable prescriptions that were written by Waller. Dr. Waller wrote a significant number of opioid prescriptions for Government Program beneficiaries, including in 2015 alone to Medicare Part D beneficiaries: 1551 Oxycodone HCL, 791 Oxycodone-Acetaminophen, 743 Hydrocodone-Acetaminophen, 297 OxyContin, 268 Fentanyl, 212 Methadone HCL, 207 Opana ER, 169 Morphine Sulfate ER, 161 Hydromorphone HCL, 76 Tramadol HCL.[372]

Dr. Waller was disciplined in January 2016 by the Virginia Board of Medicine. The Board concluded that from 2005 to 2014, Dr. Waller had prescribed opioids and other controlled

[372] ProPublica, *Prescriber Checkup, The Doctors and Drugs in Medicare Part D*, https://projects.propublica.org/checkup/providers/1093794133.

substances without proper medical diagnosis or rationale and failed to monitor or manage patients' usage of controlled substances. According to the findings of fact in her Board disciplinary order, Dr. Waller ignored evidence her patients were doctor-shopping to get additional drugs; failed to heed family members' pleas to stop prescribing to addicts; ignored suspicious urine tests; and ignored recommendations from other providers and pharmacists to stop prescribing opioids for certain patients.

726. The docinfo website (www.docinfo.org) shows that the Virginia Medical Board placed her medical license under probation in January 2016 and reinstated it in February 2016. It also shows that the North Carolina State Medical Board issued a "letter of concern" about Waller in February 2016.

727. Dr. Waller is believed to have been investigated by the DEA, and this was known to other pharmacists with whom Pharmacist No. 4 communicated. This former Lynchburg CVS pharmacist said he knew of pharmacists who had refused to fill her prescriptions because she was under investigation. However, CVS did not direct its staff to refuse to fill her prescriptions, did not caution staff to be vigilant for her scripts and did not maintain a list or database of any suspicious physicians, including Waller.

728. Many of Dr. Waller's patients were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $3,556,228 in claims for CII drugs she had prescribed:[373]

[373] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL MEDICARE COSTS ($) |
| --- | --- | --- |
| BUTALB-CAFF-ACETAMINOPH-CODEIN | 38 | 1,216.95 |
| BUTALBITAL COMPOUND-CODEINE | 63 | 6,941.95 |
| BUTALBITAL-ACETAMINOPHEN-CAFFE | 62 | 6,623.00 |
| EMBEDA | 74 | 29,883.07 |
| ENDOCET | 68 | 6,249.36 |
| EXALGO | 76 | 82,027.87 |
| FENTANYL | 1,625 | 231,837.97 |
| HYDROCODONE-ACETAMINOPHEN | 3,840 | 145,919.37 |
| HYDROMORPHONE ER | 41 | 40,239.4 |
| HYDROMORPHONE HCL | 864 | 41,598.29 |
| METHADONE HCL | 1,177 | 29,210.53 |
| MORPHINE SULFATE | 785 | 19,796.39 |
| MORPHINE SULFATE ER | 4,421 | 309,436.47 |
| OPANA ER | 1,266 | 770,223.62 |
| OXYCODONE HCL | 7,676 | 471,542.78 |
| OXYCODONE HCL ER | 12 | 2,872.9 |
| OXYCODONE HCL-ACETAMINOPHEN | 496 | 39,016.83 |
| OXYCODONE-ACETAMINOPHEN | 3,350 | 327,578.32 |
| OXYCONTIN | 1,493 | 933,459.15 |
| OXYMORPHONE HCL | 63 | 27,310.99 |
| OXYMORPHONE HCL ER | 59 | 13,446.36 |
| SUBOXONE | 75 | 19,796.94 |
| **Grand Total** | **27,624** | **$3,556,228.51** |

729. According to Pharmacist No. 4, who worked as a floater at the Lynchburg CVS stores, at some stores where he worked, 70 percent of the prescriptions were either for opioids or psychotropic medications. The most popular opioids were oxycodone, Lortab (hydrocodone), methadone, morphine and fentanyl patches. The patient base was very different from the Kmart pharmacy where he had worked years before. "This was not old ladies coming in to get their thyroid medications," Pharmacist No. 4 said. The CVS store at 2004 Wards Road in Lynchburg was so busy with it had trouble keeping opioids in stock because of the high volume. This problem occurred after the store built a "Minute Clinic" inside. Customer traffic increased substantially after that, and so did the volume of opioids that were dispensed. "After they put in the Minute Clinic it became a high-volume mess," he said.

730. The opioid business was essential to CVS's profitability. "CVS would not be profitable without the opioids," Pharmacist No. 4 said. The stores where he worked typically did a volume of 300 to 500 or more prescriptions a day. The stores did not hire enough staff to adequately handle this volume. "Staffing was always a major problem at CVS," he said. "We never had the staff we needed or wanted or asked for. It was a very stressful, understaffed environment." A workload that should have been handled by 1.5 people was assigned to one person or even three-quarters of a full-time job.

731. The chronic staffing issue created a problem in evaluating prescriptions for opioids. CVS management expected all prescriptions to be filled within 15 minutes, including prescriptions for opioids. "They had a 15-minute time limit," Pharmacist No. 4 said. "They said our paying customers need their medications in a timely manner. That was the expectation."

732. During store visits, the pharmacy supervisors would examine the store data on the time it took to fill prescriptions and would deliver verbal warnings if it exceeded 15 minutes. In the case of prescriptions for opioids, this made checking Virginia's PMP difficult. CVS did not

require its pharmacists to check the state system at this time. "If you had to PMP somebody or had multiple opioid prescriptions coming in at the same time, it was next to impossible," Pharmacist No. 4 said. It was counter-productive to conduct the proper due diligence that prescriptions for highly addictive opioids demanded.

733. He saw prescriptions for drug regimens that made no sense to him. But CVS did not incentivize him or others to challenge such prescriptions. Just the opposite, in fact. "If it got in the way of getting the prescription out the door in a quick manner, they would start causing trouble," Pharmacist No. 4 said. "They would say 'Our paying customers are waiting, they don't have time. We have to think about all our customers. This is poor customer service.' They would pull that one on you too, even if that person shouldn't have been having those medications to begin with."

734. According to Pharmacist No. 4, performance incentives were based mostly on prescription volume. The Company evaluated him on how volume grew. Other performance Metrics involved speed and volume too, such as answering phone calls by the third ring and the number of "adherence calls" made, calls to people to remind them of their maintenance medications if they were late for refills.

**3. *Norton, Virginia (Pharmacist No. 7)***

735. Norton is an independent city in the Commonwealth of Virginia. As of the 2010 census, the population was 3,958, making it the least populous city in Virginia, along with the westernmost. The landscape in Norton, deep in the ridge-and-valley portion of the Appalachians, is dramatic. Norton is 2,200 feet above sea level; another 1,200 feet above the town is an overlook, known as Flag Rock (for a flag mounted on an outcropping), and visitors first pass by a Bigfoot statue, an homage to a television documentary on the search for Bigfoot — known locally as the "Woodbooger" — that focused on this remote area.

736. Norton has been hit particularly hard by the opioid epidemic. The drug overdose mortality rate in Norton has climbed from 6-7.9 deaths per year in 1999 to over 30 deaths per year in 2016.[374] The overdose mortality rate in Norton and the surrounding counties is one of the highest in the nation.[375] This startling increase in the overdose death rate has been driven by the increase of opioid abuse in the area.

737. In addition to taking adult lives, the opioid epidemic in Norton is now affecting its youngest citizens as well. The rate of neonatal abstinence syndrome has spiked from 0 in 2013 to 41.7 per 100,000 births in 2014 and 58.8 per 100,000 births in 2015.[376] The most recent statistics show the rate at 55.6 per 100,000 births – more than 8 times greater than the statewide neonatal abstinence syndrome rate in Virginia.[377]

738. Norton is now having to allocate substantial taxpayer dollars, resources, staff, energy and time to address the damage the opioid scourge has left in its wake and to address its many casualties. The City's costs for foster care and other child placement services have been consistently high in recent years due to the number of children who need such services because opioid addiction has destroyed the structure of their families. The costs that the City has borne for incarceration and correction services have increased due to an increasing crime rate attributable to the opioid epidemic. Fire and emergency medical services are over-utilized because of an

---

[374] U.S. Ctrs. for Disease Control, Nat'l. Ctr. For Health Statistics, *Drug Poisoning Mortality Rates in the United States, 1999-2017*, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality.

[375] *Id.*

[376] Virginia Department of Health, *Virginia Opioid Addiction Indicators* (2016), https://public.tableau.com/views/VirginiaOpioidAddictionIndicators/VAOpioidAddictionIndicators?:embed=y&:display_count=yes&:showVizHome=no.

[377] *Id.*

increased number of opioid-related overdoses. The burden on law enforcement is substantially increased by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. Courts, social workers, nurses, schools, intervention programs, and clinics have all been harmed. Nearly every aspect of Norton's budget has been significantly and negatively impacted by this Defendant-made epidemic.

739. The Washington Post recently featured the CVS in Norton in an article discussing the flood of opioids that poured into the town.[378]

740. CVS's failures under the CSA and state pharmacy laws and regulations have been at the center of the problem in Norton. Its Norton pharmacy at dispensed a total of 1,427,585 doses of opioids between 2006 and 2012, or a total of 12,359,102 MME. That means that at the highest bounds of the recommended MME per day (90 MME/day) the Norton store was dispensing an average of 53 opioid prescriptions every day for seven years. Here is a summary of this CVS store's dispensing by type of opioid during this time period:




[378] Sari Horwitz, et al., *Opioid death rates soared in communities where pain pills flowed*, Wash. Post (July 17, 2019), https://www.washingtonpost.com/investigations/opioid-death-rates-soared-in-communities-where-pain-pills-flowed/2019/07/17/f3595da4-a8a4-11e9-a3a6-ab670962db05_story.html.

741. Pharmacist No. 7, who worked at the Norton CVS store from 2007 to 2010, specifically remembered that, despite concerns that some physicians may be prescribing inappropriate opioids prescriptions, CVS dispensed opioids even though they suspected the prescribers to be writing inappropriate prescriptions.

742. One such doctor was Dr. Gucharan Kanwal, based in Coeburn, Va., about 10 miles east of Norton. For many years, Kanwal had been known in the community for being very liberal with his prescription pad, he said. "Everybody kind of knew he had been doing it for like 20 years," he said. Despite that reputation, CVS did not warn its pharmacists about Kanwal, did not keep his name on any list that was available to its pharmacy staff, nor did it maintain any list or database at all of physicians suspected of running pill mill operations. In fact, Pharmacist No. 7 saw and filled prescriptions from Kanwal on a "daily" basis.

743. In November 2017, Kanwal pled guilty to one count of health care fraud and one count of distributing Ritalin and hydrocodone. He also agreed to surrender his medical license and never reapply for one. He also agreed to pay $472,500 in restitution to the Virginia Medicaid program. According to the U.S. Department of Justice, between Sept. 19, 2016 and Feb. 22, 2017, Kanwal knowingly distributed Ritalin and hydrocodone without a legitimate medical purpose and beyond the bounds of medical practice to an undercover investigator.[379] He also fraudulently billed Virginia Medicaid for services that were not medically necessary or not actually received.[380]

---

[379] Press Release, U.S. Attorney's Office, Western Dist. Virginia, *Coeburn Doctor Sentenced on Healthcare Fraud, Drug Charges* (March 19, 2018), https://www.justice.gov/usao-wdva/pr/coeburn-doctor-sentenced-healthcare-fraud-drug-charges.

[380] *Id.*

Kanwal was later in March 2018 sentenced to two years probation and ordered to pay a $25,000 fine, $945,000 restitution, and forfeited his medical license.[381]

744. Many of Dr. Kanwal's patients were Medicare beneficiaries. During the time period 2013 through 2017, Medicare Part D plans paid some $371,383 in claims for CII drugs he had prescribed:[382]

| DRUG | TOTAL MEDICARE CLAIMS | TOTAL MEDICARE COSTS ($) |
|---|---|---|
| ACETAMINOPHEN-CODEINE | 111 | 1,034.28 |
| ENDOCET | 191 | 11,191.41 |
| HYDROCODONE-ACETAMINOPHEN | 3,053 | 56,105.82 |
| OXYCODONE HCL | 1,739 | 46,761.90 |
| OXYCODONE HCL-ACETAMINOPHEN | 211 | 8,121.93 |
| OXYCODONE-ACETAMINOPHEN | 3,251 | 152,771.54 |
| SUBOXONE | 399 | 95,396.23 |
| **Grand Total** | **8,955** | **$371,383.11** |

745. Even as the opioid epidemic grew exponentially in Virginia, Pharmacist No. 7 recalled the Company had instituted no policies, procedures or guidelines to follow on when to refuse to fill prescriptions for controlled substances, even opioids. On the contrary, the Company

---

[381] CBS19 News, *Physician sentenced for Medicaid fraud, drug charges* (March 20, 2018), https://www.cbs19news.com/content/news/Physician-sentenced-for-Medicaid-fraud-drug-charges-477438323.html.

[382] This table compiles Medicare provider utilization and payment data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Part-D-Prescriber.

culture at its pharmacies demanded filling all prescriptions and continuing to grow the number of prescriptions that were dispensed at its stores. "As far as CVS was concerned, my job was to fill them [prescriptions]," he said. "They wanted every prescription filled that walked in the door." Pharmacist No. 7 said that he "felt like a pill pusher rather than a pharmacist."

746. He felt that it was not up to him to decide how to fill prescriptions – he would get fired if he started to refuse to fill. If he did not fill, the customer would call and complain and the customer would take his or her business somewhere else. Pharmacist No. 7 described a scenario where he would be in real trouble (and probably fired) if he was found to deny a prescription that was filled by another pharmacy competitor.

747. Pharmacist No. 7 felt that if the prescription was written by a doctor, he had to fill it. He said this idea was commonplace within CVS, and management did not dissuade pharmacists from it.

748. At this Norton store, opioids were regularly dispensed, with the most popular being Percocet, hydrocodone, morphine and OxyContin. OxyContin in particular seemed to be a drug that CVS management wanted to sell. "The more of that we sold, the happier my district manager seemed to be," he said. Nor did CVS provide specific training for pharmacists and staff on warning signs to look for to identify prescriptions from fraudulent physicians or doctor-shopping patients.

749. However, for Pharmacist No. 7 and other CVS pharmacists, CVS "wanted you to increase scripts each year, and every quarter." The CVS system measured nine different categories, including increase in profits; increase in prescription count; and increase in customers. "It was all about the numbers," Pharmacist No. 7 said.

750. The pressure from management to improve his scores was such that "I felt threatened that I was going to be fired if I didn't get my . . . scores up." In order to keep improving this metric, he and other pharmacists were forced to cut back on other aspects of their jobs,

especially customer service. Previously, he would go out into the store to assist customers, or to help them find products. With the increased focus on his score, however, he felt he no longer had time to do that. Although he did not like the changes he made to his work practices, Pharmacist No. 7 said he was forced to do so because of the Company's pressure. He devoted his workdays to meeting this Company metric.

751. Despite the small population of the area, at one time, the Norton store at one point was ranked No. 2 out of all the CVS stores in the country in its score, which included the number of prescriptions dispensed. The store was always in the top ten. The pharmacy business grew so substantially at the Norton store that, by 2010, CVS had built a new store there with a double drive-through window (drop off in one, pick up in the other) to increase prescription volume. The previous store did not have one. There was never any discussion at CVS about the problematic ratio of prescriptions being dispensed at the Norton store relative to the population of the surrounding area.

752. The raging opioid epidemic required ever-increasing amounts of opioids to be ordered at the CVS in Norton. Given these massive increases, wholesalers were getting in trouble and limiting supply that they sent out to customers. CVS actively tried to avoid getting cut off by instructing him to slowly increase the amounts on hand so as not to raise any red flags, including from wholesale distributors. Pharmacist No. 7 said that, for example, if you typically ordered 6 bottles of something you would add a bottle or two every month so eventually you were up to 12 bottles gradually instead of spiking all of a sudden which would draw scrutiny.

## VIII. INJURY TO GOVERNMENT PROGRAMS RESULTING FROM CVS'S ACTIONS

753. CVS is a registered pharmacy which owned, operated, and was in charge of DEA-registered pharmacies throughout the U.S., and (a) knowingly and/or recklessly dispensed controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and/or intentionally dispensed controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C.§ 841(a) and corresponding state statutes.

754. CVS repeatedly failed to exercise its corresponding responsibility as a DEA registrant to ensure that controlled substances were dispensed only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice. CVS pharmacists knowingly and/or recklessly ignored readily identifiable red flags that the controlled substances prescribed were being diverted, abused, or otherwise were not for legitimate medical purposes and dispensed despite unresolved red flags.

755. CVS's pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where its pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer.

756. Moreover, even in instances in which a prescriber told a CVS pharmacist that a suspicious prescription had been issued for a legitimate medical purpose, CVS willfully ignored its independent, legally-mandated duty to examine the other, often glaring, evidence that the prescription had, in fact, not been issued for a legitimate medical purpose or that the prescriber had acted outside of the usual course of his or her professional practice and dispense the prescription.

757. Despite the fact that CVS knew, or had reason to know, from its own robust data collection databases and from red flags, including the sheer volume of opioid drugs being dispensed at numerous many of its pharmacies and to specific prescribers, that hundreds of thousands of prescriptions were not valid, it nonetheless failed to use its own readily-available and extensive information and resources from its own data bases to fulfill its obligations under the Controlled Substances Act and ensure that the prescriptions it dispensed were issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice.

758. CVS knew, or had reason to know, the prescriptions were not valid and not only dispensed those prescriptions, but also failed to notify any authority of these issues. Instead, CVS committed affirmative acts to conceal the conspiracy, such as continued filling inappropriate and medically unnecessary prescriptions for opioids. By filling these prescriptions while the conspiracy was ongoing, CVS dispensed hundreds of millions of opioid pills based on illegitimate prescriptions.

759. Government Programs have been damaged by CVS's unfair, false, misleading, or deceptive acts or practices in the conduct of the pharmaceutical business by failing to investigate, report, and cease fulfilling inappropriate or medically unnecessary opioid prescriptions in its pharmacies.

760. Government Programs have been damaged by CVS's negligent and/or intentional and reckless actions by failing to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions dispensed at its pharmacies.

## IX. CAUSES OF ACTION

**COUNT I**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))**

761. The United States incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

762. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval of Opioids, in violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A).

763. Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

**COUNT II**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))**

764. Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

765. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B).

766. The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Opioids prescribed to patients enrolled in Federal Programs.

767. Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

**COUNT III**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))**

768. Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

769. Defendant knowingly conspired, and may still be conspiring, with the various health care professionals identified and alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1) & (a)(2), and 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B). Defendant and these health care professionals committed overt acts in furtherance of the conspiracy as alleged above.

770. Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

**COUNT IV**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))**

771. Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

772. CVS knowingly avoided or decreased its obligation to pay or transmit money to the Government. Specifically, CVS: (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) CVS knew that the records or statements were false.

773. Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

**COUNT V**
**(Violation of Florida False Claims Act)**

774. Relator incorporates herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

775. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

776. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

777. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

778. The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance plans funded by the State of Florida or its agencies.

779. Because of Defendant's actions, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## X. PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendant as follows:

A. That Defendant be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*;

B. That judgment be entered against Defendant in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[383] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C. That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

[383] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

D. That Defendant be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

E. That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

F. That the Court issue an order enjoining the Defendant from continuing to engage in the fraudulent conduct alleged herein; and

That this Court award such further relief as it deems just and proper**.**

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated: January 16, 2024

Respectfully submitted,

Plaintiff-Relator Hillary Estright,
By Her Attorneys,

*/s/ Louise A. Herman*___________________

Louise A. Herman, Esq. (Bar No. 6430)
**Herman Law Group**
1445 Wampanoag Trail, Suite 104
East Providence, RI 02915
Telephone: (401) 277-4110
Facsimile: (401) 433-0139
LHerman@LHermanLaw.com

W. Scott Simmer (*pro hac vice* forthcoming)
ssimmer@baronbudd.com
Will Powers (*pro hac vice* forthcoming)
wpowers@baronbudd.com
**BARON & BUDD, P.C.**
The Watergate, 10th Floor
600 New Hampshire Ave. NW
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Jerry E. Martin
jmartin@barrettjohnston.com
Seth M. Hyatt
shyatt@barrettjohnston.com
**Barrett Johnston Martin & Garrison, PLLC**
200 31st Ave. N
Nashville, TN 37203
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

Attorneys for Plaintiff-Relator

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing Plaintiff-Relator's Second Amended Complaint will be served upon the parties as indicated below via electronic mail on January 16, 2024. Because this action is pending under seal pursuant to 31 U.S.C. § 3730(b), Defendants are not being served with a copy of the Plaintiff-Relator's Second Amended Complaint.

*/s/ Louise A. Herman*____________
Louise A. Herman

**SERVICE LIST**

Claire L. Norsetter
Trial Attorney
U.S. Department of Justice
Civil Division / Fraud Section
175 N Street, N.E.
10th Floor
Washington, D.C. 20002
claire.l.norsetter@usdoj.gov

Sara M. Bloom
First Assistant U.S. Attorney
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903
Sara.bloom@usdoj.gov

Kevin Hubbard
Affirmative Civil Enforcement Coordinator
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903
Kevin.Hubbard@usdoj.gov

Nicholas N. Paul
Senior Assistant Attorney General
Civil Section
Division of Medi-Cal Fraud and Elder Abuse
California Department of Justice
nicholas.paul@doj.ca.gov

George A. Codding
Senior Counsel
Medicaid Fraud Control Unit
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 9th Floor
Denver, CO 80203
George.codding@coag.gov

Gregory K. O'Connell
Deputy Associate Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06106
gregory.o'connell@ct.gov

Edward K. Black
Deputy Attorney General
Medicaid Fraud Control Unit
Delaware Department of Justice
Carvel State Building
820 N. French St.
Wilmington, DE 19801
edward.black@delaware.gov

James Graham Lake
Chief, Workers' Rights and Antifraud Section
Public Advocacy Division
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., Suite 10100
Washington, D.C. 20001
Graham.Lake@dc.gov

Sara Vann
Senior Assistant Attorney General
Medicaid Fraud Division
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334
svann@law.ga.gov

Landon M.M. Murata
Director/Deputy Attorney General
Medicaid Fraud Control Unit
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
landon.m.murata@hawaii.gov

Heather Tullio D'Orazio
Director, Medicaid Fraud Control Unit
Office of the Illinois Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
heather.dorazio@ilag.gov

Matthew Whitmire
Director, Medicaid Fraud Control Unit
Office of the Attorney General
302 West Washington Street
IGCS 5th Floor
Indianapolis, IN 46204
matthew.whitmire@atg.in.gov

Tricia Dieleman
Assistant Attorney General
Medicaid Fraud Control Unit
Lucas State Office Building, 3rd Floor
321 E. 12th Street
Des Moines, IA 50319
Tricia.Dieleman@dia.iowa.gov

Nicholas J. Diez
Assistant Attorney General
Medicaid Fraud Control Unit
Louisiana Department of Justice
1885 N. 3rd Street
Baton Rouge, LA 70802
DiezN@ag.louisiana.gov

Toby Unger
Assistant Attorney General
Medicaid Fraud Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
toby.unger@mass.gov

Deshawn Madha
Assistant Attorney General
Health Care Fraud Division
Department of Attorney General
2860 Eyde Parkway
East Lansing, MI 48823
madhad@michigan.gov

Nicholas Wanka
Director, Medicaid Fraud Control Unit
Office of the Minnesota Attorney General
445 Minnesota St., Ste. 900
Saint Paul, MN 55101
nicholas.wanka@ag.state.mn.us

Thomas T. Worboys
Senior Assistant Attorney General
Director, Medicaid Fraud Control Unit
Office of the Attorney General
1 Granite Place South
Concord, NH 03301
Thomas.worboys@doj.nh.gov

Sean Sullivan
Assistant Attorney General/Director,
Medicaid Fraud Control Unit
Office of the Attorney General
201 Third Street NW, Suite 300
Albuquerque, NM 87102
ssullivan@nmag.gov

Heather M. Hadley
Supervising Deputy Attorney General
Bureau Chief, Medicaid Fraud Control Unit
Office of the Attorney General
One Appollo Drive
Whippany, NJ 07981
hadleyh@njdcj.org

F. Edward Kirby, Jr.
Senior Deputy A.G., Director
Medicaid Investigations Division
North Carolina Department of Justice
5505 Creedmoor Rd., Suite 300
Raleigh, NC 27612
fkirby@ncdoj.gov

Kathryn Heim Harris
Special Assistant Attorney General,
Medicaid Fraud Control Unit
Office of the Attorney General
28 Liberty Street, 13th Floor
New York, NY 10005
Kathryn.harris@ag.ny.gov

Charles A. Dickson, III
Deputy Attorney General, Director,
Medicaid Fraud Control Unit
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
charles.dickson@oag.ok.gov

Genevieve M. Allaire Johnson
Director, Medicaid Fraud Control and
Patient Abuse
Office of the Attorney General
150 S Main Street
Providence, RI 02903
gallaire@riag.ri.gov

Elizabeth J. Brown Fore
Chief, Civil Medicaid Fraud Division
Office of the Attorney General
6330 E Highway 290, Suite 250
Austin, TX 78723
Liz.BrownFore@oag.texas.gov

Nate Casey
Managing Attorney
Healthcare Division, Civil Medicaid Fraud
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
nate.casey@ag.tn.gov

Candice M. Deisher
Senior Assistant Attorney General
Medicaid Fraud Control Unit
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
cdeisher@oag.state.va.us

Elizabeth L. Anderson
Assistant Attorney General,
Medicaid Fraud and Residential Abuse Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609-1001
Elizabeth.Anderson@vermont.gov

Karl Sloan
Assistant Attorney General
Medicaid Fraud Control Unit
Office of the Attorney General
P.O. Box 40114
Olympia, WA 98504-0114
karl.sloan@atg.wa.gov